**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

HABEEB AHMAD,                                    Civil Case No: 1:22-cv-01248

                           Plaintiff,

   -against-

                                               **AMENDED**
                                               **COMPLAINT**

NEW YORK UNIVERSITY,
SCOTT MELLYNCHUK and
DOUG LAZZARO                                     Plaintiff Demands a
                                               Trial by Jury

                              Defendants.
----------------------------------------------------------X

Plaintiff HABEEB AHMAD (hereinafter referred to as "Plaintiff" or "AHMAD") by and through his attorneys DEREK SMITH LAW GROUP, PLLC, hereby complains of Defendants NEW YORK UNIVERSITY, SCOTT MELLYNCHUK and DOUG LAZZARO (hereinafter collectively referred to as "Defendants") upon information and belief as follows:

## NATURE OF CASE

Plaintiff complains pursuant to the Americans with Disabilities Act of 1990 ("ADA") as amended, the laws of the State of New York, and the Administrative Code of the City of New York, based upon the supplemental jurisdiction of this Court pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966), and 28 U.S.C. § 1367 seeking declaratory and injunctive relief and damages to redress the injuries Plaintiff has suffered as a result of, *inter alia*, disability discrimination, hostile work environment, retaliation, and unlawful termination by Defendants.

## JURISDICTION AND VENUE

1. Jurisdiction of this action is conferred upon this Court as this case involves a Federal Question under the ADA. The Court also has jurisdiction pursuant to 29 U.S.C. §2617; 28 U.S.C. §1331, §1343 and pendent jurisdiction thereto. Additionally, the Court has supplemental jurisdiction

under the State and City laws of New York.

2. Plaintiff satisfied all administrative prerequisites prior to the commencement of this action.

3. Venue is proper in this court, as the events giving rise to this action arose in New York County, within the Southern District of New York.

## **PARTIES**

4. Plaintiff is a disabled male resident of the State of New York, County of Nassau.

5. At all times material, Defendant New York University ("NYU") was and is a private, not-for-profit 501(c)(3) corporation.

6. At all times material, NYU LANGONE HEALTH (hereinafter referred to as "NYU Langone") is a domestic not-for-profit corporation duly existing by the virtue and laws of the State of New York that does business in the State of New York.

7. At all times material, NYU GROSSMAN SCHOOL OF MEDICINE (hereinafter referred to as "NYU MEDICINE") is a domestic not-for-profit corporation duly existing by the virtue and laws of the State of New York that does business in the State of New York.

8. At all times material, NYU Langone and NYU Medicine are administrative subdivisions of NYU.

9. At all times material, NYU, NYU Langone and NYU Medicine were either joint employers or a single integrated employer of Plaintiff (hereinafter collectively referred to as "NYU").

10. At all times material, Scott Mellynchuk (hereinafter referred to as "Mellynchuk") was and is an Employee and Labor Relations Manager with NYU. Mellynchuk held supervisory authority over Plaintiff, including the power to hire and fire Plaintiff.

11. At all times material, Dr. Doug Lazzaro (hereinafter referred to as "Lazzaro") was and is the Vice Chairman at Ophthalmology with NYU. Dr. Lazzaro held supervisory authority, controlling many of Plaintiff's job duties. Dr. Lazzaro held the power to hire and fire Plaintiff.

## MATERIAL FACTS

12. Around January 2017, Defendants hired Plaintiff for their Ophthalmology department.

13. Plaintiff was a beloved educator, known affectionately to his residents as "Dr. Beebz." In fact, Plaintiff won the distinction of "Teacher of the Year" in 2019 and 2020 in both surgical and clinical disciplines.

14. In just three years with Defendants, Plaintiff has been selected for numerous committees, won an ASCRS Foundation grant, published innovative advances in Ophthalmology education, substantially increased his department's surgical numbers at NYU Woodhull, recruited new faculty, advocated for improvement in resident morale, and started a new ophthalmology CME program at NYU.

15. Around March 10, 2020, Plaintiff e-mailed Defendants about his concerns regarding the lack of proper personal protective equipment ("PPE") masks for staff at NYU-Woodhull.

16. However, Defendants functionally ignored Plaintiff's attempt to seek PPE for both him and his staff and informed Plaintiff, that, "N-95 respirators are not recommended."

17. Around March 13, 2020, Plaintiff e-mailed Defendants about his concerns regarding the lack of appropriate equipment and a proper disinfection protocol to avoid unnecessary Covid-19 exposure at NYU Winthrop.

18. Unfortunately, Defendants again ignored Plaintiff's concerns and did not provide him or his staff the necessary PPE to safeguard them from contracting Covid-19.

19. That same day, Plaintiff contracted Covid-19 while working on the front lines to combat the

devastating global pandemic.

20. Around March 18, 2020, Plaintiff was hospitalized at Northwell Manhasset and intubated for respiratory failure. Unfortunately, Plaintiff stayed in the intensive care unit ("ICU") on ventilation for fifty-four (54) days.

21. During this time, Plaintiff suffered critical illness including pneumonia, sepsis, liver infection, organ failure, catheter related urinary tract infections, clots, pulmonary embolism, heart ischemia, critical illness neuropathy, and severe allergic syndrome in response to the medications used to treat Plaintiff.

22. In short, Plaintiff had multiple near death experiences during this timeframe and his family were extremely concerned that Plaintiff would not recover.

23. Around late May 2020, slowly started to recover and began to regain consciousness. However, Plaintiff woke up bedbound with severe atrophy. Specifically, Plaintiff was unable to use his left hand and his right leg had a sudden foot drop.

24. Around June 4, 2020, Plaintiff was transferred to NYU Rusk for several months of acute rehabilitation. During this time, Plaintiff still suffered from numerous medical complications including but not limited to, the need for blood transfusions whenever he fell and muscle bleeding.

25. Around August 10, 2020, Plaintiff was discharged as an outpatient with the inability to walk. In fact, Plaintiff required assistive devices such as crutches and an ankle foot brace in order to walk.

26. Around October 6, 2020, Respondent's Employee and Labor Relations Manager Scott Mellynchuk ("Mellynchuk") e-mailed Plaintiff to inform him that he was eligible for six (6) months of medical disability leave which had recently expired and requested that Plaintiff

provide medical documentation regarding his ability to return to work and anticipated return to work date.

27. Around November 2, 2020, Respondent's Employee and Labor Relations Manager Mellynchuk followed up with Plaintiff to remind him that he was only eligible for six (6) months of medical disability leave and that continued absence beyond six (6) months would not be paid.

28. Further, Respondent's Employee and Labor Relations Manager Mellynchuk reminded Plaintiff to email him medical documentation in support for his request for continued absence beyond six (6) months. However, Mellynchuk cautioned that any request for continued leave was not guaranteed and would only be approved if reasonable based on impact to the service.

29. That same day, Plaintiff submitted his request to work from home and advised that he would contact his primary care physician, Dr. Jason Karp ("Dr. Karp"), to make sure that he filled out his portion of the documentation.

30. In his request for an accommodation, Plaintiff informed Defendants, "AFTER MY HOSPITALIZATION, I HAD TO DEAL WITH A FEW MEDICAL CONDITIONS AND MOBILITY ISSUES FROM MY ICU STAY. CURRENTLY, I AM NOT ABLE TO DRIVE DUE TO A FOOT DROP. I HAVE DIFFICULTY WALKING AND REQUIRE THE ASSISTANCE OF A WALKER. SINCE RECEIVING PHYSICAL THERAPY, I HAVE MADE SIGNIFICANT PROGRESS, AND I NEED TO MAINTAIN MY THERAPY SCHEDULE SO I CAN CONTINUE IMPROVING BACK TO MY BASELINE."

31. Therefore, as a reasonable accommodation, Plaintiff requested that he work from home until he fully recovers or remain on a continued leave of absence. Plaintiff's request ensured Defendants that he could "STILL PERFORM NEARLY ALL OF [HIS] DUTIES

REMOTELY INCLUDING ALL CLINICAL AND SURGICAL INSTRUCTORSHIP, ADMINISTRATIVE CLINICAL OPERATIONS AND RESEARCH."

32. Around November 12, 2020, Dr. Karp completed and faxed his portion of Plaintiff's accommodation request paperwork to Defendants.

33. Specifically, Dr. Karp informed Defendants that Plaintiff had a foot drop, balance disorder, and neuropathy which limit Plaintiff's ability to drive, lift, and walk.

34. As such, Dr. Karp noted that "REMOTE WORK WOULD BE FEASIBLE AT THIS TIME INCLUDING CHIEF DUTIES TEACHING AND RESEARCH."

35. However, despite their obligations to the contrary, Defendants never attempted to engage in an interactive process with Plaintiff to help figure out a reasonable accommodation.

36. Around November 19, 2020, Respondent's Employee and Labor Relations Manager Mellynchuk emailed Plaintiff and denied Plaintiff's request for a reasonable accommodation to work from home falsely stating that Plaintiff's position was "PREDOMINANTLY CLINICAL IN NATURE, WITH COMPARATIVELY MINOR ACADEMIC AND ADMINISTRATIVE DUTIES." As such, Defendants denied Plaintiff's request claiming that he "WOULD NOT BE ABLE TO FULFILL THE PRIMARY AND ESSENTIAL FUNCTIONS OF [HIS] ROLE IN A REMOTE SETTING."

37. Additionally, Respondent's Employee and Labor Relations Manager Mellynchuk told Plaintiff that his "ABSENCE UNDULY BURDENS COWORKERS AND ADVERSELY IMPACTS PATIENT CARE."

38. Therefore, Defendants claimed that could not extend his leave of absence past the end of the month and required Plaintiff to return to work by December 1, 2020 or he would be terminated from employment.

39. Thereafter, Plaintiff called Defendants' Director of Employee Relations Beth Cooper ("Cooper") and Defendants' Vice Chairman at Ophthalmology Dr. Doug Lazzaro ("Lazarro") to address his accommodation request denial and seek alternative accommodations to attend physical therapy appointments or work part-time. However, no one responded to Plaintiff.

40. The next day, in a further effort to retaliate against Plaintiff for seeking a reasonable accommodation, Defendants emailed Plaintiff claiming that he owed them $83,453.84 because he was overpaid for four months during an unpaid sick leave while Plaintiff was lying unconscious in the hospital fighting for his life, despite the fact that Defendants assured Plaintiff that he was eligible for six (6) months of medical disability leave.

41. Thereafter, Plaintiff emailed Defendants' Chief Executive Officer and Dean of NYU School of Medicine Dr. Robert Grossman ("Dr. Grossman") to escalate the matter and request his assistance with obtaining a reasonable accommodation to work from home while he attends physical therapy and slowly gains the ability to walk again.

42. Further, Plaintiff noted that Defendants made several false statements of fact in an effort to undermine and ultimately deny his accommodation request.

43. First, Plaintiff pointed out that his position requires major academic and administrative responsibilities including acting as Site Director/Chief of Service responsible for numerous resident education and daily administrative duties resulting in a separate administrative stipend. Further, Plaintiff readily noted that most of his schedule at NYU Woodhull entails supervising and teaching residents.

44. Second, Plaintiff noted that his on call responsibilities at NYU Winthrop were incorrectly characterized as essential duties. Plaintiff reminded Defendants that he was only recently approached about handling these additional responsibilities on a trial basis which Plaintiff

accepted as a matter of professional courtesy and as an additional source of income.

45. Third, Plaintiff noted that Defendants claim that his continued absence would only serve as a burden to his colleagues remains wholly insensitive to Plaintiff's recent recovery from Covid-19 while serving on the front lines and completely fails to acknowledge that Plaintiff would still have been able to accomplish nearly all of his "ESSENTIAL DUTIES, INCLUDING CHIEF ADMINISTRATIVE DUTIES, TEACHING, AND RESEARCH."

46. Finally, Plaintiff expressed that Defendants' ultimatum of returning to work on such short notice or get terminated from employment unlawfully placed Plaintiff in the uncomfortable position of being forced "TO CHOOSE BETWEEN CONTINUING MY PHYSICAL THERAPY AND OCCUPATIONAL THERAPY OVER MY JOB."

47. That evening, Defendants' Director of Human Resources Austin Bender ("Bender") called Plaintiff. However, despite Defendants' obligations to the contrary, he did not seem interested in engaging in meaningful dialogue with Plaintiff. Rather, he called to express Defendants position by stating, "NYU DOESN'T DO REMOTE WORK" and "WE'RE STICKING WITH OUR ORIGINAL DENIAL."

48. In response, Plaintiff informed Defendants' Director of Human Resources Bender that remote work was listed as a possible accommodation, on Defendants' own application.

49. Further, Plaintiff stated that Defendants had a legal obligation to engage in an interactive process whereby they considered the feasibility of alternative accommodations such as working part-time, reassigning certain clinical duties, offer local housing, offer to provide transportation (which was given to another employee within Plaintiff's department), or a continued leave of absence.

50. Additionally, Plaintiff stated that their denial was unlawfully forcing him to choose between

his physical health and his job.

51. Moreover, Plaintiff noted that Defendants falsely characterized his job as primarily clinical in nature in an unfortunate effort to deny his accommodation request.

52. Therefore, Plaintiff said that he was concerned that he was going to be unlawfully terminated on December 1, 2020 because of his physical condition and inability to return to work.

53. In response, Defendants' Director of Human Resources Bender told Plaintiff that he was going away on vacation and that he would get back to him.

54. However, Defendants' Director of Human Resources Bender never got back in touch with Plaintiff, leaving Plaintiff to conclude that he was likely going to be fired in a few days.

55. Thereafter, Plaintiff called his department, left numerous voice mails, and texted Defendants' Vice Chairman at Ophthalmology Dr. Lazzaro multiple times to discuss his employment situation and ensure that he was not going to be wrongfully terminated.

56. However, despite Defendants' obligations to the contrary, they did not respond or interact with Plaintiff's numerous attempts to discuss his accommodation request.

57. Around November 23, 2020, Plaintiff contacted a local attorney, Scott Simpson ("Simpson"), to see if he could get more traction with Defendants before Plaintiff was scheduled for terminated.

58. Afterwards, Mr. Simpson spoke with Defendants' Associate General Counsel Daniel Driesen ("Driesen") who assured him that the over-payment request for compensation was no longer an issue and that Defendants would reach out to Plaintiff to discuss his accommodation. However, Defendants never reached out to Plaintiff to discuss his accommodation request.

59. Around November 30, 2020, Plaintiff emailed Defendants and indicated that he would show up to work the following day, so he would not get fired.

60. Around December 1, 2020, Plaintiff's counsel arranged a call with Respondent's Employee and Labor Relations Manager Mellynchuk to discuss Plaintiff's continued accommodation request. During that call, Mellynchuk promised to send Plaintiff possible work options and begin an interactive process.

61. Around December 2, 2020, Respondent's Employee and Labor Relations Manager Mellynchuk emailed Plaintiff two alternative work options that only slightly differed from Plaintiff's work schedule before he contracted Covid-19.

62. Specifically, Defendants still required Plaintiff to travel to NYU Woodhull and NYU Huntington while agreeing to "relieve" Plaintiff of his on-call responsibilities at NYU Winthrop. However, as already mentioned, Plaintiff had only recently began handling these on call responsibilities on a trial basis with the option for Plaintiff to remove from his list of responsibilities at any time.

63. Thus, Defendants were only offering to remove responsibilities that were already Plaintiff's to remove, at a significant $75,000 reduction in salary.

64. Around December 9, 2020, Respondent's Employee and Labor Relations Manager Mellynchuk emailed Plaintiff to follow up regarding Plaintiff's accommodation request. Specifically, Mellynchuk stated that the work options presented would be memorialized via an amendment to his employment contract and that he needed to accept and return to work by January 4, 2021 or he would be terminated.

65. Around December 10, 2020, Respondent's Employee and Labor Relations Manager Mellynchuk emailed Plaintiff a copy of his current contract and the draft amendment to his employment contract for is review and signature. Additionally, Mellynchuk informed Plaintiff that he needed to be medically cleared to return to work by January 4, 2021 or he would be

terminated.

66. Around December 14, 2020, Plaintiff emailed Respondent's Employee and Labor Relations Manager Mellynchuk to seek further clarification and suggest a few changes to the draft amendment to his employment contract.

67. Specifically, Plaintiff inquired when the revised employment contract would expire and suggested that the appendix table embedded within the draft amendment should be amended to "accurately reflect [his] true duties and responsibilities as Chief of Service."

68. Additionally, Plaintiff requested that he no longer suffer a decrease in salary if his Work Relative Value Unit ("wRVU") target is not met and that his wRVU target be standardized and similar to everyone else's within his department.

69. Lastly, Plaintiff requested permission to do part-time consulting/practice in a non-competitive manner similar to other colleagues within his department.

70. In response, Defendants' Vice Chairman at Ophthalmology Dr. Lazzaro emailed Plaintiff that the revised employment contract would expire on April 28, 2021, the appendix table would not be changed, everyone receives a salary decrease if their wRVU target is not met, and ignored Plaintiff final request to consult/practice in a non-competitive manner simply stating that he could imagine how Plaintiff would have the time considering his "accommodation" schedule already requires that he work two full days at NYU Woodhull and two full days at NYU Huntington.

71. Around December 16, 2020, Plaintiff replied that he does not understand why they would enter into a revised employment contract that was set to expire in less than three (3) months rather than enter into a multi-year long contract like his peers.

72. Further, Plaintiff clarified that the appendix table did not accurately "REFLECT [HIS] TRUE

DAILY ACTIVITIES. AS TEACHER OF THE YEAR IN BACK-TO-BACK YEARS, TO SAY THAT MY JOB IS NOT EDUCATIONAL AT 0% IS SIMPLY FALSE."

73. Finally, Plaintiff informed Defendants that he was aware of other employees within his department that did not receive a salary deduction if their wRVU target is not met and that his wRVU target did not reflect the same dollar per unit as colleagues within his department.

74. In response, Respondent's Employee and Labor Relations Manager Mellynchuk emailed Plaintiff that the contract length would not be changed and that, "IT DOES NOT MAKE SENSE TO NEGOTIATE A NEW MULTI-YEAR CONTRACT WHILE YOU ARE STILL ON MEDICAL LEAVE."

75. Around December 17, 2020, Plaintiff emailed Defendants that there were still some factual issues they would need to resolve in April when it was time to renew his contract. However, he was "EXCITED TO COME BACK" and "LOOK[ED] FORWARD TO BOTH NYU AND [HIS] DEPARTMENT'S SUPPORT TO ENABLE AN OPEN DIALOGUE THAT WILL EMPATHETICALLY ADDRESS ANY INDIVIDUAL NEEDS AS [HE] CONTINUES TO RECOVER."

76. Around December 23, 2020, Plaintiff emailed Respondent's Employee and Labor Relations Manager Mellynchuk and Defendants' Vice Chairman at Ophthalmology Dr. Lazzaro that he "HAD A REALITY CHECK THIS WEEK" and that he could not physically drive to work due to his ongoing disability. Therefore, Plaintiff requested "AN AMENDED ACCOMMODATION IN THE FORM OF REASSIGNMENT TO FOCUS ON [HIS] DIDACTIC, TEACHING, RESEARCH, AND ADMINISTRATIVE DUTIES" and asked to work "IN A COLLABORATIVE PROCESS SO [HE] COULD RETURN TO WORK IN A REALISTIC AND FEASIBLE MANNER GIVEN [HIS] DISABILITY."

77. Around December 30, 2020, Respondent's Employee and Labor Relations Manager Mellynchuk emailed Plaintiff and denied his recent request for a reasonable accommodation by again falsely claiming that most of Plaintiff's job is clinical in nature.

78. Additionally, Mellynchuk stated that Plaintiff needed to be medically cleared to return to work by January 4, 2021 or he would be terminated.

79. Around December 31, 2020, Plaintiff responded to Respondent's Employee and Labor Relations Manager Mellynchuk and Vice Chairman at Ophthalmology Dr. Lazzaro.

80. First, Plaintiff corrected Defendants and clarified that "TEACHING AND ADMINISTRATIVE DUTIES ARE THE PRIMARY AND ESSENTIAL FUNCTIONS OF [HIS] ROLE AND COMBINED LIKELY CONSTITUTE 60% -80% OF [HIS] JOB DUTIES."

81. Second, Plaintiff noted that his on-call responsibilities at NYU Winthrop were only recently added and always remained Plaintiff's option to remove. Further, Plaintiff pointed out that none of his peers had this responsibility, so relieving him from his on-call duties, can hardly constitute a reasonable accommodation.

82. Third, Plaintiff noted that his recent funding request for additional faculty was approved, so Defendants' claim that allowing him to work remotely would be an undue burden does not make sense, given the funding increase generated new additions to the faculty staff that could easily handle Plaintiff's clinical obligations until he recovers and can start commuting again to work.

83. On January 4, 2021, Defendants terminated Plaintiff because he did not provide medical clearance that he could drive and return to work.

84. Ultimately, Defendants unlawfully terminated Plaintiff due to his disability and in retaliation

for Plaintiff's complaints regarding the unlawful disability discrimination and hostile work environment he was forced to endure.

85. On September 23, 2021, in a further effort to retaliate against Plaintiff for seeking a reasonable accommodation and filing an EEOC Charge, Defendants sent Plaintiff another letter, falsely claiming that he now owed them $125,030 because he was overpaid during an unpaid sick leave while Plaintiff was lying unconscious in the hospital fighting for his life, despite the fact that Defendants assured Plaintiff that he was eligible for six (6) months of medical leave.

86. As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

87. As a result of Defendants' discriminatory and intolerable treatment, Plaintiff suffered and continues to suffer severe emotional distress and physical ailments including extreme anxiety and severe depression.

88. As a result of Defendants' unlawful and discriminatory actions, Plaintiff became so physically and emotionally distressed that he is having difficulty eating and sleeping.

89. As a result of Defendants' unlawful and discriminatory actions, Plaintiff has endured unwarranted financial hardships and irreparable damage to his professional reputation.

90. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation, which such employment entails. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition.

91. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full

knowledge of the law, Plaintiff demands Punitive Damages against all Defendants, jointly and severally.

92. Further, Plaintiff claims unlawful discharge and also seeks reinstatement.

93. The above are just some of the examples of unlawful discriminatory and retaliatory conduct to which Defendants subjected Plaintiff.

94. Defendants' conduct constitutes a continuing violation. Plaintiff claims a continuous practice of discrimination and makes all claims herein under the continuing violations doctrine.

### AS A FIRST CAUSE OF ACTION
### FOR DISCRIMINATION UNDER
### <u>THE AMERICANS WITH DISABILITIES ACT</u>

95. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

96. Plaintiff claims Defendant violated Title I of the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (ADA), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

97. SEC. 12112. [Section 102] specifically states "(a) General Rule. - No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

98. Section 102 continues: "As used in subsection (a) of this section, the term 'discriminate against a qualified individual on the basis of disability' includes … (4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."

99. Defendants violated the section cited herein by creating and maintaining discriminatory

working conditions, and otherwise discriminating, harassing, and retaliating against Plaintiff because of his disability.

100.    Defendant violated the above and Plaintiff suffered numerous damages as a result.

## AS A SECOND CAUSE OF ACTION
## FOR RETALIATION UNDER
## THE AMERICANS WITH DISABILITIES ACT

101.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

102.    SEC. 12203. [Section 503] states, "(a) Retaliation. - No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

103.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER
## NEW YORK STATE LAW

104. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

105. Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

106. Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of his disability, harassing Plaintiff, and causing a hostile work environment.

107. Plaintiff hereby makes a claim against Defendant under all of the applicable paragraphs of Executive Law Section 296.

108. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS A FOURTH CAUSE OF ACTION**
**FOR RETALIATION UNDER**
**<u>NEW YORK STATE LAW</u>**

109. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

110. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

111. Defendants engaged in an unlawful discriminatory practice by retaliating against Plaintiff.

112. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS A FIFTH CAUSE OF ACTION**
**FOR AIDING AND ABETTING UNDER**
**<u>NEW YORK STATE LAW</u>**

113. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of the complaint.

114. New York State Executive Law §296(6) further provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

115. Defendants engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the discriminatory behavior as stated herein.

116. Defendants violated the above and Plaintiff suffered numerous damages as a result.

### AS A SIXTH CAUSE OF ACTION
### FOR DISCRIMINATION UNDER
### <u>THE NEW YORK CITY ADMINISTRATIVE CODE</u>

117. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

118. The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienate or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

119. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, by creating and maintaining discriminatory working conditions and a hostile work environment, and otherwise discriminating against the Plaintiff because of his disability.

120. Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York City Administrative Code Title 8.

121. Defendants violated the above and Plaintiff suffered numerous damages as a result.

### AS A SEVENTH CAUSE OF ACTION
### FOR RETALIATION UNDER
### <u>THE NEW YORK CITY ADMINISTRATIVE CODE</u>

122. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

123. The New York City Administrative Code Tide 8, §8-107(1)(e) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise

discriminate against any person because such person has opposed any practices forbidden under this chapter. . . "

124. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Tide 8, §8-107(1) (e) by discriminating against Plaintiff because of his opposition to the unlawful employment practices of his employer.

125. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS AN EIGHTH CAUSE OF ACTION**
**FOR AIDING AND ABETTING UNDER**
**THE NEW YORK CITY ADMINISTRATIVE CODE**

126. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

127. The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

128. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

129. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS A NINTH CAUSE OF ACTION**
**FOR SUPERVISOR LIABILITY UNDER**
**THE NEW YORK CITY ADMINISTRATIVE CODE**

130. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

131. Section 8-107(13) entitled Employer liability for discriminatory conduct by employee, agent or independent contractor provides: "An employer shall be liable for an unlawful

discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section." b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where: (1) the employee or agent exercised managerial or supervisory responsibility; or (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct."

132. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A TENTH CAUSE OF ACTION
## FOR FAILURE TO ENGAGE IN A COOPERATIVE DIALOGUE
## THE NEW YORK CITY ADMINISTRATIVE CODE

133. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

134. Section 8-107(28)(a) holds "It shall be an unlawful discriminatory practice for an employer, labor organization or employment agency or an employee or agent thereof to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation or who the covered entity has notice may require such an accommodation […] Related to a disability as provided in subdivision 15 of this section.

135. As defined, the term "cooperative dialogue" means the process by which a covered entity and

a person entitled to an accommodation, or who may be entitled to an accommodation under the law, engage in good faith in a written or oral dialogue concerning the person's accommodation needs; potential accommodations that may address the person's accommodation needs, including alternatives to a requested accommodation; and the difficulties that such potential accommodations may pose for the covered entity.

136. Defendants violated the above and Plaintiff suffered numerous damages as a result.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in an amount which exceeds the jurisdiction of all lower courts for all damages including but not limited to compensatory damages, punitive damages, statutory damages, lost wages, back pay, front pay, attorney's fees, costs, interest and all other damages as are just and proper to remedy Defendant's unlawful employment practices.

## JURY DEMAND

Plaintiff demands a jury trial on all issues to be tried.

Date:   July 9, 2025
        New York, New York                          Respectfully Submitted,

                                                    **DEREK SMITH LAW GROUP, PLLC**


                                                    **_/s/ Alexander G. Cabeceiras_**
                                                    Alexander G. Cabeceiras, Esq.
                                                    The Nelson Tower
                                                    450 7th Avenue, 30th Floor
                                                    New York, New York 10123