22-CV-1248

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HABEEB AHMAD,

                                            Plaintiff,

                    -against-

NEW YORK UNIVERSITY, SCOTT MELLYNCHUK,
and DOUG LAZZARO,

                                            Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE, FOR A NEW TRIAL OR AN AMENDED JUDGMENT

*MURIEL GOODE-TRUFANT*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street, rm 2-316*
*New York, N.Y. 10007*

*Of Counsel: Desiree Alexander, Elisheva L. Rosen*
*Tel: (212) 356-3177*
*Matter #: 2022-010819*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................- 1 -

RELEVANT PROCEDURAL HISTORY ........................................................................- 2 -

ARGUMENT .....................................................................................................................- 3 -

    POINT I ..........................................................................................................................- 3 -

    Defendants' Rule 50 motion should be granted and the remaining SHRL and CHRL claims should be dismissed as a matter of law ...........................................................- 3 -

    POINT II .......................................................................................................................- 13 -

    The verdict should be set aside as against the weight of the evidence and a new trial should be ordered, and/or the judgment reduced pursuant to Fed. R. Civ. P. 59(a)_____ .........................................................................................- 13 -

CONCLUSION ...............................................................................................................- 25 -

CERTIFICATE OF COMPLIANCE ..............................................................................- 26 -

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bergerson v. N.Y. State Off. of Mental Health,
  526 F. App'x 109 (2d Cir. 2013) ............................................................16

BMW of N. Am., Inc. v. Gore,
  517 U.S. 559 (1996)...............................................................................19

Bouveng v. NYG Capital LLC,
  175 F. Supp. 3d 280 (S.D.N.Y. 2016)..............................................20, 21

Cardwell v. Polk,
  2023 U.S. Dist. LEXIS 26907 (S.D.N.Y. Feb. 16, 2023).......................15

Chinchilla v. N.Y.C. Police Dep't,
  2024 U.S. Dist. LEXIS 123248 (S.D.N.Y. July 12, 2024) ........................8

Cioffi v. New York Cmty. Bank,
  465 F. Supp. 2d 202 (E.D.N.Y. 2006) ...................................................20

Cosme v. Henderson,
  287 F.3d 152 (2d Cir. 2002)....................................................................8

Cruz v. Loc. Union No. 3 of the Int'l Bd. of Elec. Workers,
  34 F.3d 1148 (2d Cir. 1994).....................................................................4

Downey v. Monro, Inc.,
  2022 U.S. Dist. LEXIS 210133 (N.D.N.Y. Nov. 21, 2022) ....................17

Duarte v. St. Barnabas Hosp.,
  341 F. Supp. 3d 306 (S.D.N.Y. 2018).....................................................21

Edelman v. NYU Langone Health Sys.,
  141 F.4th 28 (2d Cir. 2025) ..............................................................19, 20

Farzan v. Wells Fargo Bank, N.A.,
  2013 U.S. Dist. LEXIS 82623 (S.D.N.Y. June 11, 2013).........................8

Goolsby v. City of New York,
  83 Misc. 3d 445 (Sup. Ct., N.Y. Cnty. 2024) ...................................10, 12

Green v. City of New York,
  359 F. App'x 197 (2d Cir. 2009) ............................................................14

Greenbaum v. N.Y.C. Tr. Auth.,
    2022 U.S. App. LEXIS 22589 (2d Cir. Aug. 15, 2022).........................................................12

Greenway v. Buffalo Hilton Hotel,
    143 F.3d 47 (2d Cir. 1998)...................................................................................15, 16

Hawkins v. 1115 Legal Serv. Care,
    163 F.3d 684 (2d Cir. 1998)............................................................................................15

Hosking v. Mem. Sloan-Kettering Cancer Ctr.,
    186 A.D.3d 58 (1st Dep't 2020) .......................................................................................9

Jacobsen v. N.Y.C. Health & Hosps. Corp.,
    22 N.Y.3d 824 (2014) .....................................................................................................4

Kolstad v. Amer. Dental Ass'n,
    527 U.S. 526 (1999)........................................................................................................20

Lazzari v. N.Y.C. Dep't of Parks & Rec.,
    751 F. App'x 100 (2d Cir. 2018) ......................................................................................4

Lee v. Delta Airlines, Inc.,
    2023 U.S. Dist. LEXIS 42989 (E.D.N.Y. Mar. 14, 2023) ......................................................23

Macmillan v. Millenium Broadway Hotel,
    873 F. Supp. 2d 546 (S.D.N.Y. 2012)..........................................................................13, 20

Manley v. AmBase Corp.,
    337 F.3d 237 (2d Cir. 2003)............................................................................................14

Marsteller v. City of New York,
    217 A.D.3d 543 (1st Dep't 2023) .....................................................................................12

Menghi v. Hart,
    745 F. Supp. 2d 89 (E.D.N.Y. 2010) ................................................................................21

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,
    2015 U.S. Dist. LEXIS 42422 (S.D.N.Y. Mar. 25, 2015) .......................................................16

Nimely v. City of New York,
    414 F.3d 381 (2d Cir. 2005)............................................................................................14

Patterson v. Balsamico,
    440 F.3d 104 (2d Cir. 2006)............................................................................................21

Pena-Barrero v. City of New York,
    2017 U.S. Dist. LEXIS 47983 (S.D.N.Y. Mar. 30, 2017), aff'd 726 F. App'x
    31 (2d Cir. 2018)...........................................................................................................5

Press v. Concord Mortg. Corp.,
   2010 U.S. Dist. LEXIS 81952 (S.D.N.Y. Aug. 5, 2010)......................................................18

Ragusa v. UPS,
   2009 US Dist LEXIS 25152 (SDNY 2009)..........................................................................15

Song v. Ives Labs., Inc.,
   957 F.2d 1041 (2d Cir. 1992)...............................................................................................14

Stuart v. T-Mobile USA, Inc.,
   2015 U.S. Dist. LEXIS 106155 (S.D.N.Y. Aug. 12, 2015)...............................................8, 12

Tingley Sys. v. Norse Sys.,
   49 F.3d 93 (2d Cir. 1995).....................................................................................................13

Turley v. ISG Lackawanna, Inc.,
   774 F.3d 140 (2d Cir. 2014).................................................................................................19

Vangas v. Montefiore Med. Ctr.,
   6 F. Supp. 3d 400 (S.D.N.Y. 2014) .......................................................................................9

Vangas v. Montefiore Med. Ctr.,
   823 F.3d 174 (2d Cir. 2016)...................................................................................................5

Vitti v. Macy's Inc.,
   758 F. App'x 153 (2d Cir. 2018) ...........................................................................................4

White v. Manhattan & Bronx Surface Tr. Operating Auth.,
   2022 US Dist LEXIS 165428 (SDNY 2022)..........................................................................6

Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ.,
   866 F. Supp. 2d 147 (E.D.N.Y. 2011) ...................................................................................8

**Statutes**

ADA...............................................................................................................................................3

SHRL...................................................................................................................................1, 3, 5, 7

CHRL......................................................................................................2-5, 7-10,  12-13, 19-22

City Human Rights Laws............................................................................................................1

N.Y.C. Admin. Code § 8-102 ....................................................................................................8

**Other Authorities**

Fed. R. Civ. P. 37.......................................................................................................................24

Fed. R. Civ. P. 50(a) ..................................................................................................3

Fed. R. Civ. P. 50(b) .............................................................................................1, 3, 4

Fed. R. Civ. P. 59(a) ...............................................................................................1, 13

Fed. R. Civ. P. 62 .......................................................................................................1

## PRELIMINARY STATEMENT

Defendants New York University ("NYU"), Mr. Scott Mellynchuk, and Dr. Douglas Lazzaro (collectively, "Defendants"), hereby submit this memorandum of law in support of their renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b),[1] or in the alternative, for a new trial or remittitur of the judgment pursuant to Fed. R. Civ. P. 59(a). Specifically, the Court should grant judgment as a matter of law that: (a) NYU's decision to terminate Plaintiff was not motivated by Plaintiff's disability under the State or City Human Rights Laws ("SHRL" and "CHRL" respectively), (b) Defendants engaged in a cooperative dialogue under the CHRL, and (c) Plaintiff is not entitled to punitive or compensatory damages as a matter of law.

In the alternative, Defendants move for a new trial or remitter of the judgment pursuant to Rule 59 because Plaintiff's punitive and compensatory damages awards were excessive, and Defendants were severely prejudiced by (1) the Court permitting Plaintiff to add a CHRL cooperative dialogue claim on the eve of trial; (2) Plaintiff's failure to produce telephone call records; (3) Plaintiff's frequent references to his coma and referring to himself as a COVID survivor; (4) Plaintiff's treating therapist Dr. Masterson's failure to turn over hundreds of treatment records; and (5) Plaintiff's expert Dr. Lerner's consistent references to matters previously excluded by the Court.

Defendants also respectfully request that execution of the judgment be stayed under Fed. R. Civ. P. 62 pending the outcome of this motion. If granted in whole or in part, this motion

---

[1] For the sake of brevity and judicial economy, Defendants incorporate by reference the arguments made on the record in support of their Rule 50 motion and focus this motion on the issues decided adversely by the jury. Defendants also preserve their arguments that the remaining SHRL and CHRL termination claims fail because Plaintiff's discharge was based on legitimate, non-discriminatory reasons, and that Plaintiff's CHRL cooperative dialogue claims fail as a matter of law.

would necessarily require a modification of the judgment now at issue. Accordingly, execution of the judgment should be stayed until the Court resolves the motion.

## RELEVANT PROCEDURAL HISTORY

Plaintiff initiated the instant lawsuit on February 14, 2022. See Complaint, filed February 14, 2022, ECF Dkt. No. 1. On February 11, 2025, the Court partially granted and partially denied Defendants' motion for summary judgment. See Order, dated February 11, 2025, ECF Dkt. No. 100. On July 9, 2025, the Court granted in part, and denied in part, Defendants' motion *in limine*. See Order, filed July 10, 2025, ECF Dkt. No. 140. Specifically, among other items, the Court precluded any evidence regarding overpayment letters or attempts to recoup overpayments, see Tr. 30:2-18,[2] and limited Plaintiff's ability to discuss his COVID diagnosis and treatment. Id. at 37:24-38:1, 40:25-41:2, 55:7-16, 56:1-13, 93:13-22.

On July 9, 2025, over Defendants' objection, the Court granted Plaintiff leave to file an Amended Complaint with a new cause of action for failure to engage in cooperative dialogue under the CHRL. See Order, filed July 10, 2025, ECF Dkt. No. 140. Plaintiff filed an Amended Complaint on July 9, 2025. See Am. Compl., filed July 9, 2025, ECF Dkt. No. 139. Defendants filed an Answer on July 21, 2025. See Answer, filed July 21, 2025, ECF Dkt. No. 153. In granting leave, the Court permitted limited discovery, including the reopening of Plaintiff's deposition. Although Defendants sought additional materials in connection with Plaintiff's new claim, those were never produced. Defendants advised the Court that this created significant prejudice, as the amendment was allowed less than two weeks before trial, leaving insufficient time to move to compel production or pursue spoliation relief. See Tr. 55:6-57:7.

---

[2] Citations to pages of the trial transcript are noted as "Tr. [Page]:[line]."

The parties selected a jury on July 22, 2025, with trial beginning on July 23, 2025. See Order, dated July 14, 2025, ECF Dkt. No. 145. Defendants moved for the entry of judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) following the close of Plaintiff's case-in-chief. See Tr. 1277:4-8. The Court partially granted the motion and dismissed the Americans with Disabilities Act ("ADA") and SHRL discrimination claims against Dr. Lazzaro and Mr. Mellynchuk. See id. at 1311:25-13:12:19. The Court reserved its decision on the remainder of the Fed. R. Civ. P. 50(a) motion. See id. at 1313:1-4. Defendants also moved for the entry of judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) following the submission of all evidence, and the Court reserved its decision. See id. at 1319:2-8.

On July 31, 2025, the jury returned a liability verdict against NYU for disability discrimination under the SHRL and CHRL, as well as failing to engage in a cooperative dialogue under the CHRL. See Verdict Form, ECF Dkt. No. 161-17, at 1-2. The jury also returned a liability verdict against Dr. Lazzaro and Mr. Mellynchuk solely for failing to engage in a cooperative dialogue. Id. However, the jury did not find liability against Defendants on Plaintiff's claim for discriminatory termination based on disability under the ADA, nor did they find that Defendants failed to reasonably accommodate Plaintiff under federal, state, or local law. As a result of the liability findings, the jury awarded Plaintiff $2 million in emotional distress damages, $1.4 million in back pay, $375,000 in front pay, and awarded $250,000 in punitive damages specifically against NYU. See id. at 3.

## **ARGUMENT**

### **POINT I**

### **DEFENDANTS' RULE 50 MOTION SHOULD BE GRANTED AND THE REMAINING SHRL**

**AND CHRL CLAIMS SHOULD BE
DISMISSED AS A MATTER OF LAW**

Pursuant to Fed. R. Civ. P. 50(b), a party that previously moved for and was denied

a motion for judgment as a matter of law may renew the motion after judgment is entered. A Rule

50 motion must be granted where "(1) there is such a complete absence of evidence supporting the

verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

(2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and

fair minded [persons] could not arrive at a verdict against [it]." Cruz v. Loc. Union No. 3 of the

Int'l Bd. of Elec. Workers, 34 F.3d 1148, 1154 (2d Cir. 1994) (internal quotation and citation

omitted). Defendants twice moved for the entry of judgment as a matter of law and the Court

reserved its decision. See Tr. 1277:4-8, 1313:1-4, 1319:2-8. For the reasons set forth below, the

remaining SHRL and CHRL claims are deficient as a matter of law and should be dismissed.

**A.      The Remaining SHRL and CHRL Claims Against NYU Should Be Dismissed Because
Its Decision to Terminate Plaintiff Was Not Motivated by Plaintiff's Disability.**

Regular attendance at work on-site is an essential function of virtually every job,

particularly those requiring direct interaction. See Vitti v. Macy's Inc., 758 F. App'x 153, 157 (2d

Cir. 2018). Where attendance is an essential function of a job, "any purported accommodation

permitting [Plaintiff's] continued excessive absences was not a reasonable one." Lazzari v. N.Y.C.

Dep't of Parks & Rec., 751 F. App'x 100, 103 (2d Cir. 2018). "Under the [SHRL], if an employee

has a physical impairment that prevents the employee from performing the core duties of his or

her job even with a reasonable accommodation, the employee does not have a disability covered

by the statute, and consequently, the employer is free to take adverse employment action against

the employee based on that impairment." Jacobsen v. N.Y.C. Health & Hosps. Corp., 22 N.Y.3d

824, 834 (2014). Likewise, under the CHRL, the fact that an employer is concerned with excessive

absenteeism after granting accommodations, where the employee fails to request further

- 4 -

accommodation, does not establish pretext. See Pena-Barrero v. City of New York, 2017 U.S. Dist. LEXIS 47983, at *38-39 (S.D.N.Y. Mar. 30, 2017), aff'd 726 F. App'x 31 (2d Cir. 2018).

Plaintiff's SHRL and CHRL wrongful termination claims are legally deficient. The trial record is entirely devoid of any evidence showing that NYU's decision to terminate Plaintiff was based on his disability; rather, the evidence overwhelmingly supports Defendants. NYU maintains an entire office dedicated to processing hundreds of reasonable accommodation requests annually. See Tr. 774:4-8. Indeed, two such disability-related accommodation requests were entered into evidence. Each employee, like Plaintiff, was provided an accommodation, but unlike Plaintiff, none ultimately were separated from their employment. See Plaintiff's Exhibit ("Pl. Ex.") 102; Tr. 912:16-9:13:9; Pl. Ex. 110; Tr. 856:7-857:2. Contrary to the jury's holding, the evidence plainly established that Plaintiff's termination was not motivated by his disability. Unlike Plaintiff, the employees against whom he was compared were not surgeons, Chiefs of Service, Ophthalmologists, or even affiliated with the Ophthalmology Department. See Pl. Exs. 102; Tr. 912:16-9:13:9; Pl. Ex. 110; Tr. 856:7-857:2. Indeed, and as mandated by law, NYU's accommodation process was highly individualized, and based not only on the employee's need but also their specific role, responsibilities, and job duties.

Plaintiff was not similarly situated to those other employees whose accommodation requests were granted. He was unable to perform the essential functions of his position, with or without accommodation: he failed to provide medical clearance to return to work; he did not request additional time to obtain such clearance; and he ultimately never returned. Thus, he was not entitled to retain his position when he could not and did not appear for work. See, e.g., Vangas v. Montefiore Med. Ctr., 823 F.3d 174, 181 (2d Cir. 2016) (finding that employee was "incapable of performing the essential functions of her job" when she was "not medically cleared to return to

work and admitted that she could not do so," and that when the employee informed the employer that she was not able to return to work without providing an end date to her leave, the employee was "requesting an indefinite leave extension, which as a matter of law is not a reasonable accommodation"); White v. Manhattan & Bronx Surface Tr. Operating Auth., 2022 US Dist LEXIS 165428, at *13-14 (SDNY 2022)(finding that the Plaintiff did not establish that "the sequence of events leading up to Plaintiff's termination—her several extended absences and her repeated failure to achieve medical clearance to resume work—support an inference that she was discharged for any reason other than her poor attendance and medical inability to do the job… [and she] offered no competent evidence whatsoever… that the reason behind Defendants' adverse employment decisions was her [protected class].)

NYU extended Plaintiff's medical leave repeatedly as an accommodation from March 2020 until January 4, 2021. See Tr. 830:16-25. On January 4, 2021, Plaintiff failed to return to work and failed to provide medical clearance. See Tr. 913:19-23. Plaintiff, himself, confirmed that he could not return to in-person work on January 4, 2021. See Pl. Ex. 53. At that point, NYU could no longer compromise patient care and departmental operations, and therefore, terminated Plaintiff's employment. See Pl. Ex. 1. Even then, NYU did not foreclose his future employment. Plaintiff was invited to return upon providing medical clearance. See Pl. Ex. 1. These undisputed facts, not his disability, formed the basis for his termination. Moreover, the finding by the jury that Defendants did not fail to accommodate Plaintiff, which encompassed the denial of additional medical leave, further supports the assertion that disability discrimination was not the basis for his termination.

At trial, Plaintiff's reliance on an email from Nancy Sanchez, the head of NYU's Human Resources office, was misplaced. See Pl. Ex. 142. When considered in context, the email

reflected a single employee's frustration after over seven months without a Chief of Service in the Department. In those months, the Service faltered, patients went unseen, and residents lacked adequate training. Ms. Sanchez's email asked a question and was not a directive. Her email posed a basic question, querying why a surgeon who was unable to perform surgeries could not be terminated. This isolated expression of exasperation is not evidence of discrimination. As this Court explained in its jury charge, blind bus drivers are disqualified from driving buses. See ECF 161-6, at 12. By Plaintiff's logic, transit agencies could never voice such concerns, even when an employee is plainly unqualified, such as a blind bus driver.

Nor does Plaintiff's characterization of Ms. Sanchez as the "head honcho" establish pretext. See Tr. 1321:18-19. Her inquiry did not trigger Plaintiff's termination. Rather, after her October 23, 2020 email, Plaintiff was granted multiple additional months of extended leave and offered two options for reduced schedules of on-site work, one of which he accepted. His termination occurred only after he reneged on the agreed upon return to work accommodation months after the email in question. If her view controlled NYU's decision-making, Plaintiff would not have been granted multiple additional months of extended leave following her October 23, 2020 email. Instead, NYU's actions demonstrate continued accommodation, not discriminatory animus.

In sum, Plaintiff's disability was not the motivating factor in his termination. He was discharged due to his inability to perform essential job functions, as evidenced by his repeated failure to provide required medical clearance and his prolonged absence from work. NYU acted for legitimate, non-pretextual business reasons. Even under the broader CHRL standard, Plaintiff has failed to show that his disability was the motivating factor in his termination. Accordingly, his remaining SHRL and CHRL claims must be dismissed.

**B. All of Plaintiff's CHRL Cooperative Dialogue Claims Should Be Dismissed.**

"To make out a claim against an individual defendant under . . . the CHRL, a plaintiff must either show direct, personal involvement in discriminatory conduct, or that the defendant 'aided and abetted' the discrimination or retaliation at issue . . . i.e., that the defendant encouraged, condoned or approved it." Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ., 866 F. Supp. 2d 147, 163 (E.D.N.Y. 2011) (internal citations and quotation marks omitted); Farzan v. Wells Fargo Bank, N.A., 2013 U.S. Dist. LEXIS 82623, at *11 (S.D.N.Y. June 11, 2013) ("[I]ndividual liability under . . . the NYCHRL attaches only where a defendant actually participates in the conduct giving rise to [the] discrimination") (internal quotation and citation omitted). "The NYCHRL requires only that Defendants engage in an interactive process with the disabled individual; it does not require that the individual be satisfied with that process or that the process result in the individual's preferred accommodation" Stuart v. T-Mobile USA, Inc., 2015 U.S. Dist. LEXIS 106155, at *30 (S.D.N.Y. Aug. 12, 2015).

The CHRL imposes a duty on employers to engage in a "cooperative dialogue," but it does not require that the individual be satisfied with that process or that the process result in the individual's preferred accommodation. See Cosme v. Henderson, 287 F.3d 152, 158 (2d Cir. 2002) ("[T]o avoid . . . liability, the employer need not offer the accommodation the employee prefers"). The cooperative dialogue may be "a written or oral dialogue concerning the person's accommodation needs, potential accommodations that may address those needs, and the difficulties that such accommodations may pose for the covered entity." Chinchilla v. N.Y.C. Police Dep't, 2024 U.S. Dist. LEXIS 123248, at *33 (S.D.N.Y. July 12, 2024) (quoting Hosking v. Mem. Sloan-Kettering Cancer Ctr., 186 A.D.3d 58, 64 (1st Dep't 2020)); see also N.Y.C. Admin. Code § 8-102. An interactive process only requires the employer to "investigate an

- 8 -

employee's request for accommodation and determine its feasibility." <u>Vangas v. Montefiore Med.</u> <u>Ctr.</u>, 6 F. Supp. 3d 400, 420 (S.D.N.Y. 2014) (quoting <u>Phillips v. City of New York</u>, 66 A.D.3d 170, 176 (1st Dep't 2009)). "An interactive process may involve a 'meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome.'" <u>Id.</u> (quoting <u>Lovejoy-Wilson v. NOCO Motor Fuel, Inc.</u>, 263 F.3d 208, 218-19 (2d Cir. 2001)) (internal quotation marks, brackets, and citation omitted). Critically, "[t]here is no rule that an employer has to engage in the process for a certain number of days or that it ultimately has to give the employee what the employee is demanding." <u>Hosking</u>, 186 A.D.3d at 66.

Here, the trial record forecloses any claim of a CHRL violation with respect to NYU and the individually named Defendants. Despite Plaintiff's repeated claims of being "ghosted," the undisputed evidence at trial demonstrates that NYU, Dr. Lazzaro, Mr. Mellynchuk and others repeatedly engaged Plaintiff, considered his requests, and explored multiple alternatives. Dr. Lazarro had numerous phone conversations with Plaintiff and brought his case to the Chair of the Department and to Human Resources for further investigation. <u>See</u> Pl. Ex 51.F. Mr. Mellynchuk, as outlined below, responded to each and every inquiry made by Plaintiff and discussed each and every request with NYU leadership, including the Ophthalmology Department, NYU Legal, the business manager for NYU's Faculty Group Practice, the Executive Vice President and Vice Dean for NYU Langone Clinical Affairs and Strategy, and the Senior Vice President of NYU Clinical Affairs and Ambulatory Care. Thus, this claim should be dismissed, not only against NYU, but particularly against the individually named Defendants.

Indeed, it was the individual Defendants—not Plaintiff—who first initiated the interactive dialogue. <u>See</u> Pl. Ex. 51.F; Pl. Ex. 150. At no point between September 25, 2020, and January 4, 2021, was Plaintiff without an HR representative actively handling his case. As a matter of law under the CHRL, an employer's obligation only arises once an "employee establishes that he or she is or may be entitled to an accommodation." <u>Goolsby v. City of New York</u>, 83 Misc. 3d 445, 462 (Sup. Ct., N.Y. Cnty. 2024) (citing <u>Hosking</u>, 186 A.D.3d at 65). Here, Defendants learned of Plaintiff's claimed need for accommodation only because they reached out to *him*.

The record is replete with evidence of good-faith dialogue between Plaintiff and Defendants:

- September 25, 2020: Dr. Lazzaro personally called Plaintiff. <u>See</u> Pl. Ex. 51.F, at D_0458.

- October 6, 2020: HR representative Scott Mellynchuk and Senior Administrator for Ophthalmology Patricia Gaeta, provided Plaintiff with accommodation paperwork. <u>See</u> Pl. Ex. 150, at D_0880 – D_0881.

- October 14, 2020: Mr. Mellynchuk learned from third party input that Plaintiff intended to return to work on December 1, 2020. <u>See</u> Pl. Ex. 137, at D_0442.

- November 2, 2020: Mr. Mellynchuk followed up with Plaintiff, seeking his accommodation request. <u>See</u> Ex 150, at D_0879.

- November 2, 2020: Plaintiff submitted his portion of his accommodation request. <u>See</u> Pl. Ex 150, at D_0879.

- November 12, 2020: Plaintiff's physician followed up with supporting documentation. <u>See</u> Pl. Ex 47, at P000041.

- November 19, 2020: After discussions with the Ophthalmology Department and input from medical directors at Huntington and Woodhull, HR extended Plaintiff's leave until December 1, 2020. Plaintiff had independently contacted these physicians about returning on December 1, 2020. <u>See</u> Pl. Ex. 150, at D_0879 – D_0880; Pl. Ex. 49A; Pl. Ex. 137, at D_0441 – D_0442.

- November 20, 2020: After Plaintiff reached out to Dean Grossman, who referred the matter to HR, Senior Director of Employee and Labor Relations Austin Bender immediately called Plaintiff. Although Plaintiff was already on extended leave, he requested a new hybrid schedule of four days remote and one day in-person at Huntington. Mr. Bender

relayed this request to Ophthalmology and conferred with Dr. Lazzaro. At that point, Dr. Lazzaro indicated that HR should take the lead in further communications. <u>See</u> Pl. Ex. 51.J, at D_0479; Pl. Ex. 96; Tr. 379:9-18, 381:8-11, 562:3-7, 564:23–565:11, 589:2-7.

- November 30, 2020: Mr. Bender again called Plaintiff to continue the dialogue. <u>See</u> Pl. Ex. 96; Tr. 379:9-18, 381:8-11, 562:3-7, 564:23-565:11, 589:2-7.

- November 30, 2020: Through newly retained counsel, Plaintiff requested a reduced schedule with partial in-person work. <u>See</u> Pl. Ex. 15.

- December 1, 2020: A call was held among Plaintiff, his counsel, and Defendants, during which various options were discussed, including non-remote arrangements. <u>See</u> Pl. Ex. 15; Tr. 383:19-24, 714:4-7, 823:24-824:3.

- December 2, 2020: Defendants proposed two concrete accommodation options that balanced Plaintiff's preferences (hours, salary, and benefits) with the Department's operational needs of having a Chief of Service present at Woodhull and providing direct patient care at Woodhull and Huntington. <u>See</u> Pl. Ex. 116.

- December 7, 2020: Plaintiff accepted the proposed four day per week return to work accommodation labeled "Option B." <u>See</u> Pl. Ex. 116, at D_0098; Pl. Ex. 53.

- December 10-17, 2020: Plaintiff and NYU engaged in a back-and forth negotiation over his contract terms. <u>See</u> Pl. Ex. 53.

- December 17, 2020: Plaintiff agreed to postpone contract negotiations until his contract expired in April and to move forward with Option B. <u>See</u> Pl. Ex. 53.

- December 23, 2020: Plaintiff repudiated the agreement and returned to the previously rejected accommodation of solely working remotely, including non-essential functions such as leading journal club. Despite the prior consideration and refusal of this accommodation request, Mr. Mellynchuk nevertheless relayed these ideas, but the Department reiterated that Plaintiff, as a clinician and surgeon, could not work from home and reaffirmed the original offer. <u>See</u> Pl. Exs. 53, 80.

- December 30, 2020: Mr. Mellynchuk again raised these proposals, though the Department reiterated that Plaintiff, as a surgeon, could not work from home and reaffirmed their original offer. <u>See</u> Pl. Ex. 80; Pl. Ex 49, at D_0298.

Over the course of three full months, Defendants engaged in a continuous, good-faith dialogue with Plaintiff and considered multiple accommodations. At no time following Plaintiff's repudiation of the negotiated agreement did he request additional time to obtain the required medical clearance. Dr. Lazarro's eventual decision to cease communicating directly with

- 11 -

Plaintiff and defer to HR to continue negotiating the matter is not a failure to engage. Notably, Dr. Lazzaro had been involved with Plaintiff's case longer than any other individual. Plaintiff simply did not receive the accommodation of his choice.

   This record is far stronger than those in cases where courts found no failure to engage. In <u>Stuart v. T-Mobile USA, Inc.</u>, the Court found no failure in the interactive process where there were only two phone calls and a denial. <u>See</u> 2015 U.S. Dist. LEXIS 106155, at *27-30 (finding that the record was "replete with evidence that Defendants *did* in fact engage in an interactive process" and that "no reasonable jury could conclude that Defendants failed to engage in an interactive process to identify a reasonable accommodation"). Similarly, in <u>Walrond v. N.Y.C. Health & Hosps.</u>, the Court held that a cooperative dialogue claim could not survive a motion to dismiss where the employer reviewed the request, offered options, and provided contact information. <u>See</u> 2025 N.Y. App. Div. LEXIS 4550, at *1 (2d Dep't July 30, 2025). Here, Defendants far exceeded that threshold, engaging in three months of sustained dialogue with multiple phone calls, meetings, and written exchanges across several NYU departments. <u>See</u> Pl. Exs. 51, 93, 137; Tr. 1060:4-9, 1137:15-18; <u>see also</u> <u>Greenbaum v. N.Y.C. Tr. Auth.</u>, 2022 U.S. App. LEXIS 22589, at *16 (2d Cir. Aug. 15, 2022) (holding that "there is insufficient evidence from which a rational jury could find that defendants failed to engage in an interactive process" where the interactive process took place "over a period of many months, including three separate meetings . . . as well as email correspondence between those meetings"); <u>Goolsby v. City of N.Y.</u>, 83 Misc. 3d 445, 458 (Sup. Ct., N.Y. Cnty. 2024), <u>aff'd</u> 236 A.D.3d 404 (1st Dep't 2025) (where "Plaintiff has not provided facts demonstrating that, in his specific circumstances, NYCHRL necessitated a more robust or individualized dialogue than the process he received") (internal citations omitted); <u>Marsteller v. City of New York</u>, 217 A.D.3d 543, 545 (1st Dep't 2023) (holding

- 12 -

that there is no need for an individualized or robust interactive process where the employer publicizes how to seek an accommodation, the employee avails themselves of the process, and the employer explains why the employee is not eligible for an accommodation).

Ultimately, Plaintiff's cooperative dialogue claim rests not on any failure by NYU to engage, but on his dissatisfaction with the result. That is not actionable under the CHRL. Because the undisputed evidence shows Defendants initiated and maintained a robust, good-faith dialogue, and Plaintiff alone repudiated the accommodation agreement, his claim must be dismissed. Accordingly, Plaintiff has failed to meet his burden at trial, and this claim should be dismissed.

## POINT II

### THE VERDICT SHOULD BE SET ASIDE AS AGAINST THE WEIGHT OF THE EVIDENCE AND A NEW TRIAL SHOULD BE ORDERED, AND/OR THE JUDGMENT REDUCED PURSUANT TO FED. R. CIV. P. 59(a)

A district court has broad authority under Rule 59(a) to order a new trial, limit retrial to damages, or condition denial of a new trial on acceptance of a reduced award. Tingley Sys. v. Norse Sys., 49 F.3d 93, 96 (2d Cir. 1995). "While it is properly within the province of the jury to calculate damages, there is an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [persons] may differ, but a question of law. [A] jury has broad discretion in measuring damages, but it may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket." Macmillan v. Millenium Broadway Hotel, 873 F. Supp. 2d 546, 559 (S.D.N.Y. 2012) (internal citations and quotation marks omitted). Pursuant to this standard, the jury's damages awards were excessive.

Moreover, a motion for a new trial should be granted pursuant to Fed. R. Civ. P. 59 where "the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice." Nimely v. City of New York, 414 F.3d 381, 393 (2d Cir. 2005) (quoting Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004)). Unlike a Rule 50 motion, a new trial may be granted even when there is substantial evidence supporting the jury's verdict. See Manley v. AmBase Corp., 337 F.3d 237, 244 (2d Cir. 2003). Thus, a court may weigh the evidence itself and need not view the evidence in the light most favorable to the non-moving party. See Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992). Indeed, "the district court is permitted to 'examine the evidence through its own eyes.'" See Green v. City of New York, 359 F. App'x 197, 199 (2d Cir. 2009) (quoting Meloff v. New York Life Ins. Co., 240 F.3d 138, 147 (2d Cir. 2001)).

Here, each category of damages awarded by the jury—economic, front pay, punitive, and emotional distress—is excessive, unsupported by the record, and the product of prejudice.

## A.    Backpay Damages

The jury's $1.4 million backpay award is excessive and unsupported by the record. Plaintiff was unemployed from January 5, 2021 through August 24, 2024—a period of nearly four years. Plaintiff's last NYU contract provided $375,000 in annual compensation—$290,000 for clinical work, $10,000 for chief responsibilities, and $75,000 for on-call duties. See Pl. Ex. 72, at P000032. But Plaintiff expressly refused to perform both clinical hours and on-call responsibilities when negotiating his return. The only mutually agreed option, Option B ($290,000), was later rejected by Plaintiff himself. See Pl. Ex. 53. No new contract was ever finalized. In short, Plaintiff cannot show entitlement to any salary after January 2021. The only figure supported by the record is zero.

- 14 -

After rejecting Option B, Plaintiff instead demanded a new position consistent with his personal "vision"—a role without patient care. See Pl. Ex. 53. Dr. Lazzaro testified that a physician who does not treat patients cannot maintain hospital privileges and thus cannot serve as Chief of Service. See Tr. 1112:14-22, 1115:6-11. Plaintiff's proposed role was therefore incompatible with his position and contract. See id. at 1115:6-11. An employee who conditions his return on being excused from essential duties cannot establish entitlement to backpay because eliminating an essential function is never a reasonable accommodation. Ragusa v. UPS, 2009 US Dist LEXIS 25152, at *11 (SDNY 2009). The jury's award, premised on duties Plaintiff refused to perform, was speculative and legally unfounded. Thus, it should be vacated in its entirety.

The award also disregards Plaintiff's duty to mitigate. Under well-established law, Plaintiff had a duty to mitigate his damages by pursuing reasonable employment opportunities. See Cardwell v. Polk, 2023 U.S. Dist. LEXIS 26907, at *119 (S.D.N.Y. Feb. 16, 2023); Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 53 (2d Cir. 1998); Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 695 (2d Cir. 1998). This duty is not onerous, but it requires reasonable diligence.

Plaintiff repeatedly failed to mitigate his damages. He declined NYU's offer of continued employment at a reduced schedule and $290,000 salary, turned down multiple six-figure roles during his unemployment, and candidly admitted that he chose to remain unemployed because his disability payments paid more. See Tr. 475:14-18. Indeed, Pl. Ex. 22 shows that Plaintiff's job applications were largely confined to 2021. He then pursued a master's degree in 2023, claiming a new career direction in informatics. See id. at 497:3-4, 443:2-4. He made informal outreach to friends about remote positions and ultimately turned down three job offers—because, by his own admission, he was earning more through disability benefits. See id. at 509:17-510:1, 475:10-18. Moreover, Plaintiff never returned to work at NYU. NYU expressly offered Plaintiff

to return to work once he provided medical clearance. See Pl. Ex. 1. He never requested reinstatement at NYU despite testifying, for the first time at trial, that during the accommodation process he was 85 to 90 percent ready to return and he only needed a few more months of leave. See Tr. 182:12-21, 183:20-184:3, 187:15-188:2, 211:8-15. Instead, Plaintiff traveled to California twice a month to pursue a master's degree in 2023, and made only cursory outreach to friends. Without doubt, against this established backdrop, the jury's backpay award constitutes a highly misplaced windfall, wrongly compensating Plaintiff for presumptive economic loss not proven during that past period.

Courts consistently bar recovery in such circumstances. The law is clear that "[j]oining a training program instead of seeking comparable employment" fails to satisfy this duty. Greenway, 143 F.3d at 54. "A few phone calls to former colleagues" is insufficient. Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 2015 U.S. Dist. LEXIS 42422, at *3-4, 12-13 (S.D.N.Y. Mar. 25, 2015). Declining a substantially equivalent job for personal reasons does not meet the mitigation standard. See Bergerson v. N.Y. State Off. of Mental Health, 526 F. App'x 109, 111 (2d Cir. 2013).

Even setting aside the absence of entitlement, the award results in a windfall to Plaintiff who rejected multiple job offers because he received higher disability income and, what is more, unabashedly misrepresented to the jury the amount of income he had received. Specifically, Plaintiff stated under oath that he had "no money" during his unemployment and that disability benefits were delayed for years. See Tr. 454:9-13, 456:6-10. Confronted with a 2021 Form 1099, however, he admitted to receiving substantial disability payments that very year on behalf of himself, his wife, and his children. See id. at 458:20–459:24. By his own testimony, Plaintiff received at least $219,000 annually from multiple sources—over $803,000 during the

relevant period. See id. at 495:16-20. Awarding $1.4 million in backpay on top of nearly $1 million in disability benefits grants Plaintiff an impermissible windfall.

It would be fundamentally unfair to require NYU to pay $1.4 million in backpay when Plaintiff himself admitted that he refused multiple job offers because his disability benefits already provided him more income than working. Backpay is an equitable remedy intended to compensate a plaintiff for actual lost wages resulting from unlawful conduct. As the Second Circuit explained in Thornley v. Penton Publ'g, Inc., damages do "not extend to granting back pay for a period when a plaintiff would have [been] unable, due to an intervening disability, to continue employment." 104 F.3d 26, 31 (2d Cir. 1997). In Thornley, the plaintiff's receipt of SSDI benefits and inability to work foreclosed any backpay award beyond the onset date of disability. Id. The Court emphasized that the appropriate cutoff is the onset date of disability and not the date the Social Security Administration issued its determination. Id.

Here, the onset date of Plaintiff's disability was September 2020, which predated Plaintiff's termination. See Tr. 468:11-13. Indeed, the Social Security Administration determined Plaintiff to be disabled in March 2020. See id. at 468:22-469:1; see also Downey v. Monro, Inc., 2022 U.S. Dist. LEXIS 210133, at *14 (N.D.N.Y. Nov. 21, 2022) ("Plaintiff is foreclosed from claiming any back pay for periods in which he received Social Security disability payments."). The law does not entitle a plaintiff to transform disability benefits into a cushion that excuses him from seeking work while simultaneously forcing his former employer to finance years of voluntary unemployment. By both (1) enjoying the high disability payments while voluntarily remaining unemployed, despite alleging he could have gone back to work, and (2) forcing NYU to finance his voluntary employment, Plaintiff is using the collateral source rule as both a shield and a sword. Plaintiff had no active contract, collected more than $803,000 in disability income, and

- 17 -

affirmatively chose not to mitigate. The $1.4 million backpay award ignores these facts and conflicts with both the record and controlling law. In balancing the equities, the Backpay award must be vacated or reduced to zero.

## B.    Front Pay

The jury's front pay award is entirely speculative and excessive. Even if the Court were to credit Plaintiff's last negotiated salary of $375,000, the evidence shows that NYU was no longer willing to pay Plaintiff that amount, Plaintiff himself no longer wished to perform the duties tied to that salary, and the jury expressly found no failure to accommodate. The record therefore contains no basis for awarding front pay as a matter of law.

At trial, Plaintiff admitted that his current salary was $300,000. Tr. 250:3-4. This figure is effectively equivalent to his last NYU compensation package once the $75,000 on-call component is removed. The on-call was a duty that Plaintiff admitted he took on only as a courtesy and could terminate at any time. Tr. 214:17-24. Plaintiff elicited no expert testimony about his projected work life, earning capacity, or how long he would remain employed in his current role. Absent such proof, any front pay award rests on "sheer speculation," which courts consistently reject. See Press v. Concord Mortg. Corp., 2010 U.S. Dist. LEXIS 81952, at *5 (S.D.N.Y. Aug. 5, 2010) (holding that an award of front pay would be unduly speculative where the plaintiff presented no evidence on his future employment prospects).

Even if the Court assumed a salary gap between Plaintiff's trial earnings and his last NYU contract, the jury's award effectively provided five years of front pay which is an amount untethered to any evidence. Nothing in the record suggested that Plaintiff would remain underpaid relative to his NYU salary for five years, or that he could not secure a more lucrative position. In fact, Plaintiff could potentially accept an offer for $500,000 today, yet under the verdict he will

still collect millions more. That is not compensation; it is a windfall. Accordingly, it should be vacated in its entirety.

Front pay is a narrow remedy intended to bridge a plaintiff temporarily until comparable work can be secured. It is not a vehicle for lottery-sized awards based on conjecture. Because Plaintiff is currently earning the same salary as he did at NYU (minus $75,000 for on-call duties which Plaintiff testified were a courtesy and could be removed at any time) Tr. 214:17-24, provided no evidence of long-term diminished earning capacity, and could potentially secure even higher-paying work, the jury's award rests on unsupported assumptions and is legally erroneous. The front pay award should therefore be vacated in its entirety.

## C.    Punitive Damages

Punitive damages are not warranted in this case. "[T]he standard for determining punitive damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." Edelman v. NYU Langone Health Sys., 141 F.4th 28, 43 (2d Cir. 2025) (quoting Chauca v. Abraham, 30 N.Y.3d 325, 334 (2017)). The New York Court of Appeals has "expressly rejected the idea that a punitive damages charge is automatic on a finding of liability" and instead "requires a high degree of moral culpability." Id.

The Supreme Court has likewise instructed that punitive damages must be judged against three "guideposts" for determining the excessiveness of punitive damage awards: "(1) 'the degree of reprehensibility' associated with the defendants' actions; (2) 'the disparity between the harm or potential harm suffered' and the size of the punitive award; and (3) the difference between the remedy in this case and the penalties imposed in comparable cases." Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 165 (2d Cir. 2014) (quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)). Of these, "reprehensibility" is the most important. BMW, 517 U.S. at 575.

Simply put, there is no evidence of "reprehensibility" on NYU's part to justify punitive damages. NYU conducted annual trainings on its written policies prohibiting harassment, retaliation, and discrimination, demonstrating its good-faith efforts to enforce anti-discrimination standards. See Tr. 776:6-11. NYU repeatedly accommodated Plaintiff, extended his leave, and engaged in months of dialogue about potential arrangements. Far from showing indifference, the record demonstrates NYU's consistent efforts to comply with the law, including annual trainings and written policies prohibiting harassment and discrimination. See id. Internal emails referenced by Plaintiff merely reflect deliberations about whether, having admitted that he could not perform essential functions, Plaintiff could remain in his role; and critically, after these internal discussions, NYU granted Plaintiff further accommodations. See Ex 46; Pl. Ex 49A; Tr. 830:16-25. This conduct falls far short of the "high degree of moral culpability" required for punitive damages. See Kolstad v. Amer. Dental Ass'n, 527 U.S. 526, 544 (1999); Cioffi v. New York Cmty. Bank, 465 F. Supp. 2d 202, 212 (E.D.N.Y. 2006); Edelman, 141 F.4th at 37, 43-44 (Second Circuit affirmed dismissal of punitive damages despite a finding on liability and evidence that the plaintiff was called a "bitch").

The record therefore does not support a finding of the "high degree of moral culpability" necessary for punitive damages. The award rests on untested testimony and evidentiary gaps, not the type of egregious or reprehensible conduct that justifies punitive relief. It must be set aside.

## D.    Emotional Damages

The jury's $2 million emotional distress award far exceeds amounts awarded in comparable and even more egregious cases and is unsupported by the trial record. As such, remittitur or a new trial on damages is warranted. A jury award should be set aside where it is "entirely out of proportion to the plaintiff's injury [and was] motivated by sympathy rather than

by evidence of harm." <u>MacMillan</u>, 873 F. Supp. 2d at 560-61 (internal citations omitted). Whether a damages award is excessive is a legal question for the Court. <u>See</u> <u>Bouveng v. NYG Capital LLC</u>, 175 F. Supp. 3d 280, 327–28 (S.D.N.Y. 2016).

    Federal courts apply New York law to determine the reasonableness of damages awarded under state or city law. <u>See</u> <u>Patterson v. Balsamico</u>, 440 F.3d 104, 119 (2d Cir. 2006). Under New York law, a jury award is excessive if it "deviates materially from what would be reasonable compensation." <u>Duarte v. St. Barnabas Hosp.</u>, 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018) (citing <u>Stampf v. Long Island R.R. Co.</u>, 761 F.3d 192, 204 (2d Cir. 2014)). This standard "requires a more exacting review than the shocks the conscience standard... and is less deferential to a jury verdict." <u>Id.</u> Courts compare the jury's award to those in similar cases and must determine whether the award is within a reasonable range. <u>Id.</u>; <u>Bouveng</u>, 175 F. Supp. 3d at 327-28.

    While "[t]he precise amount of compensatory damages . . . depends on a unique set of facts,", the Second Circuit typically classifies emotional distress claims as: (1) garden variety; (2) significant; or (3) egregious. <u>Bouveng</u>, 175 F. Supp. 3d at 328. "[G]arden variety claims" are "generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms." <u>Menghi v. Hart</u>, 745 F. Supp. 2d 89, 106 (E.D.N.Y. 2010). "Significant" claims involve supporting medical testimony or treatment, while "egregious" claims involve "outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff." <u>Id.</u>

    Here, Plaintiff's showing does not rise to the "significant" threshold. There was no evidence of shocking or outrageous conduct by NYU and Plaintiff's own doctors acknowledged other major contributing factors to his condition. <u>See</u> Tr. 951:11-17, 957:22-25, 987:6-8. Plaintiff began therapy after surviving a 52-day coma, during which he had to relearn basic functions such

as walking and eating. See id. at 451:8-13, 452:6-9. He was intubated, which his own expert conceded can itself cause PTSD, anxiety, and depression. See id. at 1001:7-25. Plaintiff did not testify that he was on any medications for his alleged disorders. None of the testifying doctors treated him during this period or identified any change attributable to NYU's conduct. Indeed, Plaintiff failed to call the person who treated him prior to his termination, relying on a therapist who began treating him only *after* his termination and on a witness who merely reviewed limited records and offered opinions. See Tr. 963:23-964:6; 979:5-23. The record contains no evidence that Plaintiff's termination—as opposed to his prolonged COVID-19 recovery or unrelated family circumstances—caused the alleged emotional harm.

Courts have drastically reduced emotional distress awards in cases with far more compelling facts. In Norville v. Staten Island Univ. Hosp., the Court reduced a $575,000 award to $30,000 where the plaintiff experienced panic attacks, sleeplessness, and daily crying, and a licensed social worker diagnosed her with PTSD. See 2003 U.S. Dist. LEXIS 28399, at *16–21 (E.D.N.Y. Oct. 17, 2003). In Mayo-Coleman v. Am. Sugar Holdings, Inc., a $1.7 million award was reduced to $500,000 in a sexual harassment case involving explicit comments, unwanted touching, corroborating testimony, and a diagnosis of major depressive disorder. See 2018 U.S. Dist. LEXIS 94821, at *8-10, 14 (S.D.N.Y. June 5, 2018). Unlike those cases, this matter does not involve harassment or egregious conduct. Plaintiff's condition was shaped by unrelated medical and personal events for which NYU cannot be held responsible.

E.    **Prejudice**

As explained in Sections II.A-D, supra, each category of damages awarded by the jury is excessive and unsupported by the record. Instead, the award is the sympathetic product of prejudice due to (1) the Court permitting Plaintiff to add a CHRL cooperative dialogue claim on the eve of trial; (2) Plaintiff's failure to produce telephone call records; (3) Plaintiff's frequent

references to his coma and referring to himself as a COVID survivor; (4) Plaintiff's treating therapist Dr. Masterson's failure to turn over hundreds of treatment records; and (5) Plaintiff's expert Dr. Lerner's consistent references to matters previously excluded by the Court.

Plaintiff was allowed to amend his Complaint less than two weeks before trial to assert a new claim that had not previously been pled. This late amendment forced Defendants to develop an entirely new defense on the eve of trial, at a point when relevant evidence had been lost. As one court has cautioned, "[t]hough there has been discovery about the facts underlying the Complaint (which undoubtedly has some overlap with the [proposed amended complaint]), 'no discovery has been conducted concerning the new causes of action.'" Lee v. Delta Airlines, Inc., 2023 U.S. Dist. LEXIS 42989, at *24–25 (E.D.N.Y. Mar. 14, 2023), report and recommendation adopted, 2024 U.S. Dist. LEXIS 51695 (E.D.N.Y. Mar. 21, 2024), aff'd, 2025 U.S. App. LEXIS 11485 (2d Cir. May 13, 2025).

The prejudice was compounded when Plaintiff was permitted to testify extensively about alleged unanswered calls and purportedly being "ghosted," yet he never produced the underlying phone records that could have corroborated or refuted those claims. See Tr. 194: 7-15; 207:4-15; 212:19-213:7; 243:11-14; 363:12-22; 378:24-25. This ghosting claim only arose once Plaintiff was permitted to pursue this new claim. As a result, the prejudice was not evident until this claim was permitted. The prejudice was evidenced by the fact that the jury found, based on the same facts, that while none of the Defendants failed to accommodate Plaintiff, all Defendants nevertheless bore liability for not engaging Plaintiff in a cooperative dialogue. This jury result shows that this claim required its own defense, and Defendants were meaningfully deprived of the opportunity to do so during the discovery period.

Prior to asserting this new claim, Plaintiff never represented that he was withholding documents that were relevant to a separate claim regarding a cooperative dialogue. He should have produced the phone records during discovery, when requested, instead of waiting until the eve of trial, after his phone is already broken, to mention their existence. See Tr. 55:24-56:8. Defendants requested such records as early as August 2022, as part of the S.D.N.Y. Pilot Program; in December 2023, in post-deposition demands; and again, immediately before trial. No records were ever produced, and Defendants had no time to meaningfully seek recourse, such as a motion to compel or Rule 37 sanctions. Had Plaintiff's cooperative dialogue claim been timely raised during discovery, Defendants could have obtained and presented the phone records to rebut Plaintiff's narrative. Instead, the jury was left with unrebutted allegations of abandonment, which likely inflamed their sentiment and contributed to an excessive damages award.

The size of the award also reflects prejudicial testimony admitted over Defendants' objections. Plaintiff was permitted to testify extensively about his coma and recovery —testimony that was undoubtedly sympathetic but bore no relation to whether NYU accommodated or retaliated against him. See Tr. 126:14-15; 127:19-21; 137:10-24; 174:13-15; 174:24-175:7; 175:22-176:13; 177:10-21; 178:9-10; 179:7-19; 180:17-21; 184:17-20; 185-9-13; 197:9-16; 207:4-15; 213:5-15; 214:7-215:1; 229:2-230:1; 365:22-366:2; 511:22-512:1. He was further permitted to testify, over Defendants' objections, a second time during his "rebuttal" – yet Plaintiff did not actually rebut anything but instead reiterated his direct testimony, including duplicative testimony regarding surviving a covid coma. See Tr. 1270: 5-9; 1273:19-23. In addition, Dr. Masterson testified to having over three hundred progress notes that she did not produce. Tr. 947:5-16. Dr. Masterson was nonetheless permitted to describe the contents of these progress notes, even though they were never produced or admitted into evidence, despite Defendants' prior request for

their production and without the curative instruction they sought. <u>See</u> <u>id.</u> at 955:5-10, 955:16-25. This deprived Defendants of the ability to adequately prepare for or cross-examine Dr. Masterson on these materials.

Despite Defendants' successful motions *in limine* and despite the Court sustaining objections to their testimony, both Dr. Masterson and Plaintiff's expert, Dr. Lerner, testified about topics previously excluded by the Court, including testimony about Plaintiff's children, employment qualifications, how Plaintiff possibly contracted COVID, and overpayment letters. <u>See</u> <u>id.</u> at 952:19-25 (Masterson), 958:15-959:3 (Masterson), 1000:5-9 (Lerner), 1000:17-25 (Lerner), 1005:17-23 (Lerner), 1006:13-19 (Lerner), 1008:7-11 (Lerner), 1009:8-10 (Lerner), 1009:17-22 (Lerner). The size of the award, viewed in context, reflects sympathy and prejudice rather than compensable harm. Accordingly, the award must be remitted or vacated.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court issue an order granting their motion for judgment as a matter of law, or, in the alternative, grant a new trial and/or reduce Plaintiff's damages, and grant a stay of execution of the judgment pending the outcome of this motion, and grant such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          August 28, 2025

**MURIEL GOODE-TRUFANT**
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 2-316
New York, New York 10007

By: /s/          Desiree Alexander_____
          Desiree Alexander
          Elisheva Rosen
          Assistant Corporation Counsel

- 25 -

## **CERTIFICATE OF COMPLIANCE**

Counsel of Record hereby certifies that, pursuant to Rule 3.C of District Judge Rochon's Individual Rules of Practice in Civil Cases, the enclosed memorandum of law was produced using 12-point Times New Roman type and, including footnotes and excluding the cover page, captions, table of authorities, and table of contents, contains approximately 7,920 words, which is less than the total words permitted by such rules. Counsel relies on the word count function of the computer program used to prepare this brief.

Dated:     New York, New York
           August 28, 2025

                              By:     /s/ *Desiree D. Alexander*
                                      Desiree D. Alexander, Esq.
                                      Assistant Corporation Counsel