UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HABEEB AHMAD, | Case No. 22 Civ. 1248 (JLR)(GWG) |
| Plaintiff, | |
| -against- | |
| NYU LANGONE HEALTH SYSTEM, NYU GROSSMAN SCHOOL OF MEDICINE, SCOTT MELLYNCHUK and DOUG LAZZARO, | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE, FOR A NEW TRIAL OR AN AMENDED JUDGMENT**

Alexander G. Cabeceiras, Esq.
DEREK SMITH LAW GROUP, PLLC
The Nelson Tower
450 Seventh Avenue, 30th Floor
New York, New York 10123

# **TABLE OF CONTENTS**

Page

I.    Introduction ...................................................................................................... 1

II.   Defendants' Rule 50(b) Motion Must Be Denied .................................... 1

      a.   SHRL & CHRL Discriminatory Termination Verdict ........................ 2

            i.   Evidence Supporting Discrimination Verdict ......................... 2
                 Failure to Communicate– Oct. 6 – Nov. 19 ............................ 3
                 Failure to Communicate – Nov. 19 – Jan. 5 .......................... 5
                 Bad Faith Discussions & Decision Making
                 Based on Disability .................................................................. 8
                 Actual Termination, Comparators, & Other Evidence .......... 10
                 Defendants Proffered Reasons ................................................ 11
                 More Pretext ............................................................................ 12

      b.   CHRL Cooperative Dialogue Verdict .............................................. 13

III.  Defendants' Rule 59(a) Motion Must Be Denied .................................... 13

      a.   Standard of Law ................................................................................ 13

            i.   There Is No Prejudice ............................................................. 14
                 Cooperative Dialogue Claim .................................................. 14
                 Plaintiff's Alleged Failure to Produce Records ..................... 15
                 Testimony About COVID & Recovery .................................... 16
                 Dr. Masterson's Notes & Testimony ...................................... 17
                 Dr. Lerner's Testimony .......................................................... 18

            ii.  Backpay Damages Must Be Upheld ......................................... 19
                 Mitigation ................................................................................ 19
                 NYU's Discriminatory Offer ................................................... 21
                 Speculative Offer to Reapply ................................................. 22
                 Masters Program ..................................................................... 22
                 Collateral Benefits Cannot Offset Award .............................. 24

            iii. Front Pay Damages Must Be Upheld ...................................... 25

            iv.  Punitive Damages Must Be Upheld ......................................... 27

NYCHRL ........................................................................................ 27

Facts Relevant to Punitive Damages...................................................... 27

    v.  Emotional Distress Damages Must Be Upheld.................................... 32

IV.    CONCLUSION.................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### <u>Cases</u>

*Arch Ins. Co. v. Precision Stone, Inc.*,
    584 F.3d 33, 35 (WDNY., 2010) ................................................................. 24

*Banks v. GM, LLC*,
    81 F.4th 242, 274 (2nd Cir., 2023) ............................................................ 6

*Bergerson v. N.Y. State Off. Of Mental Health.*,
    526 F. App'x 109, 111 (2nd Cir. 2023) ..................................................... 23

*Bmw of N. Am. v. Gore*,
    517 U.S. 559, 562 (1996) ........................................................................... 30

*Carlton v. Mystic Transp., Inc.*,
    202 F.3d 129, 137 (2d Cir. 2000) .............................................................. 12

*Casmento v. Volmar Constr.*, Inc.,
    2022 U.S. Dist. LEXIS 196744, *31 (SDNY 2022) ................................... 27

*Chauca v. Abraham*,
    30 N.Y.3d 325, 329, 89 N.E.3d 475, 477 (2017) ...................................... 27

*Chisolm v. Liberty Lines Transit*, Inc.,
    2013 U.S. Dist. LEXIS 16254, *16-17 (SDNY 2013) ................................ 25

*Clarke v. Frank*,
    960 F.2d 1146, 1152 (2d Cir.1992) ........................................................... 19

*Cruz v. Loc. Union No. 3 of the Int'l Bd. of Elec. Workers*,
    34 F.3d 1148, 1154 (2d Cir. 1994) ............................................................ 1

*Dailey v. Societe Generale*,
    108 F.3d 456 (2d Cir. 1997) ......................................................... 19, 20, 25

*DiSorbo v. Hoy*,
    343 F.3d 172, 185 (2d Cir. 2003) .............................................................. 36

*DLC Mgmt. Corp. v. Town of Hyde Park*,
    163 F.3d 124, 134 (2d Cir. 1998) .............................................................. 14

*Dunlap-McCuller v. Riese Org.*,
    980 F.2d 153, 159 (2d Cir. 1992) .............................................................. 25

*Earl v. Bouchard Transp. Co.*,
   917 F.2d 1320, 1328 (2d Cir. 1990) .................................................................. 37

*Eassa v. Hartford Fire Ins. Co.*,
   1991 U.S. Dist. LEXIS 17309, *1 (NDNY 1991) ........................................ 20

*Edelman v. NYU Langone Health Sys.*,
   141 F.4th 28, 36 (2nd Cir., 2025) ................................................................... 27

*E.E.O.C. v. Kallir*,
   420 F. Supp. 919, 925 (S.D.N.Y. 1976) ......................................................... 26

*EEOC v. Local 638*,
   674 F. Supp. 91, 104 (S.D.N.Y. 1987) ........................................................... 23

*Graham v. Long Island R.R.*,
   230 F.3d 34, 36 (2nd Cir., 2000) ................................................................10, 11

*Greenway v. Buffalo Hilton Hotel*,
   143 F.3d 47, 54 (2nd Cir. 1998) ..................................................................... 23

*Icon International, Inc. v. Elevation Health LLC*,
   347 F.R.D. 274, 195 (SDNY 2024)................................................................. 17

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   725 F.3d 65, 112 n.34 (2d Cir. 2013) ............................................................. 14

*ING Global v. UPS Oasis Supply Corp.*,
   757 F.3d 92, 94 (2nd Cir. 2014) ....................................................................... 1

*Jacobsen v. New York City Health & Hosps. Corp.*,
   22 N.Y.3d 824, 837, 988 N.Y.S.2d 86, 11 N.E.3d 159, 169 (N.Y. 2014)...................... 13

*Jae Shin v. Party Well Rest. & Oriental Bakery, Inc.*,
   2025 U.S. App. LEXIS 5728, *1 (2nd Cir. 2025) ........................................... 14

*Kuper v. Empire Blue Cross & Blue Shield*,
   2003 U.S. Dist. LEXIS 2362, *1 (SDNY 2013) ............................................. 20

*Lazzari v. N.Y.C. Dept of Parks & Recreation*,
   751 F. App'x 100, 102 (2d Cir. 2018).............................................................. 31

*Leone v. Brown Forman Corp.*,
   *2025 N.Y. Misc. LEXIS 2529, *9-10* (NY Sup., 2025)................................... 12

*Madrigal v. Montefiore Medical Center*,

2021 N.Y. App. Div. LEXIS 532 (1st Dept. Feb. 2, 2021) ............................................. 36

*Maxfield v. Sinclair Int'l*,
766 F.2d 788, 795 (3d Cir. 1985) ................................................................... 25

*Mayo-Coleman v. Am. Sugar Holdings, Inc.*,
2018 U.S. Dist. LEXIS 94821, *8 (SDNY 2018)......................................................... 35

*Mihalik v. Credit Agricole Cheuvreouz N. Am. Inc.*,
2015 U.S. Dist. LEXIS 42422, at *9-10 (SDNY March 25, 2025) ............................. 23

*Osorio v. Source Enterprises, Inc.*,
2007 U.S. Dist. LEXIS 18725, at *14-17 (S.D.N.Y. Mar. 2, 2007)............................. 36

*Padilla v. Metro-North Commuter R.R.*,
92 F.3d 117, 126 (2d Cir. 1996) ............................................................ 26, 27

*Parker v. Columbia Pictures Industries*,
204 F.3d 326 (2d Cir. 2000) ..................................................................... 5

*Phillips v. City of New York*,
66 A.D. 3d 170, 176, 884 N.Y.S.2d 369 (1st Dep't 2009)............................................ 13

*Promisel v. First Am. Artificial Flowers, Inc.*,
943 F.2d 251, 258 (2d Cir. 1991) ................................................................. 25

*Raedle v. Credit Agricole Indosuez*,
670 F.3d 411, 418 (2d Cir. 2012) ................................................................. 13

*Ragusa v. UPS*,
2009 U.S. Dist. LEXIS 25152, *6 (SDNY 2009) ......................................................... 22

*Rasmy v. Marriott Int'l, Inc.*,
2024 U.S. Dist. LEXIS 19416, *8-9 (SDNY 2024)......................................................... 2

*Ravina v. Columbia Univ.*,
2019 U.S. Dist. LEXIS 56556, *29 (SDNY 2019) ....................................................... 32

*Rivera v. National Passenger Railroad Service*,
442 F. Supp. 2d 164 at 170 (SDNY 2006) .................................................... 17

*Sequa Corp. v. Gbj Corp.*,
156 F.3d 136, 138 (2nd Cir., 1998) ............................................................. 14

*Sharkey v. Lasmo (AUL Ltd.)*,
55 F. Supp. 2d 279, 287 (SDNY 1997) ......................................................... 21

*Siracuse v. Program for the Dev. of Human Potential,*
    2012 U.S. Dist. LEXIS 73456, *40-48 (EDNY 2012) ................................. 25

*Stryker v. Hsbc Secs. (USA),*
    2021 U.S. Dist. LEXIS 223042, *1 (SDNY, 2021) ...................................... 27

*Sussle v. Sirina Prot. Sys. Corp.,*
    269 F. Supp. 2d 285, 315 (SDNY 2003) ....................................................... 8

*Taylor v. Brentwood Union Free Sch. Dist.,*
    143 F.3d 679, 684 (2d Cir. 1998) ................................................................. 11

*Travellers Int'l, A.G. v. Trans World Airlines, Inc.,*
    41 F.3d 1570, 1580 (2d Cir. 1994) .............................................................. 24

*Turley v. ISG Lackawanna, Inc.,*
    774 F.3d 140, 146 (2nd Cir., 2014) ......................................................... 36, 37

*Tyler v. Bethlehem Steel Corp.,*
    958 F.2d 1176, 1189 (2d Cir.), 506 U.S. 826, 113 S. Ct. 82,
    121 L. Ed. 2d 46 (1992) ............................................................................ 25, 27

*Vangas v. Montefiore Med. Ctr.,*
    823 F.3d 174, 180 (2d Cir. 2016) .................................................................. 1

*Wellner v. Montefiore Med. Ctr.,*
    2019 U.S. Dist. LEXIS 147844, *34 (SDNY 2019) ...................................... 3

*Wills-Hingos v. Raymond Corp.,*
    104 F. App'x 773, 776 (2d Cir. 2004) .......................................................... 20

*Zafiro v. United States,*
    506 U.S. 534, 540 (1993) .............................................................................. 14

**Statutes and Rules**

Fed. R. Civ. P. 8(c) ............................................................................................. 24

New York City Human Rights Law ................................................................. 1, 27

## I.    Introduction

The jury found NYU liable for disability discrimination under the NYSHRL and NYCHRL. (Dckt. No. 161-17, Verdict Form). Specifically, the jury found that Plaintiff proved by preponderance of the evidence that his disability was a motivating factor in NYU's decision to terminate him. (*Id.*).

Additionally, the jury found each Defendant liable for failing to engage in a cooperative dialogue under the New York City Human Rights Law ("NYCHRL").

## II.    Defendants' Rule 50(b) Motion Must Be Denied

A Rule 50(b) motion should only be granted where "(1) [T]here is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of **sheer surmise and conjecture**, or (2) there is such an **overwhelming amount of evidence** in favor of the movant **that reasonable and fair minded [persons] could not arrive at a verdict against [it].**" *Cruz v. Loc. Union No. 3 of the Int'l Bd. of Elec. Workers*, 34 F.3d 1148, 1154 (2d Cir. 1994) (emphasis added).

"A court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury, and must disregard all evidence favorable to the moving party that the jury is not required to believe." *ING Global v. UPS Oasis Supply Corp.*, 757 F.3d 92, 94 (2nd Cir. 2014). "[A]ll credibility determinations and reasonable inferences of the jury are given deference and [the court] may not weigh the credibility of witnesses." *Vangas* v. *Montefiore Med. Ctr.*, 823 F.3d 174, 180 (2d Cir. 2016). "When evaluating a motion under Rule 50, courts are required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in its favor from the

evidence." *Rasmy v. Marriott Int'l, Inc.*, 2024 U.S. Dist. LEXIS 19416, *8-9 (SDNY 2024). "The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury, and must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*

### a. SHRL & CHRL Discriminatory Termination Verdict

The jury considered written evidence and oral testimony to show what was obvious: NYU wanted to terminate Plaintiff because of his disability. (Trial Transcript [Tr.] 1458:3-9)

### i. Evidence Supporting Discrimination Verdict

On October 26, 2020—before Plaintiff or his doctor submitted any accommodation paperwork—Nancy Sanchez wrote in an email "*why can't we release [Plaintiff] if he cannot do his job?*" (Evidence 28). The jury, having been informed by Austin Bender and Defendant Mellychuk of the procedure by which NYU claims they assess accommodation requests (Tr 855:3-11, *et al.*), interpreted this email correctly—it is a blatant disregard of Plaintiff's rights and NYU's obligations to assess an accommodation for a known disabled employee. Sanchez is not just an "employee," as Defendants argue. Sanchez oversees all human resources for Defendants. (Tr. 772:5-9). Two key witnesses, Bender and Mellychuk report directly to Sanchez (Tr. 555:16-17l; 576:18-19; 696:8-9). Sanchez specifically asked Mellychuk to keep her updated as to what was happening with Plaintiff (Tr. 792:10-11; 815:25-816:2). The jury was able to see (i) Sanchez' discriminatory email; (ii) understand that she was an authority and oversaw the relevant bad actors; (iii) and see that Sanchez demanded to be updated regarding Plaintiff's case. The jury was able to contrast that Sanchez "has an expansive role" (Tr. 772:10-22) yet, at the same time, demanded to be kept up to date with an individual's case. Her intimate involvement, and her discriminatory email, sets the stage for NYU's discriminatory motives. ("Garbage rolls downhill." [Tr. 1322:11-13]). The jury also understood that Sanchez' discriminatory comment

came before any interactive dialogue took place. (Tr. 192:8-11). Nor had his doctor submitted

any paperwork relating to an accommodation. (*Id.*). Bender testified that an accommodation

request should require a "robust dialogue" between the relevant department and HR. (Tr. 578:9-

11). The jury saw no robust dialogue prior to Sanchez wanting to release Plaintiff.

      Additionally, on November 20, 2020, Andrew Rubin wrote Defendant Lazzaro stating

"HR will contact [Plaintiff] on monday and tell him decision is final [*sic*]." (Evidence 48). On

November 30, 2020, Mellychuk, wrote to Sanchez and Bender, stating Defendants' motive to

terminate Plaintiff: **"Dr. Lazzaro also agreed to postpone the termination temporarily so that**

**we can respond to the attorney letter appropriately."** (Evidence 32). Thus, the jury was able

to assess the words "postpone the termination temporarily" and come to the logical conclusion

that NYU was motivated to terminate Plaintiff before any of their proffered reasons came into

consideration.

### *Failure to Communicate – Oct. 6 – Nov. 19*

      Defendants' apathy, deviation from standard practice, and depriving Plaintiff of his rights

were considered in evaluating Defendants' motivations. ("[A] court can consider a defendant's

failure to engage in an interactive process as evidence that the defendant engaged in

discrimination or retaliation." *Wellner v. Montefiore Med. Ctr.*, 2019 U.S. Dist. LEXIS 147844,

*34 (SDNY 2019)).

      The facts speak for themselves:

- On October 6, 2020, Defendant Mellychuk reached out to Plaintiff via email

  seeking Plaintiff fill out paperwork. (Tr. 184:17-185:3).

- Plaintiff had one conversation with Lazzaro to discuss "medical leave" and trying

  to "come back to work." (Tr. 187:12-14). Plaintiff contacted Lazzaro because "no

3

one else" at NYU contacted him. (Tr. 188:15-29). This conversation between

Plaintiff and Lazzaro was the only conversation Plaintiff had with Lazzaro

throughout this process. (*Id.*) In that conversation, Lazzaro encouraged Plaintiff to

contact Dr. Kathryne Colby. (Tr: 194:9-15; "I am re-emphasizing that you will

need to speak to Dr. Colby[.]" [Evidence 6]).

- Thereafter, Plaintiff attempted to contact Lazzaro by text. (Tr. 185:24-186:3,

  Evidence 6). **Lazzaro did not respond.** (Evidence 6; Tr. 188:20-21).

- Plaintiff then had a conversation with Colby. (Tr. 189:13-21; 190:3-12). In

  response to attempting to have a conversation relating to an accommodation,

  Colby **raised her voice** and told Plaintiff "**Don't talk to me. Talk to HR.**" (*Id.*).

- That was the only conversation Plaintiff had with Colby, as Colby never followed

  up or called Plaintiff about an accommodation. (Tr: 190:13-15).

- Colby yelled at Plaintiff, despite Lazzaro instructing Plaintiff to speak to Colby.

  (Tr. 194:9-15).

- Between November 2 (the date Plaintiff submitted accommodation paperwork)

  and November 19, 2020 (the date NYU denied Plaintiff's accommodation

  request), **Defendant Mellychuk never spoke to Plaintiff.** (Tr. 192:12-15).

  Neither Mellychuk, Lazzaro, or Colby ever communicated with Plaintiff during

  that time regarding his accommodation requests. (Tr. 192:12-22). In fact, during

  that period, no one from NYU called to discuss his accommodation. (Tr. 192:23-

  193:1; Tr. 194:3-6).

- Oddly, NYU never forbade anyone involved from having conversations with

  Plaintiff relating to a potential accommodation. (Tr. 1055:4-7; Evidence 31, p. 8).

Yet they all refused, and flaunted the fact that NYU was ignoring Plaintiff (Evidence 47, "**I did not pick up or rtn his call but his message says he has a great solution whatever the means.** [*sic*].")

Thus, before the November 19, 2020 denial and demand to return to work, no one at NYU discussed different accommodation options with Plaintiff, asked about his specific work-place limitations or needs, or discussed NYU's business concerns relating to an accommodation. (Tr. 210:14-23; 211:2-7; Tr. 213:8-15). NYU's indifference was seen by the jury as evidence of discriminatory motive. (*see Parker v. Columbia Pictures Industries*, 204 F.3d 326 (2d Cir. 2000), similar actions giving rise to an inference that employer took adverse employment action against the employee because of her disability).

### *Failure to Communicate – Nov. 19 – Jan. 4*

Assessed in the vacuum of October 6 to November 19, 2020, the facts support a jury's finding that NYU held a discriminatory motive in terminating Plaintiff. But the jury also assessed NYU's actions *after* Plaintiff was forced to retain an attorney:

- On November 19, 2020, Plaintiff again tried to contact Lazzaro to no avail. (209:15-23; 220:1-6). Lazzaro even bragged about not picking up Plaintiff's call. (Evidence 47")

- Plaintiff tried to contact Colby to no avail. (*Id.,* 209:15-23; 220:1-6).

- Plaintiff tried to contact Mellynchuk to no avail. (*id.,* 210:3-4; 220:1-6).

- Plaintiff wrote an email to the Dean. (210:5-13; Evidence 11). The Dean did not respond. (Tr. 217:22-23).

- Thereafter, around 10:00 PM, Bender called Plaintiff. (Tr. 218:1-18). Bender did not identify himself, began to yell at Plaintiff, and said "**We don't do remote**

5

work."[1] (*Id.*) (Similar to Sanchez, Bender had not reviewed Plaintiff's request or spoke to Plaintiff about his job). Despite the urgency, Bender told Plaintiff he would "look into it." (Tr. 218:24-219:4). Thereafter, **Bender never called Plaintiff back.** (Tr. 219:12-17).

In light of the lack of communication from NYU, Plaintiff was forced to hire an attorney. (Tr. 220:7-10). It was only *after* NYU received a letter outlining Plaintiff pleas to "have an interactive discussion," did NYU ever contact Plaintiff to speak substantively about his accommodation request. (Tr. 221:1-5; Evidence 12 [Attorney Letter]). (Mellyhuck testified that having to pay an attorney out of pocket in order to get an accommodation or have an interactive dialogue would deter a reasonable employee from seeking an accommodation. [Tr.694:21-695:7]).[2]

For the first time, only *after* Plaintiff got an attorney involved, did Mellychuk have an actual conversation with Plaintiff. (Tr. 225:17-226:10, "I have never met Scott in person to date, and that was the first time I would speak to him on the phone."). A jury, on this fact alone, could find a discriminatory motive.

---

[1] The jury was also able to see evidence that these statements were not true. NYU allowed clinical employees to do remote work. (Evidence 35, 43).

[2] Both Mellyhuck and Bender testified to NYU's accommodation process. The record is clear they did not abide by that process with respect to Plaintiff. Significant, unexplained or systematic deviations from established policies or practices "can no doubt be relative and probative circumstantial evidence of discriminatory intent[.]" *Banks v. GM, LLC*, 81 F.4th 242, 274 (2nd Cir., 2023).

Even with Mellynchuk finally speaking to Plaintiff, the conversation between them was "awkward," at a "very high-level," and did not seek any input from Plaintiff on his accommodation needs. (Tr. 226:12-19).

Thereafter, NYU presented Plaintiff two options. Both options netted Plaintiff less money than what he was making. (Evidence 13). These options were not presented in good faith and did not address Plaintiff's accommodation needs. (Tr. 229:3-230:1). *First*, Defendants relieved Plaintiff of on-call responsibilities, but being on-call was never Plaintiff's responsibility until relatively recently and Plaintiff could have stopped providing on-call services unilaterally. (Tr. 214:17-24; 236:19-23; 309:15-16). *Second*, Defendants offered to take away the aspect of Plaintiff's job he "loved." (*Id.*). *Third*, either option left Plaintiff at a reduced salary. (Evidence 13). *Fourth*, Defendants reiterated inaccurate descriptions of Plaintiff's position. (Tr. 235:24). Plaintiff, feeling like he had no other options, picked the only option that allowed him to do his administrative tasks and retain his Chief of Service role. (Evidence 13).

Finally, on December 23, 2020, Plaintiff reached out to Defendants. The following timeline is critical:

- On December 23, 2020, Plaintiff reaches out to discuss a renewed accommodation. (Evidence 14, p. 4, "I had a reality check" / driving lessons). Plaintiff **"respectfully request[ed] an amended accommodation."** (*Id.*)

- No one from NYU called to discuss Plaintiff's amended accommodation request. (Tr. 230:2-4; Tr. 238:6-16). Plaintiff made attempts to contact Mellynchuk and Lazzaro. No one called back. (Tr. 238:14-20). Defendants, once again, failed to engage in an interactive dialogue.

7

- On December 30, 2020, Mellynchuk—without having discussed the amended accommodation request with Plaintiff directly—denied Plaintiff outright and demands he returns to work on January 4, 2021.

- On December 31, 2020, Plaintiff pleaded with Mellynchuk, offering to provide any information Mellynchuk might want regarding an accommodation. (Evidence 14). In response, Mellynchuk never answers Plaintiff. (*Id.*).

- Ultimately, on January 5, 2021, NYU terminated Plaintiff. (Tr. 1051:5-7; Evidence 15).

The jury surmised NYU was motivated to terminate because of Plaintiff's disability. Proof of a causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action. *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 315 (SDNY 2003). Within 5 business days of seeking an amended accommodation, Defendants terminated Plaintiff.

### *Bad Faith Discussions & Decision Making Based on Disability*

Before any conversation with Plaintiff took place, NYU had already made up their mind. On November 30, 2020, Mellychuk wrote Sanchez. (Evidence 32). In that email, Mellychuk recaps a conversation with Lazzaro where Lazzaro proposed an accommodation. (*Id.*). The jury found this suspicious, as this proposed accommodation came ***after*** NYU received an attorney letter. Meaning, NYU's initial decision to deny Plaintiff's accommodation outright, without speaking to him, and their statements that "we are unable to reasonably accommodate your request," was done in bad faith. (Evidence 10).

The jury found NYU's timing suspicious. Mellychuk had his first call with Plaintiff on December 1, 2020 and relayed a proposed accommodation to Plaintiff on December 2, 2020.

(Evidence 13). Yet, Mellychuk articulated an almost identical offer that Lazzaro proposed on November 30, 2020. (Evidence 32). Meaning, a jury could surmise that NYU had no interest in assisting a disabled employee.

The jury found the proposed terms (and withdrawal of proposed terms) suspicious. In discussions, NYU was going to force Plaintiff to sign a new contract with accommodations terms. (Evidence 25, "Dr. Lazzaro **would require** Dr. Ahmad to sign..."). Meaning, NYU would only accommodate Plaintiff if he signed a new contract. NYU failed to discuss how long Plaintiff would need to be accommodated, but initially NYU insisted on locking him into a job that paid him less and demoted him in prestige. The jury asked the correct question: in what world is it okay to offer an accommodation **<u>only if</u>** an employee signs a new contract and commits to, essentially, being accommodated for an entire year? (whether the accommodation is needed or not). Oddly, NYU abandoned their "requirement" when they realized Plaintiff's current contract would expire in April. (Tr. 707:3-5, "That was one of the reasons.") The jury reviewed these facts and surmised that NYU wanted to terminate Plaintiff and, letting his contract expire in April would be faster than "requiring" him to sign a new, 1-year contract.

Thereafter, when Plaintiff pushed for a new contract—which was the original plan— NYU showed their true motive: on December 16, 2020, Mellychuk wrote Plaintiff and stated: "**It does not make sense to negotiate a new multi-year contract while you are still on medical leave and your ability to return to work and perform the essential functions of your position is presently unknown.**" (Evidence 14). Mellyhuck doubled down, testifying to his discriminatory motives. (Tr. 725:14-17; Q: So you are specifically saying you will not engage in contract negotiations because [Plaintiff] is out on medical leave, right? A: **Amongst other**

**reasons**.") Mellyhuck shared with the jury that NYU subjected Plaintiff to adverse actions because of his disability.

### *Actual Termination, Comparators, & Other Evidence*

Plaintiff's final title was Clinical Assistant Professor in the Department of Ophthalmology. (Tr. 500:2, Evidence 1, 4, 18). Although inaccurate to the realities of the position, Plaintiff's contract called for him to put 90% effort into clinical matters and required Plaintiff to his 3,108 wRVU's annually. (Evidence 4).

A fellow NYU employee, Case No. 00506623 ("Case No. 23"), had a 100% Clinical Effort, had the title "Clinical Instructor in the Department of Medicine," and had wRVU targets in her contract. (Evidence 36). By the definitions and titles in her contract, her and Plaintiff were similarly situated. Yet, this individual was allowed to work from home on a full-time basis for four months. (Evidence 35). Case No. 23, too, had wRVU requirements like Plaintiff. (Evidence 1, 4, 18; Tr. 500:11-23) But, unlike Plaintiff, Case No. 23 had a 100% Clinical Effort—Plaintiff only had a 90% (Evidence 4). Additionally, Plaintiff's contract called for 3,108 wRVUs annually, whereas Case No. 23's annual wRVU requirement was 4,750. (Evidence 36). Meaning, although more clinical work was required of Case No. 23 and she had a higher wRVU target to hit, she was allowed to work from home. This was the same with other NYU employees with 100% clinical efforts, who had similar contracts to Plaintiff. (Plaintiff's Exhibit 100 and 102, Tr. 575:8; 571:1, respectfully, "Case No. 96"). The standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of a plaintiff's and comparator's cases, rather than a showing that both cases are identical. *Graham v. Long Island R.R.*, 230 F.3d 34, 36 (2nd Cir., 2000). Here, Plaintiff and Case Nos. 23 and 96 have all-but identical contracts, discipline, work under the same HR, have similar job titles, and are measured by the same metrics. Importantly, they are subject to the same performance evaluations and discipline standards.

10

*Graham* at 40.  The jury had more than enough information to draw their own conclusion

regarding comparative work. Whether two employees are similarly situated ordinarily presents a

question of fact for the jury. See *Taylor v. Brentwood Union Free Sch. Dist.*, 143 F.3d 679, 684

(2d Cir. 1998).

### *Defendants Proffered Reasons*

Defendants attempt to argue that because Plaintiff was "unable to perform", "failed to

provide medical clearance", and "never returned," NYU terminated Plaintiff.

*First,* this argument neglects the evidence the jury reviewed showing NYU's motives to

terminate Plaintiff well before January 4, 2021 (as discussed in greater detail above):

- October 26, 2020, Sanchez inquires to terminate Plaintiff before any
  accommodation discussions.

- On November 20, 2020 Andrew Rubin writes Lazzaro stated "HR will contact
  [Plaintiff] on monday and tell him decision is final [*sic*]." (Evidence 48).

- On November 30, 2020, Mellychuk confirms "Lazzaro also agreed to postpone
  the termination temporarily." (Evidence 25).

- On December 16, 2020, Mellychuk writes Plaintiff and states. "It does not make
  sense to negotiate a new multi-year contract while you are still on medical leave
  and your ability to return to work and perform the essential functions of your
  position is presently unknown." (Exhibit 14).

The jury was persuaded that Defendants were motivated to terminate him ***well before***

January 4, 2021.

*Second,* the jury was not persuaded that Plaintiff could not have returned to work.

Plaintiff could have received medical clearance. (Tr. 424: 7-10 "*I was getting ready to get the*

*medical clearance. We were in the middle of talks, and I was already told by my doctors they would clear me.*"). Plaintiff made Mellynchuk aware that he was able to perform his essential job functions. (Tr. 723:20-22; 724:3-8). The jury was able to see the dialogue between the parties leading up to the termination. They understood that Plaintiff could have obtained medical clearance but was still speaking to Defendants about an accommodation and/or a new contract. (Tr. 391:24-392:1, "*There was no reason to give medical clearance because we didn't have a contract signed…*"). Since the parties were in the midst of discussing options, a jury reviewed NYU's proffered reason "failure to obtain medical clearance" as pretextual.

Importantly, before Plaintiff got an attorney, Defendants demanded Plaintiff return to work. (Evidence 10). In that denial/demand to return to work, **<u>Defendants did not require Plaintiff submit medical clearance.</u>** Meaning, the jury found that conditioning Plaintiff's return to work on receiving medical clearance was not necessary. Changing expectations and reasoning show pretext. (*Carlton v. Mystic Transp., Inc*., 202 F.3d 129, 137 (2d Cir. 2000).

*Third,* even if the jury believed that Defendants did fire Plaintiff for its proffered reason, under the NYCHRL's mixed motive test, and given the evidence presented, the jury was entitled to find that discriminatory animus was another motivating favor in terminating Plaintiff. *Leone v. Brown Forman Corp., 2025 N.Y. Misc. LEXIS 2529, *9-10* (NY Sup., 2025).

### *More Pretext*

Patient care was not an issue; nevertheless, Defendants now argue "NYU could no longer compromise patient care and departmental operations, and therefore, terminated Plaintiff's employment." (Memo. In Support, p. 6). The jury saw that Plaintiff built a redundancy. (Tr. 1265:13-18). Plaintiff testified that there was always one or two "attending" on a given shift. (Tr. 1266:11-16). The jury saw the chart of individuals who were "attending physicians." (Evidence 3). The chart of individuals was not all encompassing, as there were others who could have

covered as the attending physician. (Tr. 1266:20-1267:3). During his tenure, Plaintiff added attending physicians, expanding by 300-400% of the faculty at Woodhull. (Tr. 156:2-157:22; Dr. Chiu testimony, 547:25-548:7). The jury saw that Plaintiff hardly had direct-patient interaction. (Tr. 501:14-20). The jury also heard that, at the time, OR and non-essentially functions of the hospital were closed (Tr. 198:13-21).

### b. CHRL Cooperative Dialogue Verdict

Under the NYSHRL and NYCHRL, failure to engage in the interactive process itself violates the law. *Phillips v. City of New York*, 66 A.D. 3d 170, 176, 884 N.Y.S.2d 369 (1st Dep't 2009)); *see also Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y.3d 824, 837, 988 N.Y.S.2d 86, 11 N.E.3d 159, 169 (N.Y. 2014) (holding that both the NYSHRL and NYCHRL require employers to engage in a good faith interactive process to assess "the needs of the disabled individual and the reasonableness of the accommodation requested[.]").

The jury had ample facts to find Defendants failed to engage in an interactive process. (*see* Section (a)(i) herein, Failure to Communicate Oct. 6 – Nov. 19, and Failure to Communicate Nov. 19 – Oct. 6, *et al.*).

### III.    Defendants' 59(a) Motion Must Be Denied

### a.  Standard of Law

When considering a motion for a new trial under Rule 59(a) on the ground that the jury's verdict is against the weight of the evidence, our cases "teach [that a] high degree of deference [is] accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).

A new trial should not be granted unless the court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice. *Jae Shin v. Party Well Rest. & Oriental Bakery, Inc*., 2025 U.S. App. LEXIS 5728, *1 (2nd Cir. 2025); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 112 n.34 (2d Cir. 2013).

A court should grant a Rule 59 motion only where the jury verdict is "**egregious**" given the evidence presented. *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998). A motion for a new trial should only be granted if "the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *DLC* at 133.

### i.   There is No Prejudice

Defendants argue they were prejudiced for multiple reasons. At the outset, there is no prejudice with the Court's curative instructions.  "[J]uries are presumed to follow their instructions[.]" *Zafiro v. United States*, 506 U.S. 534, 540 (1993). During the Jury Charge, the Court instructed the jury on what information shall be considered evidence. (Tr. 1400:12-16). The court can presume the jury followed those instructions.

### *<u>Cooperative Dialogue Claim</u>*

There is no prejudice when, as is the case here, Defendants knew about the claim for years and had every opportunity to conduct discovery related to the claim.

At the outset, Rule 59 is not a vehicle for relitigating old issues or otherwise taking a second bite at the apple. *Sequa Corp. v. Gbj Corp*., 156 F.3d 136, 138 (2nd Cir., 1998). The Court has heard and dismissed Defendants' arguments relating to the Cooperative Dialogue claim multiple times. (*See* Dckt. No. 124, 140; PRETRIAL CONFERENCE TRANSCRIPT, p. 13:1-16:13 [Cabeceiras Declaration [Cab. Dec.], Exhibit A]; Tr. 81:5-83:3). This claim was grounded in the exact same factual allegations already subject to discovery and subject to a summary

judgment ruling (Dkt. 89 at 11, in which defendants reply to the Cooperative Dialogue claim without objection.).

Out of an abundance of caution, the Court afforded Defendants discovery related to the "added" Cooperative Dialogue claim. (Tr. 81:5-83:3). Defendants took Plaintiff's deposition and requested relevant documents. There cannot be prejudice when Defendants' own counsel agreed that conducting a deposition and limited discovery into the claim would be sufficient for Defendants. (Cab. Dec., Ex. A, p. 148:4,14; "So no problem for defendants for that" 148:24-25).

### ***Plaintiff's Alleged Failure to Produce Records***

*First,* the records Defendants sought could have and should have been sought in discovery. Defendants cannot claim prejudice based on their own shortcomings.

Defendants claim "*This ghosting claim* [unanswered calls] *only arose once Plaintiff was permitted to pursue this new claim.*" (Dckt. No. 63, Memo. of Supp., p. 23). That is simply not true as Defendants' lack of communication has been central to this claim from the outset. (*see* Plaintiff's Deposition [Cab. Dec., Ex. B], p. 14: 6-13 "*I tried to call a number of people including Dr. Doug Lazzaro, and I did not get a response*"; *Id.,* 79:7-24 , "*I attempted to contact my vice chair, Doug Lazzaro, and the department, and I believe I even called HR, his number, and I did not get anywhere.*"; *Id.,*175:15-22*; Id.,*176:1-7 "*There was no conversation. There was no interaction.*"; Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment. (Dckt. No. 87, p. 5), Amended Complaint & Initial Complaint [Dckt. No. 1, 139, Paragraphs 47, 55].).

*Second,* even if Defendants were diligent, Plaintiff did not have the records Defendants requested in their limited discovery related to Plaintiff's CHRL cooperative dialogue claim or all records were already in their possession. (Cab. Dec., Ex. C). No prejudice can exist as there are

no documents at issue. Additionally, Defendants could have sent out a trial subpoena if they truly thought there were missing documents.

*Third,* there is no prejudice because each party was available for cross examination on the substance of the alleged phone calls.  Both Lazzaro and Mellychuk testified at length to their (false) factual assertions. (*See e.g.,* "I did not ghosting him [*sic*], as was previously stated" Tr. 1055:13).

### *Testimony About COVID & Recovery*

Plaintiff's underlying medical condition in this disability case involved him contracting COVID-19, falling into a medically induced coma, and recovering his basic motor skills post-coma. The Court specifically allowed Plaintiff to present evidence of his own disability, which was based on complications from COVID. (Cab. Dec., Ex. A, 34:13-22). The Court's MIL ruling forbid Plaintiff from discussing his contracting COVID at NYU, insufficient PPE at NYU, or anything related to the general dangers of the COVID pandemic overall. (*Id.,* 34:24-35:4). Plaintiff honored that throughout the trial.

Defendants allege that Plaintiff "testif[ied] extensively" about COVID (to support their argument, it appears, Defendants clicked "Ctrl+F" on the transcript and cited every time the word "COVID" was mentioned). (Memo in Supp., p. 30). A closer look reveals that during trial, Plaintiff referred to himself as a "COVID survivor" twice. (Tr. 215:1; 233:24-25). Both times were in the context of a long-winded answer. The Court then asked Plaintiff and Plaintiff's counsel to stop saying "COVID survivor" (Tr. 216:1-13; 256:5-21). Plaintiff did as instructed. Thus, any mention of COVID was limited to the Court's ruling in the MIL and any mentioned of being a "COVID survivor"—which is a 100% accurate statement—stopped upon the Court's command.

Making an innocuous, factually accurate statement twice on the record did not prejudice Defendants. (*see* FRCP 61).

### ***Dr. Masterson's Notes & Testimony***

#### ***Notes***

Defendants did not take Dr. Masterson's deposition, did not follow up with Dr. Masterson despite having an executed release, and did not seek additional documents from Dr. Masterson although they were on notice that Dr. Masterson met with Plaintiff 95 times. Defendants now attempt to use their own shortcomings as cornerstone to argue prejudice.

Previously, Defendants sought sanctions for their own error, which the Court denied, evaluating the matter pursuant to *Icon International, Inc. v. Elevation Health LLC*, 347 F.R.D. 274, 195 (SDNY 2024).

Starting with the first prong of the *Icon* analysis: Plaintiff was not in possession of these "notes." (Tr. 956: 1-2). Therefore, Plaintiff was not "in control" over the notes and could not timely produce them.

*Second,* no evidence was offered related to a "culpable state of mind." (Tr. 1087:6-19). See *Rivera v. National Passenger Railroad Service*, 442 F. Supp. 2d 164 at 170 (SDNY 2006). In this case, Plaintiff sent all relevant documents in his control.

As to the *third* prong, although the notes may be relevant, Dr. Masterson described and discussed them with opposing counsel per Defendants' own questions. (Tr. 955:19-21). Thus Defendants cross-examined Dr. Masterson on all relevant topics related to the notes at issue. Dr. Masterson did not testify extensively about what was in the notes, and she otherwise provided independent testimony about Plaintiff's progress throughout therapy. Dr. Masterson only testified

about the notes on cross examination (Tr. 955:16-23). Defendants cannot now claim prejudice based on their own trail strategy.

### *Testimony*

Defendants provide the Court three statements made by Dr. Masterson they deem prejudicial. (Tr. 947:5-16; 952:19-25; 958:15-959:3). The first section is simply not prejudicial at all. (Tr. 947:5-16). The second section was subject to a sustained objection, the witness got out a total of 7-words relating to Plaintiff's son's stress. (*Id.,* 952:6-25). The third section involved a sustained objection. (Tr. 958:15-959:3) Dr. Masterson merely testified to reviewing Plaintiff's CV, but otherwise provided no information about the CV or relied on anything she read in the CV.

### *Dr. Lerner's Testimony*

Dr. Lerner's testimony was not prejudicial, and any potential prejudice was nipped in the bud immediately by the Court. Mainly, Defendants argue that Dr. Lerner's reference to a "letter" was prejudicial. (Tr. 1006-13-19, 1008:7-15, Tr. 1009:8-10). Any testimony about a "letter" was object to and sustained or stricken completely. The jury did not hear anything about the substance of a letter and the letter was not relied in Dr. Lerner's evaluation. There cannot be prejudice when a curative step was taken by the Court. The remaining cited sections show no prejudice and were stricken from the record or not considered by the jury as evidence. (*see* Tr. 1000:17-25; 1005:17-23, Dr. Lerner was confused why he could not use his report. This was objected to and the objection was sustained; Tr. 1009:17-22 Dr. Lerner testified briefly to stress on Plaintiff's family. This topic was not subject to a MIL. This statement was objected to and the Court took curative action.).

ii.    **Backpay Damages Must Be Upheld**

The jury rendered a straight-forward decision relating to Plaintiff's owed backpay. Plaintiff was terminated on January 4, 2021. (Evidence 15). It is undisputed that Plaintiff, at the time of termination, was making $375,000 annually. (Evidence 21). It is undisputed that on or about May 17, 2024, Plaintiff accepted a job offer paying him $300,000 and he began working on August 19 2024. (Evidence 17, Tr. 445:14-22; 245:7-16). The total backpay award was $1,400,000. (Dckt. No. 161-17, p.4).  Plaintiff was out of work from January 5, 2021 to August 19, 2024, totaling about three and a half years. (Tr. 445:14-22; 245:7-16). Thus, the jury award covers the actual lost back pay Plaintiff suffered as a result of the unlawful termination.

*Mitigation*

It was Defendants' burden to show that suitable work existed and Plaintiff did not make reasonable efforts to obtain it. *Clarke v. Frank,* 960 F.2d 1146, 1152 (2d Cir.1992). Defendants did not carry their burden. Whether this burden was satisfied was a question for the jury. *Dailey v. Societe Generale,* 108 F.3d 456 (2d Cir. 1997).

The jury reviewed Plaintiff's written mitigation efforts in evidence. (Evidence 16). Plaintiff submitted approximately 60 applications in writing. (Tr. 247:12-14). The applications were one part of Plaintiff's mitigation pursuit. (Tr: 247:16-17). Plaintiff testified to the steps he took to mitigate his lost wages through calling colleagues, surgical reps, going on LinkedIn, etc. (Tr. 247:6-7; 487:18-448:1). Plaintiff applied for a variety of positions—surgical, administrative, and educational. (Tr. 248:10-15). **Plaintiff never stopped applying for jobs until he received his offer of suitable employment**. (Tr. 446:22-25). Plaintiff diligently attempted to get a new position but with global-COVID uncertainties it was increasingly difficult. (Tr. 249:7-11).

Between being terminated and accepting a job offer, Plaintiff received only 3 offers from "Kaplan Medical," "Fruit Street Health" and "Dr. Aijaz Khan." (Tr. 248:20-25; 487:24-25).

These jobs would have required Plaintiff to take a "significant pay reduction." (Tr. 249:2-6; *e.g.* Kaplan Medical paying approximately $130,000 or $140,000, Tr. 498:5-11; 513:3-8; Fruit Street Salary "low 100s." [Tr. 511:6-17]). Additionally, Fruit Street Health was a start-up with inherent uncertainties. (Tr. 497:19-24; 511:6-14). Additionally, Dr. Aijaz Khan offered Plaintiff a position. (Tr. 511:20-512:1). But this position was in a different state and, given Plaintiff's children were in school, it would have been unreasonable to disturb their life. (*Id.*). (A wrongfully discharged employee need not accept, in mitigation of damages, employment that is located an unreasonable distance from his home. *Eassa v. Hartford Fire Ins. Co.*, 1991 U.S. Dist. LEXIS 17309, *1 (NDNY 1991)).

In a plaintiff's efforts to mitigate lost wages, other suitable employment means that the offered job must be "substantially equivalent" to the plaintiff's previous job. To be "substantially equivalent," the new position must afford the plaintiff **virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status as the former position**. *KUPER v. EMPIRE BLUE CROSS & BLUE SHIELD*, 2003 U.S. Dist. LEXIS 2362, *1 (SDNY 2013). To satisfy the duty to mitigate, the unemployed need not go into another line of work, accept a demotion, or take a demeaning position. Furthermore, the claimant's burden is not onerous, and does not require him to be successful in mitigation. *Id; Dailey v. Societe Generale,* 108 F.3d 451, 456 (2d Cir. 1997).

Thus, the three job offers were not "substantially equivalent" to Plaintiff's position at NYU in pay, stability, or location. Therefore, Plaintiff was not required to take a demotion in pay or prestige. *Ford,* 458 U.S. at 231. (*See also Wills-Hingos v. Raymond Corp.*, 104 F. App'x 773, 776 (2d Cir. 2004) employment opportunities at "significantly lower wages" not substantially equivalent for purposes of mitigation)).

***NYU's Discriminatory Offers***

Defendants argue that, somehow, because "Option B" was offered to Plaintiff, he is barred from being awarded backpay.

*First,* whatever offers were made to Plaintiff *before* the termination are irrelevant. The jury made a finding that Defendants terminated Plaintiff because of his disability. The termination (*i.e.* the point in which a plaintiff incurs economic damages) happened *after* any offers to accommodate. Thus, any facts related to "Option B" are immaterial and irrelevant to the Court's analysis of the jury's award for backpay.

*Second,* Defendants fail to cite anything from the trial record to support their arguments. Defendants posit that "Plaintiff expressly refused to perform both clinical hours and on-call responsibilities when negotiating his return." (Dckt. No. 163, p. 14). Defendants then fail to cite to anything on the record indicating Plaintiff "refused" to perform clinical hours or on-call responsibilities. Defendants only reference Evidence 14, which is a series of emails, some between Plaintiff and Scott Mellynchuk, others between Scott Mellynchuk and Roger Pail. (Evidence 14). This document has nothing to do with "Option B" being presented, rejected, or helpful for the Court to determine whether "Option B" should preclude an awarded of backpay. Likewise, Defendants cite to two portions of the trial transcript (Lazzaro's Testimony) that render no support of their proposition. (*see* Tr. 1115:6-11, 1112:14-22, both only referring to "maintaining privileges.").

*Third,* presenting Plaintiff discriminatory options, during a conversation relating to accommodations, does not insulate Defendants from liability. (*see Sharkey v. Lasmo (AUL Ltd.)*, 55 F. Supp. 2d 279, 287 (SDNY 1997) "[D]efendant's claim that plaintiff was required to accept

21

their offer of employment is inapposite, since this offer does not ameliorate the effects of the discrimination.").

For their arguments Defendants cite only one case, *Ragusa. Ragusa* had nothing to do with a plaintiff's mitigation efforts or a discriminatory offer of employment made during the accommodation conversation. In *Ragusa*, "UPS offered to accommodate [plaintiff's] disability by allowing him to continue in the Preload Supervisor position without any lifting, but [plaintiff] refused and was terminated." *Ragusa v. UPS*, 2009 U.S. Dist. LEXIS 25152, *6 (SDNY 2009). *Ragusa* did not involve a finding by a jury that a defendant terminated a plaintiff because of that plaintiff's disability.

### Offer to Reapply

An employer's opened-ended, non-specific offer to allow a terminated employee to reapply to *some* position, does not impact a plaintiff's economic damages. Not only would a ruling in Defendants' favor be purely speculative, but it also ignores the realities of a soured employment relationship. ("It's like going down the street where you got mugged." Tr. 506:16-23). To rule that a plaintiff is cut-off from lost wages if there is an open-ended offer of employment from a discriminatory employer, would force a plaintiff to choose between working with a discriminatory employer or seeking backpay. The Court cannot entertain putting plaintiffs in that position.

### Masters Program

In the Title VII context, "there is no *per se* rule that finds inherently incompatible the duty of a Title VII plaintiff to use reasonable diligence in securing comparable employment and such a plaintiff's decision to attend school on a full-time basis. Rather, the central question a court must consider when deciding whether a student-claimant has mitigated her damages is

'whether an individual's furtherance of his education is inconsistent with his responsibility 'to use reasonable diligence in finding other suitable employment.'" *EEOC v. Local 638*, 674 F. Supp. 91, 104 (S.D.N.Y. 1987) (quoting *Ford Motor Co.*, 458 U.S. at 231)[3]. This analysis is the same in the ADA context. *See generally Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2nd Cir. 1998); *Dailey*, 108 F.3d at 457 (holding that plaintiff did not fail to mitigate her damages by attending school full-time after unsuccessful job search, distinguishing cases where "a plaintiff voluntarily absents herself from an active job market . . . or where the plaintiff completely fails to seek alternate employment prior to enrolling in school").

Plaintiff began his masters program at Stanford. At that time, and throughout his time at Stanford, Plaintiff did not remove himself from the labor market or stop applying for jobs. (Tr. 508:6-20; 443:20). In fact, Plaintiff joined the program to help his job prospects. (Tr. 508:21-509:1). Plaintiff did not "completely fail" to seek alternate employment prior to enrolling and Plaintiff did not voluntarily remove himself from the labor market.

The cases cited by Defendants do not support their arguments. (*Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 48, 53 (2nd Cir. 1998) (Finding a plaintiff failed to mitigate after several months of temporary work followed by a complete lack of effort to apply/look for new jobs); *Mihalik v. Credit Agricole Cheuvreouz N. Am. Inc*., 2015 U.S. Dist. LEXIS 42422, at *9-10 (SDNY March 25, 2025) (finding the employer not liable for backpay where the employee conceded she did not apply to **any jobs**); *Bergerson v. N.Y. State Off. Of Mental Health*., 526 F.

---

[3] A finder of fact can even find "one who chooses to attend school only when diligent efforts to find work prove fruitless," satisfies his or her duty to mitigation. *Local 638*, 674 F. Supp. 91, 104 (S.D.N.Y. 1987).

App'x 109, 111 (2nd Cir. 2023) (finding plaintiff never pursued any comparable employment whatsoever; "counsel conceded at oral argument that Bergerson did not pursue other comparable employment after leaving SLPC," at 112)).

### *Collateral Benefits Cannot Offset Award*

*First,* Defendants failed to claim "offset" in any affirmative defense. Therefore, they are not entitled to make this argument at trial. *see* Fed. R. Civ. P. 8(c); ECF Dckt. No. 153, Defendants' Answer). As such, Defendants are precluded from making such arguments before the Jury. (*See Arch Ins. Co. v. Precision Stone, Inc*., 584 F.3d 33, 35 (WDNY., 2010), "[setoff claims] must be set forth in the pleadings to provide a basis for relief….''; *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994), "The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver.") Had Defendants articulated this affirmative defense years ago, or in the most recent Answer, Plaintiff would have aggressively pursued defending against this affirmative defense. Allowing Defendants to argue "offset" of damages, at this point, would prejudice Plaintiff

*Second,* the benefits Plaintiff described on the record were from (i) Cigna, (ii) a policy he personally took out (Plaintiff purchased private insurance sometime in the early 2000s. [Tr. 501:2-12]), and (iii) SSDI. Court's in this Circuit, even when an affirmative defense is properly pled, do not allow damages to be reduced or offset, particularly when the benefits paid to a plaintiff—as is the case here—did not come from the employer: "[*T]he Court finds that in the context of the jury's finding of employment discrimination based on plaintiff's suffering from cancer, **the need to deter future discrimination outweighs the concern that the victim is receiving a windfall. Particularly in this case, where the disability benefits paid to plaintiff were not paid by the employer, the Court exercises its discretion in favor of plaintiff and***

*declines to impose an offset that would merely reduce the amount that the employer is required to pay for its unlawful conduct, resulting in a windfall for the very party found responsible for plaintiff's damages. Accordingly, the Court denies defendant's motion for an offset." Siracuse v. Program for the Dev. of Human Potential,* 2012 U.S. Dist. LEXIS 73456, \*40-48 (EDNY 2012) (emphasis added).

The Second Circuit has found deducting collateral benefits is "inappropriate." ("We do not believe that the rule […] requiring the deduction of these collateral benefits is appropriate[.]" *Dailey v. Societe Generale*, 108 F.3d 451, 460-461 (2nd Cir., 1997). When the benefits, as is the case here, do not come from the employer, but instead come from a collateral public source, such as unemployment or social security benefits, the Second Circuit has noted that "[A]s between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer." *Promisel v. First Am. Artificial Flowers, Inc*., 943 F.2d 251, 258 (2d Cir. 1991) (quoting *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 795 (3d Cir. 1985).

And, Plaintiff did not—as Defendants misleadingly argue—remove himself from the labor market as a result of SSDI. In fact, Plaintiff was only deemed partially disabled. (Tr. 509:6-12). As a result, Plaintiff could still work and continued to apply for jobs. (*Id.*)

### a. Front Pay Damages Must Be Upheld

The Second Circuit has observed that "front pay awards always involve some degree of speculation[.]" *Tyler v. Bethlehem Steel Corp*., 958 F.2d 1176, 1189 (2d Cir.), <u>cert. denied</u>, 506 U.S. 826, 113 S. Ct. 82, 121 L. Ed. 2d 46 (1992). A Court should consider whether the calculation of front pay would involve "undue speculation." *Chisolm v. Liberty Lines Transit*, Inc., 2013 U.S. Dist. LEXIS 16254, \*16-17 (SDNY 2013), quoting *Dunlap-McCuller v. Riese*

*Org.*, 980 F.2d 153, 159 (2d Cir. 1992). The Second Circuit has authorized front-pay awards lasting "well over 20 years . . . when necessary to provide whole relief for victims of employment discrimination[.]" *Padilla v. Metro-North Commuter R.R.,* 92 F.3d 117, 126 (2d Cir. 1996). Defendants, as is the case with backpay, have the duty to show Plaintiff was unreasonable in seeking alternative employment. *E.E.O.C. v. Kallir*, 420 F. Supp. 919, 925 (S.D.N.Y. 1976). For the reasons discussed above, Defendants have failed to meet their burden of proof. Additionally, the award of front pay wasn't unduly speculative.

Here, Plaintiff received a new job paying him $300,000. (Evidence 17). Plaintiff testified and evidenced showed that his difference in pay was $75,000 annually. (Tr. 250:3-7; Evidence 4). The jury awarded 5 years of front pay, totaling $375,000. (Dckt. No. 161-17, p. 4).

The jury understood that it took Plaintiff many years to find a new role comparable to NYU and concluded that Plaintiff made reasonable attempts to mitigate his lost wages, including front pay. (Evidence 16, Written Mitigation Efforts; Tr. 247:12-14; 247:16-17, stating that Evidence 16 reflects just some of Plaintiff's application.; Tr. 247:6-7; 487:18-448:1; 248:10-15; 446:22-25; 249:7-11). In his efforts to mitigate, Plaintiff applied for any and all types of positions, surgical positions, administrative positions, educational positions and more. (Tr. 248:2-15). Despite these efforts, the jury heard how difficult it was for Plaintiff to "fully" mitigate his lost wages. ("Hospitals weren't sure of their income. They were closing certain sections during the pandemic. It was total free-for-all, quite frankly." Tr. 249:8-11). Likewise, they heard how NYU's discriminatory termination created a ripple effect on Plaintiff's employability. (*see* Tr. 250:10-21; Tr. 250:10-21; Tr. 513:13-180). The jury rightfully found that Plaintiff was fortunate to get a position and would not be successful in "fully" mitigating his lost wages in the future. Therefore, there is no "seriously erroneous" result.

Courts routinely uphold front pay awards that include more speculative calculations than the ones at issue in this case. *Tyler v. Bethlehem Steel Corp*., 958 F.2d 1176, 1189 (2d Cir.), <u>cert. denied</u>, 506 U.S. 826, 113 S. Ct. 82, 121 L. Ed. 2d 46 (1992) (awarding front pay for a 17 year period); *Padilla v. Metro-North Commuter R.R.*, 92 F.3d 117, 126 (2d Cir. 1996) (affirming award of over twenty years of front pay for a former Metro-North superintendent of train operations given—much like Dr. Ahmad—his "unique and narrowly focused skills.")

**b. Punitive Damages Must Be Upheld**

*NYCHRL*

Under the NYCHRL claims, a jury may find Plaintiff is entitled to punitive damages if Defendants engaged in willful or wanton negligence, recklessness, or whether there was a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard. *Chauca v. Abraham*, 30 N.Y.3d 325, 329, 89 N.E.3d 475, 477 (2017). There is no requirement Plaintiff show "malice nor awareness of the violation of a protected right…" or "knowledge." *Chauca v Abraham*, 30 N.Y.3d 325, 333. The New York Court of Appeals has stated that this standard "requires neither a showing of malice nor awareness of the violation of a protected right, representing the lowest threshold, and the least stringent form, for the state of mind required to impose punitive damages." *Casmento v. Volmar Constr.*, Inc., 2022 U.S. Dist. LEXIS 196744, *31 (SDNY 2022). The burden of proof for punitive damages under the NYCHRL is a preponderance of the evidence. *Stryker v. Hsbc Secs. (USA)*, 2021 U.S. Dist. LEXIS 223042, *1 (SDNY, 2021). A lower degree of culpability is required for punitive damages under the New York City Human Rights Law. *Edelman v. NYU Langone Health Sys*., 141 F.4th 28, 36 (2nd Cir., 2025).

***Fact Relevant to Punitive Damages***

27

Defendants had knowledge of the relevant law and knowingly violated Plaintiff's rights. In doing so, Defendants acted with reckless indifference and with willful or wanton negligence. Defendants contend that their conduct was not "reprehensible" enough pursuant to *BMW* (517 U.S. 559 (1996). The jury disagreed:

Despite receiving a detailed accommodation request supported by a physician's recommendation on November 2, 2020, Defendants made no effort to initiate a conversation with Plaintiff prior to issuing a blanket denial on November 19, 2020. (Tr. 364:3–365:10, 371:17–372:25, as argued above). The November 19 denial email from Mellynchuk falsely stated that Plaintiff's role was "predominantly clinical" despite evidence that 60–80% of Plaintiff's job was administrative, educational, and research-based. (Tr. 375:18–376:14). This was factually inaccurate and counter to NYU's own policy to fully understanding what the employee does. (Tr. 562:16-18). NYU's failure to conduct any interactive process before issuing an ultimatum evinces more than mere negligence. Likewise, the jury found that NYU failed to determine what Plaintiff's job responsibility was. (There was ample evidence that a key part in HR's job is to figure out what the employees job function is. There is further testimony relating to HR speaking to only one person and reviewing one contact (Tr. 562:12-22). NYU's actions were questionable, as they knew they were obligated to engage in an interactive process with Plaintiff and present and consider feasible alternatives. (Tr. 562:12-15). The jury inferred that this conduct reflected a willful and conscious disregard of legal obligations under both federal and city law.

Numerous documents and testimonial evidence further supports a finding of punitive damages. Some examples are:

- Before any application for an accommodation was made, before any dialogue did (or did not happen), and well before any ostensible review by HR relating to

Plaintiff's primary job responsibilities, Sanchez wrote **"[Why] can't we release him if he cannot do his job."** (Evidence 28). It was noted repeatedly that Ms. Sanchez was Bender and Mellychuk's superior who, despite her being busy, stayed connected to Plaintiff's requests. In a line of questioning involving Sanchez, Mellychuk states she is a very busy, high-level person (discussed *supra*). Despite being busy, she specifically asked to be kept up to date with Plaintiff's case, as Mellychuk testified to. (Evidence 25). Thus, we have a high ranking individual in NYU's HR department—the decision-makers superior—who is, in writing: (i) seeking to terminate an employee on the basis of his disability; (ii) disregarding Plaintiff's statutory right to an accommodation; and (iii) making a determining before engaging in an interactive dialogue, among other obvious inferences. This, at a minimum, shows NYU's conscious disregard for Plaintiff's rights. It also helps establish why Sanchez' inferiors treated Plaintiff so poorly.

- Mellychuk, in an email to Plaintiff, stated that a motivating factor in his decision making was (i) Plaintiff being on medical leave and (ii) Plaintiff's "ability to return to work and perform the essential functions of [his] position [being] unknown." (Evidence 20). Mellychuk took Plaintiff's "abilities" into account, knowing that Plaintiff at that point was set to return to work. Mellychuk, in testimony, doubled down on his motives and admitted before the jury that a motivating factor in his decision-making process was the fact that Plaintiff was on medical leave. These acts alone violate the law. Administrative Code § 8-107 (1)(a). They also support the finding of a conscious disregard, willful conduct, and recklessness.

- Defendants proposed forcing Plaintiff to sign a contract with unfavorable terms. In exchange for an accommodation, Lazzaro first "required" that Plaintiff sign a new contract, locking him in, to less advantageous terms. (Evidence 25; Tr. 707:3-5).

- As testified to and shown to the jury, Lazzaro simply did not respond to Plaintiff's calls or text. (Evidence 6). This pattern continued with everyone at NYU; Colby, Mellyncuk, Grossman, and Bender. (Tr. 217:22-23, "[Dr. Grossman] never responded by email or phone. Never contacted me.").

- Lazzaro's constant negative comments related to Plaintiff such as, in response to Plaintiff choosing "Option B", stating "***Looks like he finally understands***." (Evidence 49). Additionally, Lazzaro specifically tells Plaintiff to speak to Colby. ("I am emphasizing that you will need to speak to Dr. Colby to get approval on anything regarding your FGP component of NYU compensation," [Evidence 6]). Only to turn around, when Plaintiff does as instructed, and say "***He will of course try to bypass HR…***" and speak to Dr. Colby. (Tr: 1064:15-18). Painting Plaintiff in a bad light could show the jury an invidious, unlawful motive. Presenting Plaintiff false directions then belittling him for following said directions is deceitful. (Tr. 194:9-150, Lazzaro telling Plaintiff to speak to Colby). ("[T]rickery and deceit are more reprehensible than negligence." *Bmw of N. Am. v. Gore*, 517 U.S. 559, 562 (1996)).

- The very fact that ***after*** Defendants received an attorney letter on November 30—the very same day—they come up with an alternative accommodation. (Evidence 24, 32). This shows a purposeful lack of effort in determining whether Defendants

could or could not accommodate Plaintiff. Additionally, the very fact that **after** Defendants received an attorney letter is the only time in which Plaintiff ever has a live-dialogue with anyone at NYU is telling. A reasonable juror could find Defendants knowingly disregarded Plaintiff's rights by failing to speak to him before the attorney letter.

- In response to Plaintiff stating to Defendants he is returning to work without an accommodation and has "health risks", Defendants do not seek to inquire, assess, or have a dialogue with Plaintiff related to his health risks. (*see* Evidence 12). The NYCHRL provides that "an employer make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job . . . provided that the disability is known or should have been known by the employer." *Lazzari v. N.Y.C. Dept of Parks & Recreation,* 751 F. App'x 100, 102 (2d Cir. 2018). Here, Defendants knew there was a health risk, yet purposefully failed to inquire, take any action, or off any assistance to a known disabled employee.

- Bender calling Plaintiff, screaming at him, telling him "we don't do remote work." (Tr. 218:5-11). When, in fact, NYU does do remote work. (Evidence 35, 43).

- Other individuals with greater clinical duties than Plaintiff had been granted the same temporary accommodation Plaintiff was seeking. (Evidence 35, 43).

- Defendants are repeatedly trained to comply with the ADA, NYSHRL, and the NYCHRL. (Tr. 556, *et al*). The evidence shows they fell short of complying with the law.

31

- NYU's repeated failure to respond to Plaintiff and their actively ignoring Plaintiff. (Tr. 185:24-186:3; Tr. 188:20-21; Tr. 192:12-15; Tr. 192:12-22; Tr. 192:23-193:1; Tr. 194:3-6; 209:15-23; 220:1-6; 210:3-4; 220:1-6; 209:15-23; 220:1-6; Tr. 217:22-23; Tr. 219:12-17; Evidence 6, 47 "***I did not pick up or rtn his call but his message says he has a great solution whatever the means***").

- NYU's managers repeatedly yelling at Plaintiff for attempting to get accommodated. (Tr. 189:13-21; 190:3-12).

Juries have awarded far more for far less reprehensible conduct in other matters. (*Ravina v. Columbia Univ.*, 2019 U.S. Dist. LEXIS 56556, *29 (SDNY 2019), where the Court refused to overturn the jury's award of punitive damages where a decision maker stated in two email about the plaintiff (i) "It is unreal what she did, but I am not even going to write about — I am scared shitless about anything I put in an email these days" and (ii) "Given what we are dealing with, this is a bit dangerous, but I am hoping you will simply delete the email and not mention it to anyone . . . We are dealing with at best a very sick person, at worst an incredibly evil person.";  *Tese-Milner v ATCO Props. & Mgt.*, Inc., 2020 N.Y. Misc. LEXIS 10002, *47 (2020), in evaluating punitive under NYCHRL, upheld an award, in part, where an superior's "failure to response" to a plaintiff's complaint, "clearly evinced a conscious disregard of her rights, or at the very least, conduct so reckless that it amounted to such disregard."

### v. Emotional Distress Damages Must Be Upheld

The total emotional distress award was $2,000,000. (Dckt. No. 161-17, p. 4).  After hearing Plaintiff's testimony, $2,000,000 was not enough to make Plaintiff whole:

"It's affecting me on a lot of levels, physically and emotionally. I started having PTSD, started feeling like I'm the problem. I didn't trust employers anymore. I thought I was not

enough. I felt like I wasn't complete, that nothing I did could ever, you know, be good enough for any future employer. It's really hard when a hospital lets you go, basically fires you. It makes you feel like you're the one, you're the damaged one." (Tr. 250:24-251:9).

"I felt useless. I cried a lot. […] I felt like a failure as a dad, as a husband. I got divorced. That was part of what happened afterwards. It ruined my life in so many ways." (Tr. 252:2-8).

Describing ruminating thoughts: "Early in that first year, I think I was thinking about it maybe 90 percent of the year — in the bathroom, in the shower, walking, dealing with my kids. I -- all I thought about was being a failure, and I couldn't believe -- why did this happen to me. It's unheard of for this to happen." (Tr. 253:15-19).

Plaintiff began seeing a therapist, Dr. Catherine Masterson, in 2020. (Tr. 252:19-20). Plaintiff saw (and still currently sees) Dr. Masterson 2-3 times a week for an hour. (Tr. 252:22-25). Dr. Masterson spent **353 hours** with Plaintiff listening, evaluating, and diagnosing him. (Tr. 958:12-16). Plaintiff was diagnosed with general anxiety depression and posttraumatic stress disorder. (Tr. 253:22-25). Before NYU terminated Plaintiff, Plaintiff did not have any psychiatric or mental health disorders. (Tr. 254:1-13). Plaintiff has no plans to stop going to therapy. (254:15-19).

Dr. Masterson found Plaintiff's diagnosis and emotional distress were caused by NYU (Tr. 974:4-15). Dr. Masterson's evaluation of Plaintiff was reliable. Dr. Masterson has been in psychotherapy for over 40 years and has learned to "weed out malingerers and people who are trying to use" her services for something other than mental health treatment. (Tr. 958:3-9; 945:19-23). After almost 400 hours with Plaintiff, Dr. Masterson was able to observe whether he

changed his story and what his overall affect was. (Tr. 959:7-22). Dr. Masterson shared with the jury that Plaintiff presented "full criteria" for severe post-traumatic stress disorder, other specific trauma-related disorders, and major depressive disorder with anxious distress. (Tr. 947:10-24). Dr. Masterson observed Plaintiff's symptoms over the 353 sessions they had together. (Tr. 948:2-7). Dr. Masterson shared with the jury that Plaintiff "**was the most severe case of PTSD that I've seen in my 45-plus years of experience working with patients.**" (Tr. 949:5-15). Because of the severity of Plaintiff's symptoms, Dr. Masterson recommended holding sessions three times a week, as opposed to her normal practice of seeing people once a week. (*Id.*). Dr. Masterson further testified that Plaintiff's symptoms have remained consistent over time. (Tr. 949:25-950:2). Dr. Masterson explained to the jury why other potential stressors did not fully explain Plaintiff's symptoms. (Tr. 952:10-17).

The above testimony was corroborated by Dr. Mark Lerner. Dr. Lerner is a clinical forensic psychologist. (Tr. 975:20-21). Dr. Lerner was offered, without objection, as an expert in the field of forensic psychology. (Tr. 978:21-979:3). Dr. Lerner met with Plaintiff twice. (Tr. 979:19-23). During these meetings, Dr. Lerner administered multiple tests. (Tr. 980:23-24, 981:14-19). Based on these tests and Dr. Lerner's examination, Plaintiff fit the diagnostic criteria for post-traumatic stress disorder, anxiety disorder, major depressive disorder, and indications of panic disorder. (Tr. 982:15-21). Dr. Lerner found "Significant levels of anxiety, depression, problems with sleep, **haunting nightmares**, hypervigilance, meaning excessive watchfulness or cautiousness; exaggerated startle response; avoidance behaviors, in his case, **suicidal thoughts**; **feelings of humiliation**; and if I haven't said it clearly, overall a depressive picture." (Tr. 982:23-983:3).

Dr. Lerner drew a causal connection between the workplace events at NYU and Plaintiff's psychological state. (Tr. 986:4-6; 986:23-987:2, "Absolutely" finding NYU's termination of Plaintiff played a significant role in his poor psychological state). Dr. Lerner does not expect a full recovery for Plaintiff. (Tr. 988:14-18). Based on the forensic analysis Dr. Lerner subjected Plaintiff to, he was able to conclude that NYU's discriminatory behavior caused Plaintiff's emotional distress. Again, this was unrebutted causation evidence.[4]

Based on the evidence above, the Court cannot overturn the jury's well thought out award. In making comparisons to other cases, courts consider "the duration of a complainant's condition, its severity or consequences, any physical manifestations, and any medical treatment." *In re New York City Transit Auth.*, 78 N.Y.2d 207, 577 N.E.2d 40, 55, 573 N.Y.S.2d 49 (N.Y. 1991). Here, the duration of Plaintiff's condition has been years-long and will continue to haunt him, the severity of his condition is significant ("*the most severe case of PTSD that I've seen in my 45-plus years of experience*"), his conditions have had physical manifestations (problems sleeping, haunting nightmares, startled responses, etc.), and Plaintiff has been aggressively treating his injuries (2-3 sessions a week for multiple years). "The cases in which courts permit higher damages typically involve medical treatment and physical manifestation of symptoms such as 'continued shock, nightmares, sleeplessness, weight loss, or humiliation, or of an inability to apply for a new position or to enjoy life in general." *Mayo-Coleman v. Am. Sugar Holdings, Inc*., 2018 U.S. Dist. LEXIS 94821, *8 (SDNY 2018) (Internal quotations omitted).

---

[4] Thus, when Defendants' brief states "Plaintiff's condition was shaped by unrelated medical and personal events for which NYU cannot be held responsible" those are simply the words of counsel that neglect what was provided as evidence to the jury. (Memorandum of Support, p. 22)

Plaintiff's symptoms and treatment "qualify" him for an egregious emotional distress award. (*See also, Turley v. ISG Lackawanna, Inc*., 774 F.3d 140, 146 (2nd Cir., 2014), sustaining an emotional distress verdict of $1.32 million after a hostile work environment "left the plaintiff psychologically scarred and deflated.")

Given the unrebutted supporting evidence, the verdict, like similar verdicts in this Circuit, must be upheld.[5] In *Osorio v. Source Enterprises, Inc.*, the Court denied a motion for remittitur in an unlawful retaliation claim where jury awarded $4 million (approximately $6.2 in today's dollars) for emotional distress and damage to reputation. (No. 05-cv-10029, 2007 U.S. Dist. LEXIS 18725, at *14-17 (S.D.N.Y. Mar. 2, 2007)). In the *Osorio* case, the plaintiff, much like Plaintiff here, "testified at some length about the emotional distress and damage to reputation caused by the retaliation, including how defendants' retaliation caused her to feel depressed and anxious and to feel embarrassed in front of others in the industry, as well as causing her difficulty during subsequent job interviews and professional events and the like." *Osorio* at 17-16.

Likewise, in *Serdans v New York & Presbyt. Hosp.*, 138 A.D.3d 524, 525, 2016 NY Slip Op 02911 [138 AD3d 524] (1st Dept. 2016), the Appellate Division 1st Department upheld a $4,050,000 award for compensatory and punitive damages, finding, "The award for compensatory damages does not deviate materially from what would constitute reasonable compensation to the extent indicated (CPLR 5501 [c]; *see e.g. Albunio v City of New York*, 67 AD3d 407 [1st Dept 2009], *affd on other grounds* 16 NY3d 472 [2011])." (*see also, Madrigal v.*

---

[5] The Court must account for inflation and considers the present value of the amounts awarded in comparable cases. *See DiSorbo v. Hoy*, 343 F.3d 172, 185 (2d Cir. 2003) ("When considering the sizes of the awards in earlier cases, we must take into account inflation . . .").

*Montefiore Medical Center*, 2021 N.Y. App. Div. LEXIS 532 (1st Dept. Feb. 2, 2021), 1st Department found $1,7500,000, appropriate for emotional distress in employment law case); *Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140, 163–64 (2d Cir. 2014) the Second Circuit affirmed a jury's award of $1,060,000 (which amounts to approximately $1,481,809.59 in 2025 dollars).

      In the compensatory damages context, the Second Circuit has adopted the least intrusive standard for remittitur, which holds that "a district court should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive." *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990). Here a $2,000,000 emotional distress award would be less than the "maximum amount" that would be upheld by the district court as not excessive. Thus, this portion of Plaintiff's award should go untouched.

III.    CONCLUSION

      Defendants motion must be denied in its entirety.

Date:   September 18, 2025
       New York, New York              Respectfully Submitted,

                                  **DEREK SMITH LAW GROUP, PLLC**

                                  ***/s/ Alexander G. Cabeceiras***
                                  Alexander G. Cabeceiras, Esq.
                                  The Nelson Tower
                                  450 7th Avenue, 30th Floor
                                  New York, New York 10123

Certificate By Alexander G. Cabeceiras:

This document contains 10,504 words, inclusive of headers and signature block.


Date:    September 18, 2025
         New York, New York

                                        */s/ Alexander G. Cabeceiras*
                                        Alexander G. Cabeceiras, Esq.