22-CV-1248

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HABEEB AHMAD,

                                                                                             Plaintiff,

                          -against-

NEW YORK UNIVERSITY, SCOTT MELLYNCHUK, and DOUG LAZZARO,

                                                                                            Defendants.

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE, FOR A NEW TRIAL OR AN AMENDED JUDGMENT**

    *MURIEL GOODE-TRUFANT*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, New York 10007*
*Of Counsel: Desiree Alexander, Elisheva L. Rosen, Conner J. Quinn*
*Tel: (212) 356-3177*

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................. I

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................... 1

    POINT I ............................................................................................................................ 1

        DEFENDANTS' RULE 50 MOTION SHOULD
        BE GRANTED AND THE REMAINING SHRL
        AND CHRL CLAIMS DISMISSED ........................................................... 1

    POINT II .......................................................................................................................... 6

        THE VERDICT SHOULD BE SET ASIDE AS
        AGAINST THE WEIGHT OF THE EVIDENCE
        AND A NEW TRIAL SHOULD BE ORDERED,
        AND/OR THE JUDGMENT REDUCED
        PURSUANT TO FED. R. CIV. P. 59(A) ..................................................... 6

        A.   Prejudice Existed ................................................................................ 6

        B.   Damages ........................................................................................... 10

CONCLUSION .......................................................................................................................... 15

CERTIFICATE OF COMPLIANCE ....................................................................................... 16

## TABLE OF AUTHORITIES

Page(s)

**Cases**

Bergerson v. N.Y. State Off. of Mental Health,
   526 F. App'x 109 (2d Cir. 2013) ...................................................................................11

In re Digital Music Antitrust Litig.,
   2015 U.S. Dist. LEXIS 195055 (S.D.N.Y. 2015)..........................................................12

Downey v. Monro, Inc.,
   2022 U.S. Dist. LEXIS 210133 (N.D.N.Y. 2022)..........................................................12

Elmessaoudi v Mark 2 Rest. LLC,
   2016 U.S. Dist. LEXIS 125927 (S.D.N.Y. 2016)............................................................5

Fernandez v. Beehive Beer Distrib. Corp.,
   2017 U.S. Dist. LEXIS 151284 (S.D.N.Y. 2017)..........................................................12

Goolsby v. City of N.Y.,
   83 Misc. 3d 445 (Sup. Ct., N.Y. Cty. 2024) aff'd 236 A.D.3d 404 (1st Dept
   2025) ...............................................................................................................................5

Greenbaum v. N.Y. City Tr. Auth.,
   2022 U.S. App. LEXIS 22589 (2d Cir. 2022) .................................................................5

Greenway v. Buffalo Hilton Hotel,
   143 F.3d 47 (2d Cir. 1998).......................................................................................10, 11

Jacobsen v. N.Y. City Health & Hosps. Corp.,
   97 A.D.3d 428 (1st Dept 2012).......................................................................................5

Madrigal v. Montefiore Med. Ctr.,
   191 A.D.3d 407 (1st Dept 2021)..............................................................................13, 14

Marsteller v. City of New York,
   217 A.D.3d 543 (1st Dept 2023), lv to appeal denied, 41 N.Y.3d 960 (2024)................4

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,
   2015 U.S. Dist. LEXIS 42422 (S.D.N.Y. 2015)............................................................10

Rhee v. SHVMS, LLC,
   2024 U.S. Dist. LEXIS 102358 (S.D.N.Y. 2024)..........................................................12

Schlant v. Victor Belata Belting Co.,
   2000 U.S. Dist. LEXIS 16977 (W.D.N.Y. Nov. 9, 2000) .............................................12

**Cases** **Pages**

Serdans v. N.Y. & Presbyterian Hosp.,
 138 A.D.3d 524 (1st Dept 2016)..................................................................................13

Smith v. Interstate Mgt. Co. LLC,
 2022 U.S. Dist. LEXIS 176616 (S.D.N.Y. 2022).........................................................12

Sooroojballie v. Port Auth. of N.Y. & N.J.,
 816 F. App'x 536 (2d Cir. 2020)..................................................................................14

Thornley v. Penton Publ'g, Inc.,
 104 F.3d 26 (2d Cir. 1997)...........................................................................................12

Turley v. ISG Lackawanna, Inc.,
 774 F.3d 140 (2d Cir. 2014).........................................................................................14

Walrond v NY City Health & Hosps. Corp.,
 2025 N.Y. App. Div. LEXIS 4550 (2nd Dept 2025).....................................................5

**PRELIMINARY STATEMENT**

Defendants submit their reply in response to Plaintiff's opposition, which does not adequately respond to Defendants' legal arguments. Instead, Plaintiff speculates about the jury's reasoning, assumes without basis what weight the jury attributed to certain testimony, and relies on counsel's summation – which is not evidence. Plaintiff offers no juror affidavits, admissible evidence, or legal authority to support his conjecture. Given this, and for the reasons otherwise raised by Defendants, the Court should dismiss Plaintiff's claims as a matter of law, or, in the alternative, remit the judgment or set the matter down for a new trial.

**ARGUMENT**

**POINT I**

**DEFENDANTS' RULE 50 MOTION SHOULD BE GRANTED AND THE REMAINING SHRL AND CHRL CLAIMS DISMISSED**

Plaintiff's argument that NYU terminated him because of his disability rests on the premise that he was able to perform his job's essential functions. He was not. On December 31, 2020, Plaintiff admitted he was unable to "resume [his] on-call duties" and was not "well enough to provide proper patient care." See Ex 53 at D_0281. No medical clearance was provided confirming his fitness to return to essential duties prior to his termination. See Tr. at 847:7-19; 913:19-21. Nancy Sanchez's email and the initial denial of remote work months occurred months before his termination and therefore irrelevant. Plaintiff presumes he received clearance to return to work but did not provide any such clearance and to this date, no evidence has been presented that Plaintiff was able to perform the essential functions of his job at Woodhull, Huntington, or Winthrop.

The evidence at trial overwhelmingly established that Plaintiff's termination was not motivated by his disability. NYU maintains an entire office dedicated to processing hundreds

of reasonable accommodation requests annually. See Tr. 774:4-8. That office conducts a highly individualized process for accommodation requests. No individual presented at trial was similarly situated or "all but identical" to Plaintiff as he asserts. See Opp at 10. The purported comparators were not ophthalmologists, surgeons, or chief of service of their respective departments, nor did they work at any of Plaintiff's worksites. See Tr. 575:21-576:4; 849:24-850:1, 850:10-17, 853:18-19, 835:24-856:1, 856:5-21, 912:16-913:6. Moreover, Plaintiff's academic track was strictly "Clinical," while theirs were "Clinical Investigator/Educator" and "Clinical Instructor." See Tr. 850:20-21, 856:1-2; Ex 37 at P000179 (Plaintiff); Ex 39 at P00192 (Plaintiff); Ex 102 at D_Supp_01220 (comparator); Ex 110 at D_Supp_01149 (comparator).

Plaintiff fails to refute these facts. His arguments that he was "ghosted" and not accommodated are contradicted by the record. For example, Plaintiff now contends that Austin Bender yelled at him and never responded to his communications. See Pl. Opp. at 5-6. That is contrary to the evidence, which established that Bender spoke with Plaintiff on November 20 and November 30, 2020, did not yell, and investigated the feasibility of remote work. See Ex 96; Tr. 564:18-565:2, 566:4-14, 566:20-567:12, 567:20-568:11, 585:15-23, 582:14-20, 585:5-8.

Plaintiff was accommodated with extended leave for nearly a year, which exceeded accommodations provided to other employees discussed at trial. See Tr. 854:20-24, 911:9-11. Plaintiff work with a designated HR representative throughout the accommodation process. Plaintiff's argument that he agreed to a modified work schedule because "he had no other options" is disingenuous. See Pl. Opp. at 7. Plaintiff's lawyer negotiated a modified work schedule on his behalf. In fact, Plaintiff's attorney initiated the request for a modified schedule with a corresponding salary reduction as a reasonable accommodation. See Ex 15 at D_0097. Defendants immediately met with Plaintiff and his attorney and offered two options. See Ex 116 at D_0098-

2

D_0097. Plaintiff accepted one option after further consulting with his medical provider and attorney. Id.

No evidence supports Plaintiff's assertion that NYU forced a new "contract with unfavorable terms" or discriminatorily refused to negotiate a multi-year contract. See Pl. Opp. at 9, 30. No new contract was signed. When Plaintiff sought an accommodation, his prior contract remained valid. As Mr. Mellynchuk testified, the Employee and Labor relations team is not responsible for negotiating contracts, instead assisting with accommodation requests and investigating reports of workplace discrimination and harassment. See Tr. 770:8-17, 836:19-22. Plaintiff never provided medical clearance that he could perform his job's essential functions, with or without accommodation. It was reasonable for NYU to await Plaintiff's medical clearance confirming his ability to perform essential clinical duties before negotiating a new contract. See Tr. 836:5-22.

Plaintiff's arguments rely on his own unsupported allegations that Woodhull was largely self-sufficient and could run without him. See Pl. Opp. at 12-13. Plaintiff was assigned to three work sites – Woodhull, Huntington, and Winthrop. Plaintiff wholly ignores his responsibilities at Huntington and Winthrop. Numerous witnesses, including Plaintiff's own, testified that Woodhull could not run effectively without him. Kaira Kwong testified that Plaintiff worked "closely" in the clinic with medical staff to ensure it ran "smoothly." See Tr. 524:25-525:8, 526:5-10. Dr. Bing Chiu testified that Plaintiff was his attending physician during his Woodhull residency and enabled residents to "develop our surgical skills…[and] learn different techniques under his supervision." Tr. 536:9-13, 537:1-16, 538:1-5, 538:12-16. Dr. Michael Rothschild, another former resident, testified that Plaintiff was "an all-encompassing force [at Woodhull]" and

3

was a "constant" for the residents, and in the operating room with residents several times a week. See Tr. 926:1-5, 927:8-25, 930:25-931:5, 935:13-25.

Plaintiff insists that Exhibit 3 shows Woodhull ophthalmology's attending physicians. See Pl. Opp. at 12. However, the image includes optometry staff who are not medical doctors, is undated, and does not establish schedules, subspecialties, or employer affiliations. See Ex 3, Tr. 529:12-19. For example, Kaira Kwong was employed by SUNY, not NYU. See Tr. 530:1-5. Dr. Joseph Sturm was also not an NYU employee and "was not allowed to see patients with residents." Id. at Tr. 1256:10-12. Dr. Chiu testified that Plaintiff, as Chief of Service, was required to supervise the more junior attendings. Id. Tr. 546:24-547:7. As Dr. Rothschild and Dr. Lazzaro testified, the doctors in Woodhull's ophthalmology department rotated, were not full-time, and specialized in different areas and thus unable to fill in for Plaintiff, who was a cataract specialist. See Tr. 940:16, 941:12-19, 1066:22-1067:13, 1256:8-1257:7. Plaintiff's self-serving assertions about Woodhull's staffing do not establish pretext and are irrelevant, particularly given the jury found no liability on the failure to accommodate claim (see ECF Dkt. No. 161-17 at 2). His assertions are equally irrelevant to his wrongful termination and cooperative-dialogue claims.

Plaintiff speculates about Woodhull during the COVID-19 pandemic (see Pl. Opp. at 13), but lacks any first-hand knowledge of the conditions, staffing needs, or the demands at Woodhull, Huntington, or Winthrop. His conjecture is irrelevant. NYU contacted Plaintiff because his leave expired, and his continued absence created an undue hardship. NYU needed him to return or, if he could not, to open the position to someone else. See Tr. 926:2-4.

Plaintiff also insists that the jury verdict is correct because Defendants failed to have a "robust dialogue" about his accommodation See Pl. Opp. at 3. The law imposes no such requirement. See Marsteller v. City of New York, 217 A.D.3d 543, 545 (1st Dept 2023), lv to

4

appeal denied, 41 N.Y.3d 960 (2024); Goolsby v. City of N.Y., 83 Misc. 3d 445, 458 (Sup. Ct., N.Y. Cty. 2024) aff'd 236 A.D.3d 404 (1st Dept 2025). The CHRL only requires that an employer investigate the accommodation request and determine its feasibility; Plaintiff's satisfaction is not required. See Greenbaum v. N.Y. City Tr. Auth., 2022 U.S. App. LEXIS 22589, at *16-17 (2d Cir. 2022); Walrond v NY City Health & Hosps. Corp., 2025 N.Y. App. Div. LEXIS 4550 (2nd Dept 2025). The record clearly demonstrates that the Defendants satisfied this standard.

Moreover, Plaintiff accepted numerous accommodations— extended leave through January 4, 2021, and a reduced work schedule. Once accepted, Defendants' duty to continue the cooperative dialogue ended. See Elmessaoudi v Mark 2 Rest. LLC, 2016 U.S. Dist. LEXIS 125927, at *24-35 (S.D.N.Y. 2016); Jacobsen v. N.Y. City Health & Hosps. Corp., 97 A.D.3d 428, 433 (1st Dept 2012).

Plaintiff now asks the Court to "assess[] in the vacuum of October 6 to November 19, 2020." See Pl. Opp. at 5. The Court should not artificially splice the accommodation process into isolated segments. Even considering Plaintiff's arbitrary timeframe, the record shows that Defendants engaged with Plaintiff in good faith: granted nearly a year of medical leave and offered several accommodations. Indeed, Defendants initiated the accommodation process by contacting Plaintiff on October 6, 2020, and providing him with the accommodation paperwork. See Ex 51.F at D_0456; Ex 150 at D_0880-81; Tr. 780:25-781:6, 782:24-783:16. In October 2020, Plaintiff reached out to several site supervisors at Huntington and Woodhull, who contacted NYU to see how to proceed. See Ex 137 at D_0441-D_0442; Tr. 788:8-10. NYU extended Plaintiff's leave of absence as an accommodation pending submission the accommodation paperwork. See Tr. 786:22-787:6. When, on October 15 and 22, Plaintiff contacted Dr. Lazzaro, Dr. Lazzaro agreed to

5

converse. See Ex 137 at D_0441; Ex 93 at D_0334-35; Tr at 1060:4-9, 11:37:15-18. Likewise, with Dr. Colby on October 23, 2020. See Pl. Ex 136 at D_0438-39.

On November 2, 2020, Mr. Mellynchuk contacted Plaintiff to confirm whether he intended to pursue an accommodation request. See Ex 150 at D_0879-80. Only then did Plaintiff return partial paperwork. See Ex 150 at D_0879; Tr. 361:20-22. As Mr. Mellynchuk explained, he could not process the request without information from Plaintiff's treating physician. See Tr. 791:1-4, 8-13. Mr. Mellynchuk did not receive this documentation until November 12, 2020, and he promptly confirmed its receipt. See Ex 47 at P000040-41. Defendants then evaluated Plaintiff's request for indefinite remote work. See Ex 8 at D_0088-90; Ex 134 at D_0433-34; Ex. 51.A at D_0425 – D_0430; Tr. 636:16-25, 799:17-24. During this period, Mr. Mellynchuk remained in communication with Plaintiff. See Ex 47 at P000040; Ex 46; Ex 49A.

Only after Plaintiff reneged on the agreed January 4, 2021 return-to-work date, without proposing any alternative, that NYU determined it could not continue to hold his position open and needed to recruit. See Ex 1; Ex 53 at D_0280 – D_0281; Tr. 1096:20-21. The record confirms that Plaintiff's disability was not a motivating factor in NYU's decision and that Defendants engaged in the required cooperative dialogue. Therefore, Defendants' motion should be granted.

## POINT II

**THE VERDICT SHOULD BE SET ASIDE AS AGAINST THE WEIGHT OF THE EVIDENCE AND A NEW TRIAL SHOULD BE ORDERED, AND/OR THE JUDGMENT REDUCED PURSUANT TO FED. R. CIV. P. 59(a)**

**A.  Prejudice Existed**

Plaintiff's arguments against prejudice are unavailing. His claim that "Defendants knew about the [cooperative dialogue] claim for years," (Pl. Opp. at 14) is contradicted by the

6

Court's own ruling. The Court expressly held: "[a]s a threshold matter, the Court disagrees that plaintiff properly pleaded a standalone cooperative dialogue claim. Plaintiff should have known that simply referring to 'all applicable paragraphs' of Title 8 in his sixth cause of action was not sufficient to put defendants on notice of this claim." See Tr. July 9, 2025, at 13:18-14:8. Defendants cannot have notice of a claim that was not properly pleaded.

Plaintiff also misrepresents the record in asserting "Defendants' own counsel agreed that conducting a deposition and limited discovery into the claim would be sufficient for Defendants." See Pl. Opp. at 15. Defendants repeatedly objected to Plaintiff's eleventh-hour request to add a new claim. See Defs. Memo., ECF Dkt. No. 128; Tr. July 9, 2025, ECF Dkt. No. 148. Plaintiff's excerpted quotation is out of context. See Pl. Opp. at 15. Defense counsel's "no problem from defendants" concerned the Court's instruction that any discovery disputes should be raised in a July 16, 2025, status letter for the Court's resolution. See Tr. July 9, 2025, at 148:17-25. Moreover, Plaintiff refused to produce any documents in response to Defendants' supplemental discovery demands. See ECF Dkt. No. 166-4 at 4-5.

The prejudice resulting from Plaintiff's late-added claim cannot be understated. Defendants were forced to scramble to conduct discovery, serve an Answer, respond to Plaintiff's motion to compel, and move to quash Plaintiff's subpoena—all while simultaneously preparing motions in *limine*, oppositions, proposed jury instructions, and other pre-trial submissions. Defendants were left without any practical recourse to compel the discovery Plaintiff withheld.

Defendants' prejudice is not theoretical. The jury rejected most of Plaintiff's extant claims but imposed liability for the new cooperative dialogue claim, added on July 9, 2025, thirteen days before the trial commenced. Plaintiff's suggestion that Defendants subpoena his phone records is disingenuous. See Pl. Opp. at 16. Plaintiff bore the obligation to disclose all relevant

7

documents and records yet failed to do so. Indeed, Plaintiff admitted that the records on his phone were—conveniently—destroyed shortly before he amended his complaint, the moment he first put Defendants on notice such records existed or were relevant. See Pl. Depo., July 15, 2025, at 281:18-20, 282:14-20, annexed to Rosen Decl. as Ex. A. Plaintiff's shifting claims concealed the relevance of these records until his belated amendment. Plaintiff should not be permitted to profit from such gamesmanship.

Prejudice also arose from Plaintiff's medical testimony. Plaintiff testified at length not only about contracting COVID-19 but about his entire recovery. This evidence, unrelated to whether Defendants engaged in cooperative dialogue or discriminated against him, only served to engender the jury's sympathy, and was adduced despite repeated objections and a motion in *limine*. See Tr. 126:14-15; 127:19-21; 137:10-24; 174:13-15; 174:24-175:7; 175:22-176:13; 177:10-21; 178:9-10; 179:7-19; 180:17-21; 184:17-20; 185-9-13; 197:9-16; 207:4-15; 213:5-15; 214:7-215:1; 229:2-230:1; 365:22-366:2; 511:22-512:1.

While claiming that Dr. Masterson's references to the stress of Plaintiff's child and his employment qualifications were not prejudicial (see Pl. Opp. at 18), the record shows otherwise. Dr. Masterson continued to testify over defense's sustained objections, requiring the Court to interrupt her multiple times to prevent further improper testimony. See Tr. 952:21-953:2, 958:17-959:3. Plaintiff also downplays Dr. Lerner's testimony (see Pl. Opp. at 18), but his repeated attempts to discuss precluded topics even after being warned by the Court, coupled with his angry outburst at sustained objections, rendered the rulings ineffective. Plaintiff excuses the conduct by suggesting that Dr. Lerner was "confused why he could not use his report." Pl. Opp. at 18. But as a self-described expert who "testified in court at least a dozen times," Dr. Lerner knew that expert reports are inadmissible, and courts routinely preclude them. See Tr. 978:5–8. Plaintiff was

8

obligated to ensure his witnesses understood the limits of their testimony and how to comport themselves on the stand. His failure to do so was to Defendants' detriment.

Even more prejudicial was Dr. Masterson's intentional failure to hand over more than 353 hours of treatment session notes. Plaintiff emphasizes Dr. Masterson's extensive treatment to justify his high emotional distress damages (see Pl. Opp. at 33-34), yet Defendants were denied access to the very records that would have allowed effective cross-examination. Plaintiff argues this was not prejudicial because Defendants "did not follow up" (Pl. Opp. at 17), but that is incorrect. Defendants served Dr. Masterson with the HIPAA authorization and Dr. Masterson failed to produce all responsive documents. Defendants had no reason to believe the Dr. Masterson would fail to fully and truthfully comply with the HIPAA authorization. Plaintiff also contends he cannot be faulted for non-production because he did not personally possess the notes. See Pl. Opp at 17. But Plaintiff attended hundreds of sessions where Dr. Masterson presumably took notes. Plaintiff plainly knew, or should have known, that such records existed and should have ensured their disclosure. His failure deprived Defendants of the ability to probe his medical treatment and to confront Dr. Masterson with contemporaneous records. This is the definition of prejudice.

Finally, Plaintiff argues that references to his COVID illness and coma were minimal and ceased at the Court's request. See Pl. Opp. at 16. The record proves otherwise. Plaintiff repeatedly referred to himself as a COVID survivor, surviving a coma, COVID coma survivor, and a survivor after the Court twice instructed him to cease. See Tr. 215:2-10 (instruction), 256:5-21 (instruction), 229:23 ("I just survived a coma"), 233:24-25 ("Why is a COVID survivor who just woke up going there?"), 250:12-13 ("I felt a bit of survivor's guilt"). Nevertheless, Plaintiff continued to do so: "I don't think it's feasible to do a two-hour thing for

9

somebody who just survived" (see Tr. 410:12-13), "when you get fired with two firing letters right after you survive and you're fighting for your life" (449:20-22), and "Let's make it crystal clear. I survived a COVID coma" (Tr. 1270:8-9). Plaintiff's counsel compounded this prejudice by highlighting COVID-19 and Plaintiff's illness in both opening (Tr. 94:11-95:7) and closing (Tr. 1332:2-12), and by eliciting extensive testimony on Plaintiff's illness and recovery (Tr. 1332:2-12). This repeated, improper emphasis on Plaintiff's illness was irrelevant to the legal issues, yet highly prejudicial. It undeniably influenced the jury's perception and, taken together with the withheld records and improper witness testimony, deprived Defendants of a fair trial. The verdict should be set aside.

**B.    Damages**

As explained in Defendants' moving papers (see ECF Dkt. No. 163 pp. 13-25), the Court should either set aside the jury's damages award, reduce it, or order a new trial on damages. The jury's damages award is excessive and unsupported by the record. Plaintiff fails to meaningfully rebut any of Defendants' arguments.

Plaintiff argues that he adequately sought to mitigate his damages and that he "**never stopped applying for jobs until he received his offer of suitable employment**." Pl. Opp. at 19 (emphasis in original). His own documentary evidence proves otherwise. See Ex 22. Plaintiff stopped applying for jobs while attending school —a choice that does not constitute mitigation. See Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 53 (2d Cir. 1998); Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 2015 U.S. Dist. LEXIS 42422, at *3-4, 12-13 (S.D.N.Y. 2015).

Plaintiff's assertion that he "diligently attempted to get a new position" is contradicted by his testimony. He admittedly rejected several jobs due to salary or location—even though he attended school in person in California and relocated there for a position with Johnson & Johnson in August 2024. See Tr. 117:11-20, 245:7-13, 442:19-443:8, 473:4-9, 473:17-474:6.

10

He further declined certain jobs because his disability benefits paid him more than those positions. See Tr. 475:14-18. It is well settled in the Second Circuit that declining a substantially equivalent job for personal reasons does not meet the mitigation standard. See Bergerson v. N.Y. State Off. of Mental Health, 526 F. App'x 109, 111 (2d Cir. 2013). NYU cannot be held liable for full back pay when Plaintiff deliberately chose to forgo employment in favor of higher disability benefits. Had he accepted those jobs, NYU would at most be responsible for the difference. Plaintiff's choices instead shifted the entire financial burden to NYU, which the law does not allow.

Plaintiff also argues that none of the job offers were substantially equivalent to his position at NYU and, therefore, rejecting them was not a failure to mitigate (see Pl. Opp. at 20). This argument is misplaced. Plaintiff's duty was to seek substantially similar employment, not identical employment. See Greenway, 143 F.3d at 53. By his own admission, Plaintiff applied for jobs he considered non-equivalent and then rejected offers for these same positions. Plaintiff failed to mitigate by failing to seek substantially similar employment. Moreover, Plaintiff testified that his disability benefits, conservatively estimated at $220,000.00, were partial benefits and he could still work while receiving them. See Tr. 495:16-23, 509:6-12. Had Plaintiff accepted one of the "low six-figure" positions offered, his salary with disability benefits would have equaled or exceeded his NYU compensation. Plaintiff's decision not to accept those positions was a voluntary choice that extinguishes any entitlement to full back pay or front pay.

Front pay is equally unsupported. Plaintiff's argument rests on a claimed $75,000 salary difference. But this figure corresponds to his on-call responsibilities at Winthrop, a position that Plaintiff repeatedly testified he assumed as a "courtesy" and could be unilaterally rejected at any time. See Pl. Opp. at 26; Tr. 214:17-24. Plaintiff cannot simultaneously argue that his

11

Winthrop duties were not essential functions when disputing liability, and then seek a windfall by claiming those same duties as the basis for front pay.

Plaintiff insists Defendants waived their offset argument by not pleading it as an affirmative defense. See Pl. Opp. at 24. While offset may be pleaded as an affirmative defense, it may also be raised as a counterclaim. See Fernandez v. Beehive Beer Distrib. Corp., 2017 U.S. Dist. LEXIS 151284, at *7 (S.D.N.Y. 2017). If the Court determines that offset should have been plead as an affirmative defense, Defendants should be permitted to amend their Answer to include such a defense. "In fact, courts have allowed defendants to amend their answers post-trial to assert a collateral source offset as an affirmative defense, finding that there was no prejudice or surprise to the plaintiff." Smith v. Interstate Mgt. Co. LLC, 2022 U.S. Dist. LEXIS 176616, at *30 (S.D.N.Y. 2022); see also Rhee v. SHVMS, LLC, 2024 U.S. Dist. LEXIS 102358, at *3-4 (S.D.N.Y. 2024); In re Digital Music Antitrust Litig., 2015 U.S. Dist. LEXIS 195055, at *44 (S.D.N.Y. 2015).

As explained in the joint letter (see ECF Dkt. No. 158 at 4-5), the damages award should be offset by the amount Plaintiff received from Social Security Disability Insurance benefits, as he was—by definition—unable to work. Courts in this Circuit have held that backpay is not available where a plaintiff was medically incapable of working, including periods during which they receive disability benefits. See Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 31 (2d Cir. 1997); Downey v. Monro, Inc., 2022 U.S. Dist. LEXIS 210133, at *14 (N.D.N.Y. 2022); Schlant v. Victor Belata Belting Co., 2000 U.S. Dist. LEXIS 16977, at *4-5 (W.D.N.Y. Nov. 9, 2000).

As for punitive damages, Plaintiff fails to meet the high standard necessary required. See Pl. Opp. at 27. Rather than address Defendants' legal arguments, Plaintiff provides

a laundry list of "Fact [sic] Relevant to Punitive Damages" and speculates on the jury's thought process and reasoning. Id. at 27-32. Speculation about jury deliberations cannot sustain an extraordinary punitive award.

The same is true for emotional distress damages. Plaintiff again avoids the law and parrots his and Dr. Masterson's testimony (Id. at 32-34)—testimony already tainted by Dr. Masterson's willful withholding of over 350 treatment session notes. Reliance on incomplete and prejudicial testimony cannot justify the excessive award.

Additionally, Plaintiff's cited cases are easily distinguishable. Id. at 36-37. Plaintiff claims that the Osorio case is similar because Plaintiff "testified at some length about the emotional distress and damage to reputation caused by the retaliation." Id. at 36. While Osorio upheld a verdict for emotional distress and reputational damage, the decision is distinguishable because the claims are different. In Osorio, the damages were the result of retaliation and defamation. Here, however, the jury explicitly found Defendants not liable for retaliation and Plaintiff did not assert a defamation claim or a cause of action for reputational harm. Furthermore, in Osorio, the $4 million award was to be divided among four defendants found jointly and severally liable, unlike here where only NYU was found to be liable for damages.

Plaintiff also asserts that the Serdans court "upheld a[n]...award for compensatory and punitive damages." Id. at 36. That is incorrect. The Serdans court only awarded compensatory damages and vacated the punitive damages award because "[w]e see no basis for punitive damages." Serdans v. N.Y. & Presbyterian Hosp., 138 A.D.3d 524, 525 (1st Dept 2016). It is unclear how much of the Serdans award remained after the punitive damages were vacated.

Plaintiff's remaining cited cases similarly do not support Plaintiff position. In Madrigal, the First Department upheld the award for retaliation and a hostile work environment

13

stemming from "a years-long onslaught of vulgar ethnic slurs, accompanied by demeaning work assignments not given to others." Madrigal v. Montefiore Med. Ctr., 191 A.D.3d 407, 409 (1st Dept 2021). Defendants were not found liable for retaliation or hostile work environment. Nor is there any evidence comparable to that of a "years-long onslaught ethnic slurs" or "demeaning work assignments." The Second Circuit in Turley vacated punitive damages, remanded for remittitur to determine a lower punitive damages amount, and upheld compensatory damages where there was intentional infliction of emotional distress and hostile work environment. See Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 162 (2d Cir. 2014). None of those facts are present here. Plaintiff's misleading use of these cases as comparable to the facts here is disingenuous.

Plaintiff claims that the emotional distress award should "go untouched" because "it is less than the 'maximum amount' that would be upheld by the district court as not excessive." See Pl. Opp. at 36-37. It is unclear what Plaintiff means by the "maximum amount," especially since he fails to identify any jury awards based on similar facts. Courts drastically reduce emotional distress damages in cases with far more compelling facts than Plaintiff's. See ECF Dkt. No. 163 at 20-22. Here the evidence "falls far short of the type of shocking, prolonged discriminatory conduct and/or long-term emotional harm that are part and parcel of the larger damage awards." Sooroojballie v. Port Auth. of N.Y. & N.J., 816 F. App'x 536, 547 (2d Cir. 2020) (collecting cases). The Second Circuit in Sooroojballie found that a jury's $2,160,000 award "far surpasses the upper limit of the reasonable range" and concluded "that $250,000 is the upper limit" in a case involving far more egregious facts than is present here, including hostile work environment and retaliation claims.

Thus, the Court should set aside the jury's damages award, or in the alternative set a new trial date for the issue of damages.

14

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court issue an order granting their motion for judgment as a matter of law, or, in the alternative, grant a new trial and/or reduce Plaintiff's damages, and grant a stay of execution of the judgment pending the outcome of this motion, and grant such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          October 10, 2025

                                **MURIEL GOODE-TRUFANT**
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 2-316
New York, New York 10007

By: /s/          Desiree Alexander
                 Desiree Alexander
                 Elisheva Rosen
                 Connor Quinn
                 Assistant Corporation Counsel

15

## **CERTIFICATE OF COMPLIANCE**

Counsel of Record hereby certifies that, pursuant to Rule 3.C of District Judge Rochon's Individual Rules of Practice in Civil Cases, the enclosed memorandum of law was produced using 12-point Times New Roman type and, including footnotes and excluding the cover page, captions, table of authorities, and table of contents, contains approximately 4,270 words, which is less than the total words permitted by such rules. Counsel relies on the word count function of the computer program used to prepare this brief.

Dated:     New York, New York
            October 10, 2025

By:   /s/ *Elisheva L. Rosen*
        Elisheva L. Rosen
        Litigating Senior Counsel