UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HABEEB AHMAD,

                              Plaintiff,

            -against-

NEW YORK UNIVERSITY, SCOTT
MELLYNCHUK and DOUG LAZZARO,

                              Defendants.

---

Case No. 1:22-cv-01248 (JLR)

**OPINION AND ORDER**

---

JENNIFER L. ROCHON, United States District Judge:

Dr. Habeeb Ahmad ("Plaintiff") was an ophthalmologist and associate professor of
medicine at New York University ("NYU"), serving as Chief of Service in NYU Langone's
Ophthalmology Department.  In March 2020, he contracted COVID-19, fell into a monthslong
coma, and suffered disabling complications from his illness.  Six months later, on September 13,
2020, Plaintiff's medical leave from NYU expired.  Because Plaintiff had not fully recovered, he
was informed that he could submit a request for a reasonable accommodation if he intended to
return to work and keep his position.  In November 2020, Plaintiff submitted a request to work
remotely, which was denied, and over the ensuing weeks, the parties were unable to come to an
agreement on an accommodation that would permit Plaintiff to return to work.  Plaintiff's leave
was ultimately extended through January 4, 2021, by which time he was expected to appear at
work, in person, with medical clearance.  Plaintiff did not do so, and he was terminated the next
day.

Plaintiff brought this suit in February 2022, asserting claims for retaliation and disability
discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112(a),
12203(a), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(1)(a), (7),
and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(1)(a),

(7), (28), against NYU,[1] his supervisor Dr. Doug Lazzaro, and Employee and Labor Relations ("ELR") manager Scott Mellynchuk (collectively, "Defendants").  The Court held a jury trial in July 2025, and the jury found NYU liable for discrimination under the NYSHRL and NYCHRL and all three Defendants liable for failure to engage in a cooperative dialogue under the NYCHRL.  The jury awarded Plaintiff $2 million in emotional-distress damages, $1.4 million in backpay, $375,000 in front pay and, against only NYU, $250,000 in punitive damages. Defendants now move for judgment notwithstanding the verdict ("JNOV") pursuant to Federal Rule of Civil Procedure ("Rule") 50(b) and, in the alternative, for a new trial or remittitur of damages pursuant to Rule 59(a).  For the reasons that follow, the Rule 50(b) motion is GRANTED in part and DENIED in part, and the Rule 59(a) motion is GRANTED in part and DENIED in part.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from the testimony of witnesses and exhibits introduced at trial.  Further elaboration on these events is provided later in this Opinion where relevant to the Court's legal analysis.

In March 2020, at which time Plaintiff was working as Chief of Service of the Woodhull Clinic at NYU Langone, Plaintiff became gravely ill with COVID-19.  He drove himself to the hospital on March 18, 2020, fell into a coma, was intubated, and awoke two months later. Plaintiff learned that he had a minor heart attack and developed pneumonia, sepsis, and organ failure, among other things.  When Plaintiff was released from the hospital in June 2020, he

---

[1] Plaintiff had previously named NYU Langone and the NYU Department of Medicine as Defendants, but they were replaced with NYU prior to trial.  *See* Dkt. 140.

continued to suffer from complications, namely neuropathy, balance disorder, and foot drop. Trial Transcript ("Tr.") at 173:5-179:6; Plaintiff's Exhibit ("PX") 8 at 4.

On September 25, 2020, Plaintiff and Defendant Lazzaro spoke over the phone after Plaintiff's medical leave expired. Plaintiff expressed his desire to return to work in the future with potential modifications to his role. Lazzaro informed Plaintiff that human resources ("HR") would be in touch with him regarding next steps. *See* PX 51.F at 5. On October 6, Patricia Gaeta, a senior administrator in the Ophthalmology Department, emailed Plaintiff and instructed him to complete an attached form to request an accommodation for his disability. *See* PX 48 at 3; PX 51.F at 3-8; PX 8 at 2-5. Defendant Mellynchuk, an HR and ELR manager, followed up later that day to advise Plaintiff that his six-month medical-leave benefit had expired. PX 48 at 2. He directed Plaintiff to submit any accommodation request, supported by medical documentation, to ELR. *Id.* at 2-3. Mellynchuk informed Plaintiff that he may be released from employment if he did not submit the required documentation or return to work and advised him that he could apply for long-term disability benefits. *Id.*

On November 2, Plaintiff submitted his portion of the reasonable-accommodation form to Mellynchuk. *Id.* at 1. Plaintiff wrote that he was unable to drive and had difficulty walking, although he was making significant progress, and requested a remote-work accommodation. PX 8 at 2-3. On November 12, Plaintiff's physician, Dr. Brad Karp, sent his portion of the form to NYU, identifying Plaintiff's impairments as "foot drop, balance disorder, [and] neuropathy," the duration of which "depend[ed] on [his] progress." *Id.* at 4. Dr. Karp noted that Plaintiff's affected job functions were "walking," "lifting," and "driving," *id.*, and opined based on those limitations that "remote work would be feasible at th[at] time including chief duties[,] teaching and research," *id.* at 5. No one from NYU spoke to Plaintiff about his request between November 12 and November 18. Tr. at 192:12-193:1.

3

On November 18, Mellynchuk advised Plaintiff that his accommodation request was under review.  PX 47 at 1.  The next day, Mellynchuk informed Plaintiff that his request was denied, that his leave would be extended through November 30, and that Plaintiff would be released from employment if he did not return to work, in person, on December 1.  PX 46 at 1.  Mellynchuk explained that a remote-work accommodation would not allow Plaintiff to perform the essential functions of his role, which was "predominantly clinical in nature, with comparatively minor academic and administrative duties," and that "[t]he vast majority of [his] clinical responsibilities c[ould] only be performed in person."  *Id.*  He noted that onsite patient care was "an essential function of [his] job that [could not] be removed or delegated to other clinicians without unduly burdening the service and negatively impacting patient care."  *Id.*  At trial, Plaintiff strongly disputed Mellynchuk's characterization of his job duties and maintained that there were other reasonable accommodations that would have allowed him to perform the essential functions of his position without imposing an undue burden on NYU.  *See, e.g.*, Tr. at 206:21-207:15.  Mellynchuk testified that he made this decision based on the accommodations form, Plaintiff's contract (which described his duties as 90 percent clinical, *see* PX 40 at 1), and discussions with Lazzaro and Gaeta.  *See* Tr. at 677:15-679:2, 699:16-19.

After receiving the denial from Mellynchuk, Plaintiff testified that he feared that he would be fired because he was given less than two weeks' notice to return to work, and his only request was denied without further conversation or inquiry.  Plaintiff subsequently made multiple attempts to get in contact with Lazzaro, ELR, HR, the Dean of NYU Langone, and Vice Chair Dr. Kathryn Colby.  *See id.* at 212:13-213:15; 217:7-219:4.  Internal emails from November 20 indicate that Plaintiff's communications were received, although the relevant decisionmakers in those departments did not believe that a solution was possible.  *See* PX 51.M at 5 (Dean Grossman: "Can someone handle this? Thx"); *id.* (Andrew Brotman: "His illness was terrible but

4

an ophtho cannot work from home."); *id.* at 4 (Andrew Rubin: "[I] know Dr. Lazzaro was encouraging him to take LTD but he was resistant"); *id.* at 3 (Lazzaro: "[U]nless we change what he does, I do not see a solution."); *id.* at 2 (Rubin: "HR will contact him on Monday to tell him [the] decision is final — [h]e should apply for LTD").  Between November 19 and November 30, which included the Thanksgiving holiday, Plaintiff heard back from only Austin Bender, the Director of ELR, who called Plaintiff on the night of November 20, after Plaintiff emailed the Dean.  Tr. at 217:22-218:9.  According to Plaintiff, Bender raised his voice and "was kind of yelling saying, we don't do remote work."  *Id.* at 218:9-10.  Plaintiff testified that after Bender "eventually . . . calm[ed] down a bit," Plaintiff spoke for a few minutes regarding his request and sought clarification about return-to-work expectations.  *Id.* at 218:3-24; *see id.* at 218:20-24 (Plaintiff: "I said, listen, you are firing me December 1.  Nobody has told me where to go, which location. . . . What I could do, what I can't do, I don't understand.  You're basically firing me.  What can I do?").  Bender told Plaintiff that he was "going on vacation" but would "look into it" and reach back out to Plaintiff before December 1.  *Id.* at 218:25-219:4.

Plaintiff testified that he did not hear back from Bender, so he hired an employment attorney to contact NYU on his behalf.  *Id.* at 219:5-220:10.  On the morning of November 30, the day before Plaintiff was expected to report to work, Plaintiff's attorney sent a letter to Mellynchuk and Dan Driesen, NYU's in-house counsel, to facilitate further conversation.  *See* PX 44; PX 15; Tr. at 220:1-10, 587:23-588:10.  Plaintiff sent the following email to Mellynchuk later that afternoon:

> My attorney Scott Simpson sent you and Dan Driesen a letter this morning.  As of now, I know that if I don't physically report to work tomorrow NYU has said they will release me.  Despite the health risks I face, I will be reporting to Woodhull tomorrow following my physical therapy appointment in the morning.  It seems at this point I have no other choice.  I should be there by 1 pm.

PX 44.  Mellynchuk thanked Plaintiff for the message and gave him a "reminder" that he was "required to present medical clearance from [his] healthcare provider . . . in order to return from medical leave."  *Id.*  Several hours later, Mellynchuk emailed Nancy Sanchez, Director of HR, informing her that they had received a letter from Plaintiff's attorney.  PX 60 at 1.  Mellynchuk stated that he had spoken with Lazzaro to develop two potential accommodations, but noted that Lazzaro said no remote work, in any capacity, could be approved "due to the clinical nature of [Plaintiff's] responsibilities."  *Id.*  According to Mellynchuk, "Lazzaro also agreed to postpone the termination temporarily so that [they] [could] respond to the attorney letter appropriately." *Id.*  Mellynchuk explained that the two proposals "would" relieve Plaintiff "of on call and surgical work" for the duration of a new, one-year contract.  *Id.*

The next day, on December 1, Plaintiff had a brief phone call with his attorney and Mellynchuk, which was the only time Plaintiff had any live conversation with Mellynchuk.  *See* Tr. 226:9-17, 243:9-17, 677:3-11; PX 116 at 3.  After Plaintiff inquired about his options to avoid termination, Mellynchuk said he would "check with [Lazzaro]" and "try to get [Plaintiff] some options by email," although Plaintiff claims that there was no discussion about his limitations.  Tr. at 226:17-19.  On December 2, Mellynchuk emailed Plaintiff two return-to-work options that would require Plaintiff to sign a new "1 year contract to reflect the revised responsibilities and compensation."  PX 116 at 3.  Both options would relieve Plaintiff of his on-call responsibility and reduce his salary by $75,000, *id.*, although Plaintiff testified that those responsibilities were already "[his] to remove at any time," added only months prior, and "a temporary thing that [he] did as a courtesy to the department," Tr. at 229:11-17.  Option A would have (1) relieved Plaintiff of his "Woodhull Chief of Service/Admin responsibilities," along with a $10,000 pay cut; (2) required him to work one full day per week at the Woodhull Clinic, which was multiple hours from his home; and (3) required him to work three sessions per week at the

6

FGP Huntington Clinic, which was only twenty minutes from his home.  PX 116 at 3; *see* Tr. at 229:2-25.  Option B would have (1) retained Plaintiff's "Woodhull Chief of Service/Admin responsibilities"; (2) required him to work two full days per week at Woodhull; and (3) required him to work two full days per week at Huntington.  PX 116 at 2-3.  Neither option relieved Plaintiff of his surgical duties.  *See id.*

Plaintiff believed the two options were inadequate — both required him to sign a new contract and take a significant pay cut; Option A came with an easier commute but removed his Chief of Service duties, "the very thing [he] love[d] and the very thing that [he] could do remotely"; and Option B came with a challenging commute but allowed him to keep his Chief of Service position.  Tr. at 229:2-230:1.  Plaintiff testified that he reluctantly chose Option B because he felt he had had "no other choice" and wanted to retain his preferred Chief of Service position, along with its associated research, teaching, and administrative duties.  *Id.* at 230:5-17.  Given the demanding commute to Woodhull and Plaintiff's limited driving abilities, Plaintiff requested additional time to retrofit his car and take driving lessons.  *See id.* at 232:14-233:2; PX 116 at 1.  On December 9, Mellynchuk emailed Plaintiff informing him that NYU could grant "a final extension of [his] medical leave through January 3, 2021" and that if he did not return to work by January 4, he would be terminated.  PX 49.C at 14.  Mellynchuk informed Plaintiff that he was required to obtain medical clearance to perform all revised job duties "without restriction," including surgeries, *id.* at 14-15, although Mellynchuk had previously indicated to Sanchez that Lazzaro had envisioned relieving Plaintiff of his surgical duties, PX 60 at 1.

On December 23, 2020, Plaintiff emailed Mellynchuk and Lazzaro, copying Gaeta, to inform them that he "had a reality check," as driving proved to be "more challenging than [he] anticipated."  PX 49 at 8.  He asked whether an alternative arrangement could be made based on his current limitations, such as an adjustment of responsibilities with a salary cut.  *Id.* at 9.  Two

hours later, Lazzaro emailed Colby and Dr. Andrew Brotman (who oversaw clinical operations): "[My] feeling based on this email . . . is that we make the decision to terminate him Jan 4 . . . I know this is unfortunate but I believe we have to move on from him at that point." PX 49.C at 2; *see* Tr. at 821:22-24. Colby and Brotman agreed, and Brotman opined that Plaintiff "misjudged his whole situation and should have accepted our advice on disability." *Id.* Plaintiff subsequently attempted to communicate with Defendants to work out a solution to return to work as soon as possible, but he was unable to speak to anyone from HR, Mellynchuk, or anyone else at NYU. *See id.* at 238:6-239:8. According to Plaintiff, he could have returned to work immediately with an accommodation on a temporary basis, as he needed only a couple of months to fully regain his abilities. *See id.* at 182:14-21, 211:11-18, 235:12-22, 239:9-19. Plaintiff received just one email from Mellynchuk, on December 30 — the final business day before Plaintiff's expected return — which reaffirmed NYU's original offer without referencing any alternatives and reminded Plaintiff that he was required to return to work on January 4 with medical clearance. *See* PX 49.D at 2-3; PX 34. Plaintiff followed up and offered to provide additional information, *see* PX 49.D at 2, but after receiving no response, he did not return to work on January 4, *see* PX 1. Plaintiff received a letter from Lazzaro the next day informing him that he was being "released from employment effective immediately due to [his] inability to return to work." *Id.*

## II.    Procedural History

On February 14, 2022, Plaintiff filed this action. *See* Dkt. 1 ("Compl."). Defendants filed summary judgment and *Daubert* motions on May 20 and 21, 2024. *See* Dkts. 77, 81. After oral argument, on February 11, 2025, the Court granted the motion for summary judgment as to Plaintiff's NYCHRL interference claim and narrowed Plaintiff's retaliation claim, but denied the motion in all other respects, finding genuine issues of material fact precluding summary

judgment on all of Plaintiff's remaining claims. *See* Dkt. 100 at 1. The Court also denied

Defendants' motion to entirely preclude the testimony of Plaintiff's experts, although the Court

agreed with Defendants that Plaintiff's experts could not testify as to legal conclusions, such as

the characterization of an action as retaliatory. *See id.*; Dkt. 166-2 ("FPTC Tr.") at 98:2-16.

In June, after a trial date was set, the parties filed motions *in limine*. *See* Dkts. 123, 125.

Plaintiff also moved to amend his Complaint to expressly add a claim for failure to engage in a

cooperative dialogue under the NYCHRL against all Defendants, as the parties disagreed over

whether such a claim was properly pleaded in the first instance. *See* Dkt. 124. At the final

pretrial conference ("FPTC") held on July 9, 2025, the Court ruled on the motions *in limine* and

granted Plaintiff's motion to amend, finding good cause and neither undue prejudice nor unfair

surprise. *See* Dkt. 140; FPTC Tr. at 13:2-16:16.

On July 22, 2025, the jury trial commenced. On July 29, Defendants moved for

judgment as a matter of law ("JMOL") pursuant to Rule 50(a). *See* Tr. at 1277:7-1311:8. The

Court granted the Rule 50(a) motion in part and dismissed Plaintiff's ADA claims against

Defendants Lazzaro and Mellynchuk, as Plaintiff conceded that individual liability was not

available under the ADA. *See id.* at 1311:21:1312:1. The Court reserved judgment on the

remainder of Plaintiff's Rule 50(a) motion. *Id.* at 1313:3-4.

The jury deliberated for two days and returned a verdict on July 31, 2025, finding NYU

liable for disability discrimination under the NYSHRL and NYCHRL, and all Defendants liable

for failing to engage in a cooperative dialogue under the NYCHRL. The jury did not find any of

the Defendants liable for retaliation or discrimination under the ADA, for retaliation under the

NYSHRL or NYCHRL, or for disability discrimination based on a failure-to-accommodate

theory under the ADA, NYSHRL, or NYCHRL. The jury awarded Plaintiff $1.4 million in

backpay, $375,000 in front pay, $2 million in emotional-distress damages, and $250,000 in punitive damages against only NYU. *See generally* Dkt. 161-17.

Defendants move pursuant to Rule 50(b) for judgment notwithstanding the verdict ("JNOV"), seeking dismissal of Plaintiff's prevailing claims for disability discrimination and failure to engage in a cooperative dialogue, as well as incorporate all aspects of their earlier Rule 50(a) motion. In the alternative, Defendants move pursuant to Rule 59(a) for a new trial or remittitur of damages. *See* Dkt. 162; 163 ("Br."). The motion was fully briefed as of October 10, 2025. *See* Dkt. 166 ("Opp."); Dkt. 171 ("Reply").

**LEGAL STANDARD**

### I. Rule 50(b)

"A party has two opportunities to seek judgment as a matter of law during trial. Under Rule 50(a), a party may move for JMOL 'at any time before the case is submitted to the jury.'" *Edelman v. NYU Langone Health System*, 141 F.4th 28, 41 (2d Cir. 2025) (quoting Fed. R. Civ. P. 50(a)(2)). "If the Rule 50(a) motion is not granted *before* the matter is submitted to the jury, and the jury finds against the movant, the movant may renew its motion after trial under Rule 50(b) as a motion for JNOV," or judgment notwithstanding the verdict. *Id.* The district court may grant the motion for JNOV only if "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Triolo v. Nassau County*, 24 F.4th 98, 105 (2d Cir. 2022) (quoting *Ashley v. City of New York*, 992 F.3d 128, 138-39 (2d Cir. 2021)).

"The movant's burden is 'particularly heavy' where, as here, the 'jury has deliberated in the case and actually returned its verdict.'" *Id.* (quoting *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)). The court "'may not weigh the credibility of witnesses or otherwise

consider the weight of the evidence' on its own." *Edelman*, 141 F.4th at 44 (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)). "Instead, the court must consider 'the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor,'" as well as "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* (first quoting *Wolf v. Yamin*, 295 F.3d 303, 308 (2d Cir. 2002); and then quoting *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 153 (2d Cir. 2014)).

## II.    Rule 59(a)

Under Rule 59(a), "[t]he trial judge has '"discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence." . . . This discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur).'" *Knox v. John Varvatos Enters. Inc.*, 512 F. Supp. 3d 470, 492 (S.D.N.Y. 2021) (omission and second alteration in original) (quoting *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998)). If the court finds a damages award to be excessive, "[r]emittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (quoting *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)). "In considering motions for a new trial and/or remittitur, '[t]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.'" *Id.* (alteration in original).

"Unlike a motion for judgment as a matter of law under Rule 50, a motion for a new trial under Rule 59 'may be granted even if there is substantial evidence to support the jury's verdict.'" *D.R. ex rel. Rodriguez v. Santo Bakery, Inc.*, 716 F. Supp. 3d 228, 235 (S.D.N.Y.

2024) (quoting *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)).  "'[A] trial judge is free to weigh the evidence [her]self, and need not view it in the light most favorable to the verdict winner.'  However, a court 'must bear in mind . . . that the court should only grant such a motion when the jury's verdict is egregious.'"  *Ortiz v. Stambach*, 137 F.4th 48, 71-72 (2d Cir. 2025) (omission in original) (quoting *DLC Mgmt. Corp, v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998)).  "Such a motion ordinarily should be denied 'unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"  *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 324 (2d Cir. 2022) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998)).  "The calculation of damages is the province of the jury," and a court must "not vacate or reduce a jury award merely because [it] would have granted a lesser amount of damages."  *Ortiz*, 137 F.4th at 72-73 (quoting *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014)).  "Under New York law, a court 'shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.'"  *Stampf*, 761 F.3d at 204 (quoting N.Y. C.P.L.R. § 5501(c)).  "To determine whether a jury award is excessive . . . , New York courts compare it with awards in similar cases."  *Id.*

## DISCUSSION

### I.    Rule 50(b) Motion

Defendants seek judgment as a matter of law on Plaintiff's claims for disability discrimination under the NYSHRL and NYCHRL and for failure to engage in a cooperative dialogue under the NYCHRL.  Defendants also argue that Plaintiff is not entitled to punitive damages as a matter of law.  The Court concludes that the jury's verdict as to liability was sufficiently supported by the trial record but that the jury's award of punitive damages must be set aside as matter of law.

12

### A.    Disability Discrimination – NYSHRL/NYCHRL

The jury rejected Plaintiff's discrimination claim under the ADA but found NYU liable for discrimination under the NYSHRL and NYCHRL.  "[T]he [NYS]HRL forbids employment discrimination on the basis of an employee's disability, and the [NYC]HRL provides even greater protection against disability-based discrimination." *Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 11 N.E.3d 159, 166 (N.Y. 2014) (collecting cases).  "NYSHRL and NYCHRL claims are both analyzed using the three-step burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Uttarwar v. Lazard Asset Mgmt. LLC*, No. 24-1085, 2025 WL 704278 (2d Cir. Mar. 5, 2025) (summary order) (collecting cases).  To establish a *prima facie* case of disability discrimination under either statute, the employee must show that he "suffers from a statutorily defined disability and the disability caused the behavior for which [he] was terminated." *Jacobsen,* 11 N.E.3d at 166 (collecting cases).  Unlike the NYSHRL, "the [NYC]HRL's definition of 'disability' does not include 'reasonable accommodation' or the ability to perform a job in a reasonable manner.  Rather, the [NYC]HRL defines 'disability' solely in terms of impairments." *Hosking v. Mem'l Sloan-Kettering Cancer Ctr.*, 126 N.Y.S.3d 98, 102 (App. Div. 2020) (quoting *Romanello v. Intesa Sanpaolo, S.p.A.*, 998 N.E.2d 1050, 1053 (N.Y. 2013)).  Accordingly, under the NYSHRL, the employee bears the burden of proving that he could perform the essential functions of his position with or without a reasonable accommodation, whereas under the NYCHRL, the employer bears the burden of proving otherwise. *See Jacobsen*, 11 N.E.3d at 166-67; *Williams v. MTA Bus Co.*, 44 F.4th 115, 136-37 (2d Cir. 2022).

If the employee establishes a *prima facie* case, the employer "then has the opportunity to offer legitimate reasons for its actions."  *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75-76 (2d Cir. 2015).  If the factfinder determines that the employer has articulated a legitimate,

nondiscriminatory basis for the plaintiff's termination, the employee may still prevail by proving

"'that the employer's stated justification for its . . . action was nothing but a pretext for

[disability] discrimination' or 'that[] even if the employer had mixed motives, the plaintiff's

[disability] was at least one motivating factor in the employer's . . . action.'" *Collymore v. City

of New York*, No. 23-1304, 2025 WL 1323784, at *3 (2d Cir. May 7, 2025) (summary order)

(second alteration in original) (quoting *Bart v. Golub Corp.*, 96 F.4th 566, 567 (2d Cir. 2024));

*see Bart*, 96 F.4th at 574 ("[A] plaintiff alleging that an employment decision was motivated

both by legitimate and illegitimate reasons may establish that the 'impermissible factor was a

motivating factor, without proving that the employer's proffered explanation was not some part

of the employer's motivation.'" (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 142 (2d Cir.

2008))).

### 1. Qualifications and Essential Functions

Defendants argue that NYU is entitled to judgment as a matter of law on the NYSHRL

and NYCHRL disability-discrimination claims because Plaintiff was not able to perform the

essential functions of his job, with or without an accommodation.  Whether Plaintiff was

qualified to perform the essential functions of his position, with or without a reasonable

accommodation, was a hotly contested issue during the trial.  Defendants argued that Plaintiff

was an eye surgeon with almost entirely clinical duties whose medical condition plainly

precluded him from performing his core responsibilities.  Plaintiff, however, disagreed with

Defendants' characterization that his job primarily consisted of in-person clinical duties and

called into question the accuracy of the job description found in his contract:

> Q. What percentage of your duties would you say were dedicated to clinical
> responsibilities?
> A.  Again, probably 10 to 15 percent, max.
> Q.  You notice this chart [in the contract] says zero percent effort into
> education.  Is that accurate?

    A. Absolutely not. . . .

    Q. Roughly, what percentage of your work was dedicated to education?

    A. I would say again, also 50-plus percent every day.

    Q. What about research?

    A. Research was about 25 percent, give or take, on a weekly basis.

Tr. at 166:14-167:14 (Plaintiff's Direct Examination). Defendants vigorously disputed

Plaintiff's position on cross-examination and elicited conflicting testimony from other NYU

employees, but the jury was entitled to credit Plaintiff's testimony, which was substantiated by

other witnesses. For example, Plaintiff's counterpart in another department, Dr. Kaira Kwong-

Tam, testified that "perhaps more than 50 percent of [Plaintiff's] time [in the Woodhull clinic]

was dedicated to administrative duties," *id.* at 528:7-11, at least some of which "could have been

done at home," *id.* at 526:11-17. In addition, two of Plaintiff's former residents, Dr. Michael

Rothschild and Dr. Bing Chiu, testified that that Plaintiff's position at Woodhull entailed

significant educational and administrative responsibilities. *See id.* at 539:3-17 (Chiu); *id.* at

927:8-930:21 (Rothschild). Dr. Rothschild further testified that a "minority of [Plaintiff's]

duties" there consisted of being "in the operating room with residents," *id.* at 930:25-931:5, and

that "even when [Plaintiff] was at other sites, he was still involved in teaching," *id.* at 928:16-18.

This testimony provided a basis for the jury to find that Plaintiff's contract, and Defendants'

characterizations of his job duties, did not accurately capture the true nature of his day-to-day

functions. Indeed, Lazzaro had written in an email "that one could debate whether [Plaintiff's]

administrative role was as high as 25 percent at Woodhull" — not 10 percent as represented in

the contract. *Id.* at 1071:19-21; *see* PX 40 at 1. While Lazzaro ultimately insisted that the "vast

majority of [Plaintiff's] work was clinical," Tr. at 1072:10-11, Plaintiff testified that he did not

recall ever working with Lazzaro at Woodhull, *see id.* at 161:9-13, and Dr. Rothschild testified

that he never saw Lazzaro at Woodhull to observe the work being performed there, *see id.*

at 930:22-24 (Rothschild: "I worked with [Lazzaro] at other locations but I don't recall ever

seeing him at Woodhull."); *see also id.* at 1067:25-1068:1 (Lazzaro: "I had visited Woodhull at

least on five occasions . . . ."). And because Mellynchuk maintained that Plaintiff's work "was

primarily clinical" based on "conversations with [Defendant] Lazzaro" and Plaintiff's contract,

among "other sources of information," *id.* at 713:12-20, the jury had a basis to question

Mellynchuk's characterization of Plaintiff's job duties as well.

Regardless of the precise mix of Plaintiff's essential functions, Defendants maintained

that Plaintiff's in-person clinical work — especially surgical work — was essential to his

position and that his limitations disqualified him from performing those duties. Br. at 5. At trial,

Defendants largely relied on the form from Dr. Karp, submitted in connection with Plaintiff's

initial remote-work request, stating that Plaintiff had three "physical impairments or mental

impairment[s]": "foot drop, balance disorder, [and] neuropathy." PX 8 at 4. Defendants

presented this form to Dr. Himani Goyal, Plaintiff's successor, and asked whether she had seen

someone with those limitations successfully perform microscopic ophthalmic surgery. *See* Tr.

at 1030:16-1031:1. In response, Dr. Goyal opined that she did not think that someone with foot

drop could safely perform certain surgical duties involving a foot pedal. *Id.* at 1031:3-18.

Dr. Goyal also opined that someone with Plaintiff's limitations may be unable to "pick up a lens,

be able to hold it, balance it, be able to lean over onto the microscope that the patient is leaning

into, [or] be able to walk from one room to the next or however, depending on how the room is

set up." *Id.* at 1033:1-14. On cross, however, Dr. Goyal admitted that she "didn't actually see

[Plaintiff] working as chief in 2019," *id.* at 1043:18-25, was not "part of the conversations about

whether to accommodate [Plaintiff]," *id.* at 1044:7-9, and was testifying in support of her current

employer, who was paying her salary, and Defendant Lazzaro, who was her former supervisor,

*id.* at 1042:1-17, all of which the jury could have used to discount some of her assertions.

Moreover, the form listed only three "job function(s) . . . affected by [Plaintiff's] disability" —

"walking," "lifting," and "driving," PX 8 at 4, which was consistent with Plaintiff's own description of his physical limitations as of November 2020, *see* Tr. at 194:22-195:1 (Plaintiff: "[O]bviously there were certain things I couldn't do at that time. So heavy lifting, like 10, 20, 30 pounds. . . . Gait, balance, lifting, walking, things like that."). The form did not opine on his ability to perform surgical or other clinical work as of November 2020, let alone as of January 2021. *Cf. Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000) ("Although [defendant] claims that [plaintiff] was not medically cleared for work . . . , his medical reports no longer prescribed 'no work,' suggesting at least the possibility that Parker had recovered enough to resume his duties with some accommodation."). Moreover, clinical work encompassed more than surgeries, and Mellynchuk relayed to Sanchez that Lazzaro had originally considered relieving Plaintiff of his surgical duties, PX 60 at 1, although that option was never presented to Plaintiff. *See also* Tr. at 1093:13-1094:2 (Lazzaro: acknowledging that prior to Plaintiff's absence, direct surgical work could be as little as 10 percent of Plaintiff's responsibilities).

The jury also heard testimony suggesting that Defendants never followed up with Dr. Karp or requested Plaintiff's medical records in order to fully understand Plaintiff's physical limitations. *Id.* at 919:20-920:10 (Mellynchuk). While Defendant Mellynchuk maintained that he "followed up with [Plaintiff], not his provider," *id.* at 920:6, Plaintiff testified that he faced substantial difficulty communicating any information to Defendants, including HR and ELR, in the weeks leading up to his termination:

> Q. Between you asking to reevaluate your accommodation and January 4th, who at NYU did you talk to about your accommodation request?
> A. Other than the emails that were exchanged [denying the request and setting a return date], there was no discussion.
> Q. Did anyone at NYU attempt to call you during that time frame?
> A. No, not at all.
> Q. Did you make any further attempts to contact anyone at NYU?
> A. Yeah, I tried Scott one more time, and Doug, as well. No response.
> Q. How did you try them?

A. Voice.  Because of the sense of urgency.
Q. Did you receive any callbacks?
A. No.
Q. Did you attempt to speak to anybody else at NYU?
A. I didn't get anybody from — unfortunately, from NYU.
Q. No one at HR?
A. No.

*Id.* at 238:6-24.  Plaintiff further testified that he spoke to Defendant Mellynchuk only "one time,

when [he] hired [his] attorney." *Id.* at 243:9-10.  After October, Plaintiff "never spoke verbally

or in person" with Defendant Lazzaro, and no one from NYU "asked what [he] can and

can't do, driving updates or [his] physical improvements, nothing," *id.* at 243:11-18; *see also*

*id.* at 1079:8-1080:13 (Lazzaro: testifying that Plaintiff called him on November 23 with a

potential "solution," but he "didn't pick up the phone" because he "didn't want to interfere with

the [HR] process" and "didn't want to [keep] hav[ing] the same conversation [with Plaintiff]").

Plaintiff was also unable to reach Colby, *id.* at 209:15-23, 220:1-6, or Dean Grossman,

*id.* at 210:5-13, 217:22-23, and while Plaintiff eventually spoke with Bender over the phone,

Bender went on vacation and did not follow up, *see id.* at 218:25-219:17.

Ultimately, according to Plaintiff, the short form from Dr. Karp was not meant to be a

final reflection of Plaintiff's job limitations, but rather an "update" on his progress as of

November 2020.  Tr. at 197:2-8; *see also* PX 8 at 4 (noting on medical form that the "End Date"

of Plaintiff's job-function limitations "depend[ed] on [his] progress").  Plaintiff testified that he

had made significant progress in his recovery as of December 2020, "was getting ready to get

the medical clearance," and "was already told by [his] doctors they would clear [him]."

Tr. at 424:7-10.  Plaintiff explained that he had not provided medical clearance to NYU in

January 2021 because they "just hadn't agreed on any accommodation," not because he was

unable to obtain medical clearance at all.  *Id.* at 424:9-10; *see also id.* at 391:24-392:1 ("There

was no reason to give medical clearance because we didn't have a contract signed, and we were basically just discussing things.").

Defendants' cited case, *Vangas v. Montefiore Medical Center*, is thus distinguishable. *See* 823 F.3d 174 (2d Cir. 2016). In *Vangas,* the Second Circuit concluded that the plaintiff was "incapable of performing the essential functions of her job" because "[s]he was not medically cleared to return to work *and admitted that she could not do so*." *Id.* at 181 (emphasis added). In the instant case, Plaintiff "never admitted that [he] could not" return to work and could not get medical clearance. *Id.* Moreover, "the only possible accommodation" for the *Vangas* plaintiff's lack of medical clearance "was an extension of leave, as she was incapable of working, in any capacity, whether at home or in the office." *Id.* She "did not request an extension of leave for a specific time period — she simply informed [her employer] that she was not feeling well, would not be returning to work [the next day], and could not give . . . a date for her return to work." *Id.*; *see id.* at 178. Here, in contrast, and as set forth below, Plaintiff maintained that reasonable accommodations were available that could have enabled him to perform his job remotely, part-time, or with temporary adjustments to his responsibilities, in addition to or instead of an extension of leave, and he never represented that he was wholly incapable of performing work "in any capacity." *Id.* at 181.

After considering the nature of Plaintiff's position, in order to assess whether Plaintiff was qualified to do his job, the jury was also required to determine whether an accommodation would have allowed Plaintiff to perform his essential functions without imposing undue hardship on NYU. On this topic, Plaintiff testified that he discussed various potential accommodations with Defendants that were all either cursorily rebuffed or never addressed, including transportation assistance, Tr. at 398:18-399:8, part-time, short-term, or long-term remote-work arrangements, *id.* at 197:9-199:24, 239:2-8, 410:6-411:10, 414:12-415:5, temporary

reassignment to a clinic closer to his home, even with "a pay cut," *id.* at 239:2-18, or "temporary

leave without pay," *id.* at 239:19.  *See* N.Y. Comp. Codes, R. & Regs. tit. 9, § 466.11(a)(2)

("Reasonable accommodations [under NYSHRL] may include, but are not limited to: . . . job

restructuring; modified work schedules; adjustments to work schedule for treatment or

recovery . . . .); *Campbell v. IPsoft Inc.*, No. 18-cv-10684 (DF), 2021 WL 4248861, at *25

(S.D.N.Y. Sept. 17, 2021) ("[T]here is nothing inherently unreasonable . . . in requiring an

employer to furnish an otherwise qualified disabled employee with assistance related to her

ability to get to work." (quoting *Nixon-Tinkelman v. N.Y.C. Dep't of Health & Mental Hygiene*,

434 F. App'x 17, 19 (2d Cir. 2011) (summary order)); *Romanello*, 998 N.E.2d at 1052 ("[U]nlike

'the [NYS]HRL . . . there is no accommodation (whether it be indefinite leave time or any other

need created by a disability) that is categorically excluded from the universe of reasonable

accommodation" under the [NYC]HRL."); *cf. Tse v. N.Y. Univ.*, No. 10-cv-07207 (DAB), 2016

WL 10907062, at *9-10, *28-29 (S.D.N.Y. Aug. 29, 2016) (finding that while plaintiff lacked

manual dexterity to perform certain laboratory work, other accommodations existed that could

have allowed plaintiff to perform her essential job functions).  Many of these options were listed

as example accommodations on NYU's own form.  *See* PX 8 at 3 ("Depending on the

circumstances, examples of an accommodation may include, but are not limited to, modification

of your work schedule, modified work tools or duties, working from home, or a leave of

absence.").  And Plaintiff's attorney had informed Defendants that while "Dr. Ahmad initially

requested to work 100% remotely, he [was] completely open to other accommodations that NYU

might view as less burdensome, such as working on-site part time or even a temporary reduction

of his job responsibilities and/or work hours, along with a corresponding reduction in his

compensation, while he completes his recovery."  PX 15 at 5.

Notably, Plaintiff maintains that none of his proposed accommodations would have needed to be permanent.  He testified that as of November 2020, he was at "a good enough baseline" to be "physically ready to return to work" to perform many of his duties — "[e]nough to be on [his] feet at Woodhull" and walk multiple blocks without stopping — and that he was primarily concerned about driving two hours to the Woodhull location in his retrofitted vehicle. *Id.* at 184:4-16; *see id.* at 233:17-234:11, 239:9-16.  As Plaintiff explained, he "was willing . . . for sure" to return to work in December "[e]ven if [he] needed to get somebody to drive [him] or be in an Uber or something," and he was "confident at that time with a temporary accommodation [he] could have returned to work." *Id.* at 211:11-18; *see also id.* at 243:19-21 (Counsel: "How long did you want to work from home?" Plaintiff: "I didn't need a lot. . . . I was doing pretty good.  Like I said, I was about 90, 90-plus percent, and I was already making pretty good incremental changes . . . .").  Indeed, after Plaintiff was terminated on January 5, 2021, his position remained vacant until May 1, 2021, *see id.* at 1045:4-6, by which time Plaintiff maintains he would have been "back to normal," *see id.* at 182:12-21.

The jury also heard testimony from Plaintiff and various witnesses that COVID-19 resulted in a significantly reduced patient volume, more remote work, fewer surgeries, and the temporary closure of clinics, which could have minimized any undue hardship that Plaintiff's suggested accommodations may have otherwise posed (although witnesses did offer conflicting testimony as to how long the pandemic affected operations).  For example, Plaintiff testified:

> [T]here were certain nonclinical, nonessential parts of the hospital that were being closed, including clinic and the OR.  Patients weren't coming in.  There wasn't this burden on the hospital.  Everybody was directing it towards the critically ill in ICU. . . .
>
> [O]n top of that, a significant amount of my duties were done — teaching, administration, computers, meetings — and I thought that [remote work] was a very reasonable ask, given what was happening at the time. . . . I was given the understanding that nonessential clinics, like dermatology or things like

ophthalmology, where it was routine classes or things that weren't essential, like critical heart surgery, were shut down during the pandemic. . . .

[W]e had built-in redundancy in the overall department. We only had three sites, and we had dozens and dozens of faculty — that's A. B, patients weren't coming in for a global pandemic for certain what was deemed as nonessential services. This was at a time when, you know, people were spraying bleach on their fruits. I wasn't . . . concerned about patients at that time, because there were also adequate doctors. We had a schedule, we had multiple doctors, and I knew patients were covered . . . . We had worked to get to that level.

Tr. at 198:12-199:13, 200:19-201:4; *see also id.* at 533:15-21 (Rothschild: "I don't think they officially shut [the Woodhull clinic] down. We were still virtually seeing patients, so to speak. We would still be there for emergencies, but a large part of it we had to go and help in the ED and other departments."); *id.* at 938:24-939:2 (Rothschild: "I don't believe any patients were being seen [when Plaintiff went out on leave in March 2020], except for emergencies. That's the case at least where I was in New York. Pretty much all ophthalmology shut down, including surgeries."). Plaintiff also introduced evidence that NYU physicians in other departments were granted remote-work accommodations for multiple months at a time, including physicians with 100% clinical responsibilities, which the jury could have understood to mean that a temporary remote-work request was not as infeasible as Defendants represented. *See id.* at 755:9-22; PX 102; PX 107; *see also* PX 8 at 3 (listing remote work as an example of an accommodation on NYU's standard accommodations form).

Witnesses also provided corroborating testimony that even when in-person clinical work began to resume, there were up to nine other physicians who could temporarily fill coverage gaps and perform the percentage of Plaintiff's clinical duties that he would be unable to perform remotely or from another site. *See Hosking*, 126 N.Y.S.3d at 104 (finding that employer could have accommodated employee by "try[ing] to create a schedule that would allow [her] to rotate to functions that she could perform" where "four other employees [were] available to perform

functions that plaintiff could not perform," including functions that comprised only 20 percent of her duties); *see, e.g.*, Tr. at 157:21-158:1 (Plaintiff: "We actually expanded by three or 400 percent our faculty at Woodhull."  Counsel: "If you were not physically present in the surgery room as the resident, could any of [your Woodhull colleagues] have acted as the attending physician?  Plaintiff: "Absolutely, yes."); *id.* at 548:3-7 (Chiu: "I was one of the people he . . . recruited to fill that [coverage] gap."  Counsel: "So, by the time you left Woodhull, there were more attending physicians than when you started?" Chiu: "Yes."); *id.* at 928:7-15 (Rothschild: "[F]or a clinic in a given day, there would be one attending staffing the multiple residents who were there.  [Plaintiff] brought on several new attendings just in the few months that I was there to sort of create redundancies so that it wasn't completely reliant on one person . . . ."); *id.* at 932:4-5 (Counsel: "From the time you started versus the time you finished, were there more or less attendings?" Rothschild: "Certainly more."); *id.* at 939:3-941:2 (Counsel: "You don't know that [the Woodhull clinic] actually opened back up in June 2020; right?" Rothschild: "I was not there . . . [b]ut I do know that he brought in close to ten other attendings to fill the void that would have been there had he not hired those people. . . . There were not eight to ten people there on a given day, . . . [but there] were new attendings for different [ophthalmic] subspecialties . . . who were not there prior."); *see also id.* at 1043:10-14 (Counsel: "[Y]our colleagues could fill [your] teaching role . . . when you weren't there; right?" Goyal: "Yes."); *id.* at 1067:11-12 (Lazzaro noting that there was a "glaucoma person" at Woodhull who could do the cataract surgeries Plaintiff had performed).  This testimony allowed the jury to more fully credit Plaintiff's position that his proposed accommodations would not have posed an undue hardship while he fully recovered.  *See id.* at 242:3-243:5 (Counsel: "Lazzaro states that your absence impacts NYU's ability to deliver adequate patient care and places a burden on other staff members. . . . Did you agree with this statement . . . ?"  Plaintiff: "No, because . . . I did the

schedule, . . . and we had nine redundancies, plus many more faculty.  They had endowment, they had government funds.  There was no burden that I could foresee.  It didn't make sense."); *see also id.* at 203:14-205:4 (Plaintiff discussing the administrative and educational duties that he could have performed from home on his computer versus the in-person duties that could be performed by colleagues during his temporary absence).  Again, Defendants vehemently disputed that Plaintiff's accommodations would have been reasonable, but there was sufficient evidence for the jury to find that Plaintiff was qualified to do his job with a reasonable accommodation.  Thus, even if the jury determined that some of Plaintiff's clinical duties could not have been fully satisfied with a remote-work accommodation, they could have found that a combination of the other accommodations would have sufficed without presenting an undue burden on NYU.

For these reasons, the Court does not find that "the evidence in favor of [Defendants] is so overwhelming that reasonable and fair minded persons" could not conclude that Plaintiff was qualified to perform his essential functions, with or without a reasonable accommodation. *Triolo*, 24 F.4th at 105 (quoting *Ashley*, 992 F.3d at 138-39).  Nor is there "such a complete absence of evidence" on this issue that "the jury's findings could only have been the result of sheer surmise and conjecture."  *Id.*

### 2.  Pretext and Mixed Motives

Because the jury had sufficient evidence to conclude that Plaintiff could perform the essential functions of his position with an accommodation but was nonetheless fired, the Court proceeds to the second step of the *McDonnell Douglas* framework.  At this step, the burden shifts to the employer to "'articulate some legitimate, nondiscriminatory reason' for its . . . action." *Bart*, 96 F.4th at 570 (quoting *Vega*, 801 F.3d at 83) (articulating application of *McDonnell Douglas* framework to mixed-motive cases); *see Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir.

2015) (applying mixed-motive framework for NYSHRL claim); *Russell v. N.Y. Univ.*, 246 N.E.3d 868, 875 (N.Y. 2024) (noting that NYCHRL claims are properly analyzed under "mixed-motive standard").  From there, the plaintiff has two paths: either "show that the employer's stated reason was false, and merely a pretext for discrimination," or "produc[e] other evidence indicating that the employer's . . . action was motivated at least in part by" discrimination.  *Bart*, 96 F.4th at 576.  In other words, the plaintiff "need not prove that the employer's stated reason was *false*," but rather "that the employer's stated reason — even if true or factually accurate — was not the 'real reason,' in the sense that it was not the *entire* reason due to a coexisting impermissible consideration."  *Id.* at 575 (quoting *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010)).  This requires the plaintiff "to produce 'admissible evidence . . . show[ing] circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  *Id.* at 576 (alteration and omission in original) (quoting *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016)).  Any "conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder."  *Id.* (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)).  The Second Circuit has warned that courts resolving a motion for JNOV should act with caution when assessing the evidence of discrimination that was presented at trial, particularly circumstantial evidence, because "plaintiffs usually must rely on bits and pieces of information to support an inference of discrimination."  *Edelman*, 141 F.4th at 49 (quoting *Vega*, 801 F.3d at 86).

Defendants' articulated reasons for Plaintiff's termination were that he "failed to return to work and failed to provide medical clearance" by January 4, 2021, and "[a]t that point, NYU could no longer compromise patient care and departmental operations."  Br. at 6.  Plaintiff

contends that he presented sufficient evidence to demonstrate that these reasons were pretextual and that his termination was at least in part motivated by his disability. *See* Opp. at 12. The Court agrees that Plaintiff marshaled sufficient evidence to allow the jury to find NYU liable on his state and city disability-discrimination claims.

"A plaintiff may show pretext 'by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, [nondiscriminatory] reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason.'" *Cherry v. N.Y.C. Hous. Auth.*, 564 F. Supp. 3d 140, 175 (E.D.N.Y. 2021) (alteration in original) (quoting *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016)) (collecting cases). For instance, while Plaintiff was purportedly terminated due to his failure to provide medical clearance, the jury could have questioned this rationale based on Plaintiff's testimony that he was prepared and ready to furnish medical clearance as soon as Defendants engaged with him on his renewed accommodation request. *See, e.g.*, Tr. at 424:7-10 (Plaintiff: "I was getting ready to get the medical clearance. We were in the middle of talks, and I was already told by my doctors they would clear me. So, we just hadn't agreed on any accommodation."); *id.* at 422:14-17 (Plaintiff: "We were in the middle of talks, so how could I work if I didn't have a plan signed with a contract that was agreeable or that was a fair and reasonable accommodation?"). Moreover, there was evidence suggesting that Defendants did not raise the medical-clearance requirement, at least clearly, until the day before Plaintiff was expected return to work on December 1, *see* PX 44; PX 46, and Plaintiff presented evidence that he told Defendants that he was in the process of obtaining it, *see* PX 116 at 1 (Plaintiff to Mellynchuk on December 7: "I spoke to my doctors and do expect to receive written medical clearance . . . ."). *Cf. Domenech v. N.Y.C. Emps.' Ret. Sys.*, 564 F. Supp. 3d 126, 138 (E.D.N.Y. 2021) ("[A] defendant's inconsistent justifications for an employment

action can be sufficient for a plaintiff to establish pretext." (alteration in original) (quoting *Ludwig v. Rochester Psychiatric Ctr.*, 347 F. App'x 685, 686 (2d Cir. 2009)).  In addition, Defendants required Plaintiff to obtain medical clearance specifically to perform surgeries, PX 49.C at 14-15, although Mellynchuk previously indicated to Sanchez that Lazzaro envisioned relieving Plaintiff of his surgical duties, PX 60 at 1.

Defendants were clearly not amenable to a remote-work accommodation, but even assuming that full-time remote work would have posed an undue hardship, Plaintiff raised numerous other potential accommodations that were purportedly never discussed or addressed, which "is evidence tending to show disability discrimination."  *Sheng v. M&TBank Corp.*, 848 F.3d 78, 87 (2d Cir. 2017) (analyzing ADA claim, which must satisfy higher standard than state or city claim).  Specifically, in the weeks preceding his termination, Plaintiff attempted to contact several NYU employees to discuss short-term solutions that would have allowed him to return to work as soon as possible, but Plaintiff presented evidence that they largely ignored his communications, and while he testified that his condition was quickly improving, there is evidence that Defendants did not inquire about his progress.  *See* Tr. at 227:3-13; 238:6-239:8. Plaintiff was then terminated on January 5, 2021, and his position remained open for five or six more months.  *See id.* at 240:15-241:4; 1045:2-6.  While Defendants stressed that they urgently needed someone in Plaintiff's position working at full capacity, the jury could have credited Plaintiff's representation that he could have been medically cleared to return to work immediately with accommodations and achieve full working capacity only months later, *see id.* at 182:14-21, which would have eliminated the need for NYU to go through the monthslong process to fill his position.

Most importantly, the jury also heard evidence from which they could have concluded that Plaintiff's termination was predetermined because NYU employees were not interested in

landing on a reasonable accommodation for his disability, they believed it would be more convenient for NYU for Plaintiff to go on long-term disability rather than afford him an accommodation, or they prematurely assumed without sufficient inquiry into his physical limitations that he would be unable to perform his job duties because of his disability. *See, e.g.*, *Jacobsen*, 11 N.E.3d at 168 ("[I]n amending the [NYS]HRL, the legislature evidently concluded that an employer cannot disadvantage a disabled employee based on a generalized sense that disabilities of the kind suffered by the employee can rarely be accommodated and that the employee is unlikely to be able to satisfy his or her employment responsibilities."); *Hosking*, 126 N.Y.S.3d at 102-103 (noting that evidence of employer's failure to consider proposed accommodations or take accommodations process seriously can support inference of discrimination).

Specifically, on October 26, 2020, before Defendants had engaged in any process to evaluate Plaintiff's medical condition or any potential accommodations, Nancy Sanchez, a senior HR employee, wrote to Defendant Mellynchuk's direct supervisor: "So what is the department supposed to do since he has exhausted his sick leave?  Why can't we release him if he can't do his job?"  Tr. at 578:4-7; *cf. Parker*, 204 F.3d at 338 ("At the very least, . . . an employee who proposes an accommodation while still on short-term leave . . . triggers a responsibility on the employer's part to investigate that request and determine its feasibility.  An employer who fails to do so, and instead terminates the employee based on exhaustion of leave, has discriminated 'because of' disability within the meaning of the ADA.").  A couple of weeks later, Defendants denied Plaintiff's remote-work request without speaking to Plaintiff, exploring alternatives, or seeking further medical information, and they informed him that he must return to work less than two weeks later or he would be terminated.  *See* Tr. at 655:24-656:2 (Counsel: "In your email on November 19th, you're telling Dr. Ahmad, he has to return to work December 1st without an

accommodation or be terminated, right?"  Mellynchuk: "Well, right.").  There is evidence that on

November 20, after Plaintiff tried to reach out to discuss alternatives, Defendants continued to

conclude that there was no possible solution, after which Andrew Rubin, the head of the faculty

group practice, informed his colleagues that "HR [would] contact [Plaintiff] on Monday to tell

him the decision is final."  PX 51.M, at 2; Tr. at 1081:24-1084:3.  Moreover, Defendants' failure

to ascertain whether other accommodations were available or reach out to Plaintiff to seek

further clarification about his proposal or medical limitations arguably violated Defendants'

standard procedures, *see* Tr. 770:20-772:4, which can be "probative circumstantial evidence of

discriminatory intent," *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 274 (2d Cir. 2023) (quoting

*Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012)).

Further evidence that the jury could have relied upon to conclude that Defendants had a

predetermined intent to terminate Plaintiff based on his disability was Mellynchuk's

communication to Sanchez that he and Lazzaro had "agreed to postpone the termination

temporarily" while they responded to the letter received by Plaintiff's counsel.  PX 60 at 1; *see*

PX 15; Tr. at 1088:21-1090:14.  Lazzaro and Mellynchuk worked together to develop and

propose two alternative options to Plaintiff, even though they concluded two weeks earlier that

no accommodation was possible.  PX 60 at 1; PX 116 at 3.  The jury could have credited

Plaintiff's testimony that these options did not adequately address his health needs and were

not developed based on any consideration of his limitations.  *See, e.g.*, Tr. at 229:4-6 ("They

felt arbitrary.  They didn't address the issue of what I needed, and again there was nobody

that asked: What do you need to get back to work?").  On December 7, Plaintiff accepted

Option B — even though he said it did not address his key concerns and required him to agree

to a new one-year contract — because it was the "lesser of two evils" and was he "trying to get

back to work right away and do anything and show good faith."  *Id.* at 230:6-9; *see, e.g.*, *id.*

29

at 229:22-230:4 (Plaintiff: "[Option B] didn't address I just survived a coma.  How am I going to commute from Long Island to Woodhull?  It's a good one-and-a-half hour, two-hour commute one way.  So it felt like they weren't engaging."  Counsel: "Did anyone, after the attorney letter, ask you about troubles with your commute?"  Plaintiff: "No.").  Although Lazzaro helped create Option B, there was evidence that he had not attempted to ascertain the current status of Plaintiff's medical condition or limitations, and he informed his colleagues the next day, on December 8, that he did not believe Plaintiff would be able to obtain medical clearance by January due to his disability.  PX 89 at 1 (Lazzaro: "[Plaintiff] would not be able to obtain [medical clearance to perform surgeries] specifically as he has a neurological complication of COVID."); *see also id.* (Mellynchuk: "If we have reason to doubt the medical clearance he provides we can discuss options after reviewing the document.").  On December 23, 2020, Plaintiff reported that he was not yet sure if he was able to drive two hours to work and asked to discuss other options.  PX 49.C at 3-5.  However, rather than engage with the request, Defendants almost immediately internally discussed how Plaintiff would be terminated on January 4, suggesting that he should have just gone on long-term disability instead of pursuing accommodations.  PX 49.C at 2.  Although Plaintiff subsequently made repeated attempts to contact Defendants to find another solution or provide additional information, a jury could find that his pleas were disregarded so that the Defendants could follow through on their intent to terminate his employment.  *See id.* at 238:6-239:8.

*     *     *

There are certainly different inferences that could have been drawn from the evidence presented at trial and many witnesses who presented varying accounts of Plaintiff's job responsibilities and the discussions surrounding his disability and termination.  However, based on the aforementioned evidence, the jury could have reasonably concluded that Plaintiff was

qualified for his position and drawn an inference of discrimination based on circumstantial

evidence of shifting explanations and expectations, procedural inconsistencies, and an allegedly

predetermined push from the managerial level toward Plaintiff's termination based on an

assumption that he could not perform his duties without meaningful consideration of whether

feasible alternative accommodations would have enabled Plaintiff to remain in his role.  Such a

conclusion cannot be said to be based on "sheer surmise and conjecture."  *Triolo*, 24 F.4th at 105

(quoting *Ashley*, 992 F.3d at 139).  Thus, the Court will not disturb the jury's determination that

NYU is liable for disability discrimination under the NYSHRL and NYCHRL.

### B.    Failure to Engage in a Cooperative Dialogue – NYCHRL

For many of the same reasons already discussed, even though contrary inferences could

certainly have been drawn, the Court finds that the trial record adequately supports the jury's

finding that Defendants failed to engage in a good-faith cooperative dialogue in violation of the

NYCHRL.

"The need for individualized inquiry when making a determination of reasonable

accommodation is deeply embedded in the fabric of disability rights law."  *Phillips v. City of

New York*, 884 N.Y.S.2d 369, 372-73 (App. Div. 2009).  Unlike under the ADA and NYSHRL,

an employer's "failure to engage in a 'cooperative dialogue' . . . is 'independently actionable as a

separate claim under the NYCHRL.'"  *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 249

(S.D.N.Y. 2025) (quoting *Greenbaum v. N.Y.C. Transit Auth.*, No. 21-1777, 2022 WL 3347893,

at *5 (2d Cir. Aug. 15, 2022) (summary order)); *see* N.Y.C. Admin. Code § 8-107(28)(a) ("It

shall be an unlawful discriminatory practice for an employer . . . or an employee or agent thereof

to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a

person who has requested an accommodation . . . .").  The NYCHRL defines "cooperative dialogue" as:

> the process by which a covered entity and a person entitled to an accommodation, or who may be entitled to an accommodation under the law, engage in good faith in a written or oral dialogue concerning the person's accommodation needs; potential accommodations that may address the person's accommodation needs, including alternatives to a requested accommodation; and the difficulties that such potential accommodations may pose for the covered entity.

*Hosking*, 126 N.Y.S.3d at 103 (quoting N.Y.C. Admin. Code § 8-102)).

In connection with this requirement, an employer's determination "that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job . . . may only be made after the parties have engaged, or the [employer] has attempted to engage, in a cooperative dialogue." *Lee v. N.Y.C. Fire Dep't*, No. 24-cv-04772 (VMS), 2025 WL 2772855, at *4 (E.D.N.Y. Sept. 29, 2025) (quoting N.Y.C. Admin. Code § 8-107(28)(e)).  To satisfy the cooperative-dialogue requirement, "the record has to reveal 'at least some deliberation'" of the feasibility of an employee's accommodation request, but this "does not mean that an employer can take a haphazard approach to the interactive process or engage in it without taking the process seriously."  *Hosking*, 126 N.Y.S.3d at 104.  "[T]here is no rule that an employer has to engage in the process for a certain number of days or that it ultimately has to give the employee what the employee is demanding."  *Id.*  "However, the process has to be held in good faith and the essential functions of the position need to be part of the interactive process the law requires, not a unilateral employer decision cloaked by business judgment."  *Id.*

While Defendants may have kicked off the accommodation process in October 2020 after Plaintiff's leave expired, there was adequate evidence to support the jury's conclusion that the ensuing dialogue was insufficient and not undertaken in good faith.  After Plaintiff submitted his

initial remote-work request on November 2, Defendants denied the request on November 19 without speaking to Plaintiff or his doctor, after which Mellynchuk directed Plaintiff to return to work in less than two weeks without discussing any alternatives. *See* Tr. at 655:24-656:2. Prior to that denial, Mellynchuk did not have any "live interactions," in person or by phone, with Plaintiff to discuss his physical limitations, and he did not speak to "[Plaintiff]'s former chair of ophthalmology," "to any attending physicians who worked with [Plaintiff]," "to his counterpart, Dr. Kwong," or "to any of the residents who he was working with." *Id.* at 677:3-678:13. Rather, Mellynchuk relied on the submission from Dr. Karp (which spoke only to Plaintiff's driving, lifting, and walking limitations), Plaintiff's contract (which the jury could have found did not accurately capture his responsibilities), and discussions with Defendant Lazzaro (who had little to no daily interaction with Plaintiff) and Gaeta (a clinic administrator who was not a doctor). *Id.* at 677:15-25, 699:16-19; *see also id.* at 668:4-670:11 (Mellynchuk admitting that his trial testimony about speaking with Gaeta conflicted with his deposition testimony about speaking with only Lazzaro). Plaintiff also testified that prior to November 19, he attempted to speak with other employees to discuss potential accommodations but was unsuccessful, and that no one asked him about his "specific limitations," no one raised any "business concerns related to [his] proposed accommodation," and no one "ask[ed] him to send additional documentation." *Id.* at 210:14-211:7; *see id.* at 194:9-15 (Plaintiff: "Doug Lazzaro was my vice chair, so I tried to call him because he knows what I can and cannot do. He knows about the clinic. I got ghosted. I didn't hear back from him. And that one meeting with Dr. Colby, she said go to HR, and Dr. Lazzaro told me to go back to Colby, so I was kind of getting a bit of a run-around."); *cf. Goldman v. Sol Goldman Invs. LLC*, No. 20-cv-06727 (MKV) (SN), 2022 WL 6564021, at *9 (S.D.N.Y. Aug. 5, 2022) (finding that defendant failed to engage in cooperative dialogue when there was no evidence that defendant "requested additional information about [plaintiff's]

conditions and limitations, offered or discussed available alternatives, or even discussed his

request for an accommodation at all"), *report and recommendation adopted*, 2022 WL 4482296

(S.D.N.Y. Sept. 27, 2022).

After Plaintiff's remote-work request was denied on November 19, Plaintiff attempted to

reach out to Defendants to discuss alternatives.  Defendants presented Plaintiff with alternatives

only after Plaintiff retained counsel and, even in that context, internally stated that they would

"postpone the termination temporarily" while they engaged with Plaintiff's counsel.  PX 60 at 1;

*see* PX 51.M, at 2; Tr. at 243:7-18, 1081:24-1084:3, 1088:21-1090:14.  While two options were

subsequently presented to Plaintiff in December, the jury could have concluded that they were

developed without an understanding of Plaintiff's actual medical limitations, *see, e.g.*, Tr.

at 229:2-230:4, or based on the timing, were pretextual unrealistic options offered for the

primary purpose of fending off Plaintiff's attorney until Plaintiff's only temporarily postponed

termination could be effectuated.  Indeed, it appears that Lazzaro, who helped develop these

alternatives, was under the impression that Plaintiff would not be able to obtain medical

clearance to perform surgical work regardless of which option Plaintiff chose.  *See* PX 89 at 1.

The jury could have credited Plaintiff's view that the two options were developed without

meaningful engagement with him — he testified that "nobody asked what [he] can and can't do,

driving updates or [his] physical improvements, nothing."  Tr. at 243:17-18.  According to

Plaintiff, he never met with Mellynchuk in person and otherwise had only a single, relatively

cursory phone conversation with his attorney and Mellynchuk, which occurred after Mellynchuk

and Lazzaro already determined the framework of the options they would be providing.  *See id.*

at 226:6-19 (Plaintiff: "[W]e had a very high-level, maybe under 20 minutes, discussion of like

I'd like to come back to work, please.  Why am I being fired?  What can happen?  What are the

options? And Mr. Mellynchuk said, I will check with Doug [Lazzaro].  I'll try to get you some

options by email.  There was no questioning about what I can or can't do."); *id.* at 384:4-11; PX

60 at 1.  After Plaintiff sent his "reality check" email about driving two hours to Woodhull in his

retrofitted vehicle, he attempted to discuss other options with Defendants, but there was evidence

to support a conclusion that no alternatives were considered.  *See* Tr. at 238:6-239:8; PX 49 at 8.

Again, there were different inferences that could have been drawn from the evidence

regarding the dialogue that took place between Plaintiff and Defendants about his disability and

accommodation requests.  The dialogue also continued for several months, and Plaintiff's

termination date was extended to afford him with additional time.  But viewing all of this

evidence in the aggregate, the Court cannot conclude that the jury lacked an evidentiary basis to

determine that Defendants did not participate in a good-faith cooperative dialogue with Plaintiff

such that its conclusion was based on sheer surmise and conjecture.  *See, e.g.*, *Jacobsen*, 11

N.E.3d at 172 (finding question of fact as to existence of good-faith interactive process where

employer had "limited interactions with plaintiff," denied plaintiff's initial request "without

considering it and instead merely provide plaintiff" with an inadequate alternative, and "did not

specifically address the viability of [his subsequent accommodation request], but rather made the

conclusory assertion that plaintiff could not work safely in any position"); *Krow v. PineBridge*

*Invs. Holdings U.S. LLC*, No. 19-cv-05711 (ER), 2022 WL 836916, at *9 (S.D.N.Y. Mar. 21,

2022) ("'In determining responsibility for the failure of an interactive process, courts look to

*good faith* and *reasonable efforts* in light of the complete set of circumstances to isolate the

cause of a breakdown and assign liability.'  A party that obstructs or delays the interactive

process, or that fails to communicate, is not acting in good faith." (quoting *Goonan v. Fed. Rsrv.*

*Bank of N.Y.*, No. 12-cv-03859 (JPO), 2014 WL 3610990, at *5 (S.D.N.Y. July 22, 2014))).

Accordingly, the Court will not disturb the jury's verdict on Plaintiff's cooperative-dialogue

claims under the NYCHRL.

C.    **Punitive Damages**

Finally, Defendants contend that the jury's award of punitive damages in the amount of

$250,000 against NYU should be vacated because there is insufficient evidence to "support a

finding of [a] 'high degree of moral culpability.'" Br. at 20.  Plaintiff highlights the lower

standard for punitive damages under the NYCHRL and argues that NYU's conduct evinced, at

the very least, a conscious disregard of Plaintiff's rights or reckless indifference, warranting an

award of punitive damages.  *See* Opp. at 32.

Defendants contend that punitive damages are "not warranted" and that the Court should

"set aside" the jury's award of punitive damages pursuant to Rule 59(a) because the evidence

provided did not meet the standard for punitive damages.  Br. at 19-20.  They also incorporate by

reference into their Rule 50(b) motion the arguments they made in their Rule 50(a) motion, *see*

*id.* at 1 n.1, which included a similar request for judgment as a matter of law on Plaintiff's

request for punitive damages, *see* Tr. at 897:16-899:6, 1229:12-1230:1, 1309:13-1311:5.  The

Court reserved decision on Defendants' motion under Rule 50(a) regarding punitive damages,

but noted that "[i]t's a very close call." *Id.* at 1230:2-1231:8.  The Court permitted the punitive-

damages claim to be presented to the jury based on the Second Circuit's guidance that "the

prudent course of action" is to reserve judgment as a matter of law until "after the verdict has

been returned, so that if the court of appeals eventually determines that judgment should not have

been granted as a matter of law, the need for a second trial will be avoided." *Galdieri-Ambrosini*

*v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 282 (2d Cir. 1998); *see* Tr. at 1313:5-21 (citing

*Raniola v. Bratton*, 243 F.3d 610, 616 n.5 (2d Cir. 2001)); *Williams v. County of Westchester*,

171 F.3d 98, 102 (2d Cir. 1999) ("This Court has repeatedly advised that when the trial judge has

such doubts, it is preferable, in the interest of judicial efficiency, for the judge to refrain from

granting a directed verdict and to allow the matter to be decided, at least in the first instance, by

the jury.").  Now, having reviewed the evidence and the full briefing of the parties, the Court agrees with Defendants that NYU is entitled to judgment as a matter of law on Plaintiff's claim for punitive damages.

NYU, the only Defendant against whom the jury awarded punitive damages, *see* Dkt. 161-17 at 3, was found liable for disability discrimination under the NYSHRL and NYCHRL, *see id.* at 1, and for failure to engage in a good-faith cooperative dialogue under the NYCHRL, *see id.* at 2.  The jury did not find NYU liable on any federal claim, *see id.* at 1, and the Court will therefore follow Plaintiff's lead in evaluating the punitive-damages award under the lower NYCHRL standard.

"Under the NYCHRL, 'a plaintiff is entitled to punitive damages where the wrongdoer's actions amount to willful or wanton negligence, or recklessness, or where there is a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'"  *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 325 (S.D.N.Y. 2018) (quoting *Chauca v. Abraham*, 89 N.E.3d 475, 477 (N.Y. 2017)); *accord Edelman*, 141 F.4th at 43.  "This standard is lower than that required to recover punitive damages under the federal civil rights laws, and does not require a showing of 'malice or awareness of the violation of a protected right.'"  *Id.* (quoting *Batten v. Glob. Contact Servs., LLC*, No. 15-cv-02382 (NG) (SJB), 2018 WL 3093968, at *9 (E.D.N.Y. June 22, 2018)).  This standard "represent[s] the lowest threshold, and the least stringent form, for the state of mind required to impose punitive damages."  *Casmento v. Volmar Constr., Inc.*, No. 20-cv-00944 (LJL), 2022 WL 15773966, at *10 (S.D.N.Y. Oct. 28, 2022) (quoting *Chauca*, 89 N.E.3d at 481)).  However, "[t]he New York Court of Appeals has expressly rejected the idea that 'a punitive damages charge is automatic on a finding of liability' under the NYCHRL, instead 'requiring an appropriate showing of heightened culpability for [an award of] punitive damages.'"  *Edelman*, 141 F.4th at 43 (quoting *Chauca*, 89 N.E.3d at 481).  "Such conduct

requires 'a high degree of moral culpability.'" *Id.* (quoting *Home Ins. Co. v Am. Home Prods. Corp.*, 550 N.E.2d 930, 934 (N.Y. 1990)).

Plaintiff argues that "Defendants had knowledge of the relevant law and knowingly violated Plaintiff's rights," thereby "act[ing] with reckless indifference and with willful or wanton negligence." Opp. at 28. In arguing that punitive damages are warranted, Plaintiff largely relies on evidence from which a jury could infer that Defendants acted inconsistently with NYU's antidiscrimination policies and procedures (and the law) by failing, for example, to fully ascertain Plaintiff's limitations after he submitted an accommodation request, to consider or discuss in good faith Plaintiff's alternative proposals, or to sincerely attempt to explore whether other accommodation options were possible. *See id.* at 28-32.

While that evidence may support a finding of a violation of the NYCHRL, a defendant must do more than just violate the NYCHRL to face liability for punitive damages. *See Edelman*, 141 F.4th at 43. Instead, there must be evidence of "willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard," *id.* at 43 (quoting *Chauca*, 89 N.E.3d at 481), and the evidence here does not support a finding that Defendants violated Plaintiff's rights with such a "high degree of moral culpability," *id.* (quoting *Home Ins. Co.*, 550 N.E.2d at 934); *cf. Ruderman v. L. Office of Yuriy Prakhin, P.C.*, No. 19-cv-02987 (CBA) (LB), 2024 WL 1952582, at *19 (E.D.N.Y. Mar. 28, 2024) (permitting punitive damages against employer who was aware of, but blatantly disregarded, antidiscrimination obligations after "ma[king] the calculus that he would not have to compensate [p]laintiff under the law").

It is true that there was testimony that Defendants had knowledge of the relevant law and NYU's policies that prohibited disability discrimination and required an interactive process in evaluating accommodation requests. *See, e.g.*, Tr. 770:20-772:4 (Mellynchuk noting that NYU's

procedures entail seeking information from employees to understand their "limitations, the accommodations they're seeking, expected duration, [and] other pertinent information," which, prior to "relay[ing] the outcome to the employee, typically by email," may require "ask[ing] questions of the employee to clarify what they're requesting or what their limitations are, and also of the department management regarding . . . what options may be available"); *id.* at 770:9-17 (noting that ELR "provide[s] training on all these topics to managers," and "often create[s] and provide[s] guidance on understanding and complying with [NYU]'s policies and procedures."). But the fact that Defendants were generally aware of their legal and internal-policy obligations to engage in a cooperative dialogue and not to discriminate is insufficient to demonstrate that they took action against Plaintiff "with willful or wanton negligence, or recklessness, or a conscious disregard" of his rights. *Edelman*, 141 F.4th at 44 (quoting *Chauca*, 89 N.E.3d at 477). Justifying punitive damages simply because NYU had antidiscrimination policies would be inconsistent with the New York Court of Appeal's decision in *Chauca* and undermine the NYCHRL's mitigation provision, which allows "an employer liable for the conduct of an employee to mitigate punitive damages liability . . . where the employer can prove it has put into place policies and procedures to educate employees" on discriminatory conduct. *Chauca v. Abraham*, 841 F.3d 86, 90 (2d Cir. 2016) (quoting N.Y.C. Admin. Code § 8-107(13)(d)-(e)). The evidence in this case shows that Defendants engaged in a dialogue over several months with Plaintiff regarding accommodations, albeit one that the jury found was insufficient or not in good faith, and ultimately terminated Plaintiff when he did not return to work medically cleared to perform what they maintained were the essential functions of the Chief of Service position in the Ophthalmology Department, a decision that the jury found to be motivated at least in part by Plaintiff's disability. Such a finding of liability does not support

a punitive-damages award just because the Defendants were generally aware of antidiscrimination policies and procedures at NYU.

Nor do the cited communications from Lazzaro, Mellynchuk, and other NYU supervisors demonstrate that they acted with the requisite mental state to justify the imposition of punitive damages. Even if the jury construed the early email from Nancy Sanchez that questioned why Plaintiff could not be terminated if he could not do his job, *see* PX 142, as demonstrating that she was disregarding the required accommodations or cooperative-dialogue process, extended discussions took place after this email, and Plaintiff was not terminated until months later. Plaintiff points to evidence that NYU employees were unresponsive to his calls, raised their voices at times, and internally complained, for example, that Plaintiff "says he has a great solution whatever that means" or was "try[ing] to bypass HR." Opp. at 30-32; *see* PX 51.J at 2 (Lazzaro to Bender and Colby: "FYI — [Plaintiff] called me today [November 23, 2020] — I did not pick up or [return] his call but his message says he has a great solution whatever that means."); PX 136 at 1-2 (Lazzaro commenting favorably on a draft communication to Plaintiff that directed him to HR to discuss accommodations, stating Plaintiff "will of course try to bypass HR so having that part included in your response is very good"); Tr. at 189:13-190:12, 218:3-18 (Plaintiff testifying that Bender and Colby raised their voices at Plaintiff when he tried to discuss accommodations). Even if the jury could infer from this evidence a frustration with Plaintiff during this process, the evidence does not support a finding of the "high degree of moral culpability" necessary to sustain an award of punitive damages, *Edelman*, 141 F.4th at 43 (quoting *Home Ins. Co.*, 550 N.E.2d at 934)), especially considering that NYU initiated the accommodations process and engaged in a dialogue for several months, albeit one the jury found inadequate, and extended Plaintiff's leave for several months after it had expired while the discussions took place. *See, e.g.*, *Tse*, 2016 WL 10907062, at *37 (finding that defendants'

40

conduct did not amount to malice or reckless indifference despite finding that they "did not act in good faith in seeking to accommodate [plaintiff], . . . kept [her] in the dark about the future of her position and salary at NYU, and ushered her onto LTD benefits and out of employment"); *cf. Edelman*, 141 F.4th at 43 (affirming judgment as a matter of law in favor of defendants on punitive damages where there was evidence that a defendant told plaintiff that NYU "own[ed]" her and caller her a "bitch" during his rant against her); *E.E.O.C. v. Yellow Freight Sys., Inc.*, No. 98-cv-02270 (THK), 2002 WL 31011859, at *36 (S.D.N.Y. Sept. 9, 2002) (awarding punitive damages against employer whose conduct amounted to "flouting federal anti-discrimination law" and a "wholesale failure to engage in [an] interactive process"). Finally, the Court does not agree with Plaintiff that punitive damages are warranted because the dialogue with Plaintiff increased after Defendants received a letter from Plaintiff's counsel. *See* Opp. at 31. Behavior that facilitates the goals of the interactive process, like extending the termination date, engaging in further discussions, and presenting options for Plaintiff to return to work, does not demonstrate willful or wanton negligence, or a conscious or reckless disregard of Plaintiff's rights, justifying punitive damages.

Plaintiff contends that punitive-damages awards have been sustained in cases involving "far less reprehensible conduct," Opp. at 32, but the Court does not agree with Plaintiff's characterization of those cases. In *Tese-Milner v. ATCO Properties & Management, Inc.*, the court found that punitive damages were available against the corporate defendant based on a supervisor's "failure to respond" to the plaintiff's complaints of "pervasive incidents of sexual harassment," among other things. No. 113902/2007, 2020 WL 6591380, at *9, *15 (N.Y. Sup. Ct. Nov. 10, 2020). The complaints concerned male coworkers exposing themselves to plaintiff and verbally harassing her with sexually explicit language. *See id.* at *4. Ignoring such complaints is in no way comparable to the conduct of NYU's employees in the instant

case. Similarly, in *Ravina v. Columbia University*, the jury found that an individual defendant was liable for "retaliating against [the plaintiff]" after she accused him of sexual harassment. No. 16-cv-02137, 2019 WL 1450449, at *5 (S.D.N.Y. March 31, 2019); *see id.* at *7. The court declined to disturb the jury's award of punitive damages due to emails that the defendant sent to colleagues "indicat[ing] that [he] was aware of, but disregarded, [the plaintiff's] right to be free from retaliation for having complained about [his conduct]," and asking them to delete his retaliatory email "and not mention it to anyone." *Id.* at 8. The conduct underlying that case is again far more egregious than that alleged here, and Plaintiff introduced no comparable communications between NYU employees or evidence otherwise indicating that they were acting with a similarly high level of moral culpability or conscious disregard of Plaintiff's rights.

In sum, drawing all reasonable inferences in Plaintiff's favor and construing the evidence presented at trial in the light most favorable to Plaintiff, a reasonable jury could not have concluded that Defendants acted with "willful or wanton negligence," "recklessness," or "a conscious disregard" of Plaintiff's rights, *Chauca*, 89 N.E.3d at 477 (quoting *Home Ins. Co.*, 550 N.E.2d at 932)), such that NYU's moral culpability is any higher than is present in every instance of disability discrimination or failure to engage in a good-faith cooperative dialogue. *See Edelman*, 141 F.4th at 43-44 (upholding trial court's decision to preclude punitive damages as a matter of law under Rule 50(a) where plaintiff "d[id] not point to any evidence presented at trial suggesting that any of the defendants retaliated against her . . . with a higher degree of moral culpability than is present in every instance of retaliation in the workplace" (citing *Chauca*, 89 N.E.3d at 481)). The Court will thus grant judgment notwithstanding the verdict in favor of NYU on Plaintiff's request for punitive damages.

## II.    Rule 59

In the alternative, Defendants move for a new trial or remittitur under Rule 59, arguing that the damages awarded are "excessive, unsupported by the record, and the product of prejudice." Br. at 14.  The Court starts with Defendants' prejudice arguments and then turns to assessing each category of damages.  As set forth below, the Court rejects Plaintiff's prejudice arguments, finds that there is a sufficient basis for the jury's backpay award, but concludes that remittitur of the front-pay award to $250,000 and the emotional-distress award to $1 million is appropriate.

### A.    Prejudice Arguments in Support of Motion for New Trial

Defendants first argue that a new trial is required because the jury's award of damages "is the sympathetic product of prejudice due to (1) the Court permitting Plaintiff to add a [NY]CHRL cooperative dialogue claim on the eve of trial; (2) Plaintiff's failure to produce telephone call records; (3) Plaintiff's frequent references to his coma and referring to himself as a COVID survivor; (4) Plaintiff's treating therapist Dr. Masterson's failure to turn over hundreds of treatment records; and (5) Plaintiff's expert Dr. Lerner's consistent references to matters previously excluded by the Court."  Opp. at 22-23.  The Court finds that a new trial or remittitur is not warranted on these bases.

#### 1.    Amendment and Phone Records

More than a month before trial, Plaintiff moved to amend his complaint under Rule 15 "to expressly articulate a cause of action" under the NYCHRL for failure to engage in a good-faith cooperative dialogue.  Dkt. 124-1 at 1.  Defendants opposed the motion, arguing that it would, among other things, result in undue prejudice, largely because it would require additional discovery and reconfiguration of their trial strategy.  Dkt. 128 at 7-9.  The Court granted Plaintiff's motion at the final pretrial conference, finding that Defendants had "not shown . . .

that [P]laintiff's amendment 'would result in new problems of proof,' 'substantially change the theory on which the case has been proceeding,' 'require defendants to expend significant additional resources to conduct discovery and prepare for trial,' or 'significantly delay the resolution of the dispute.'"  FPTC Tr. at 15:11-17 (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008)).  Although the cooperative-dialogue claim was not clearly pleaded, "[t]here was briefing about such a claim in the [parties'] summary judgment papers" in June 2024, more than a year before the trial, and the "claim rest[ed] on facts alleged in the complaint that ha[d] been known to [Defendants] for years." *Id.* at 15:20-23.  Specifically, Plaintiff addressed this claim in his summary-judgment brief, Dkt. 87 at 23, and Defendants, in turn, responded to this claim in their summary-judgment papers without raising any objection that there was no such claim in the case, Dkt. 89 at 11.  The Court also determined that the claim would not result in a substantial shift in trial strategy, as Defendants needed to address the interactive-process issue at trial to defend against Plaintiff's other claims.  *See, e.g.*, *Sheng*, 848 F.3d at 86 ("[D]istrict courts may admit an employer's failure to engage in an interactive process as evidence of discrimination under the ADA."); Compl. ¶ 47 (initially alleging that "despite Defendants' obligations to the contrary, [Bender] did not seem interested in engaging in meaningful dialogue with Plaintiff").

However, to minimize any potential prejudice, in an abundance of caution, the Court directed Plaintiff to produce "any additional documents or discovery that would be relevant to such a claim, . . . if it ha[d]n't already been produced," FPTC Tr. at 19:10-12, including phone calls and texts messages between Plaintiff and NYU employees, and permitted Defendants to conduct an additional deposition of Plaintiff, *see id.* at 19:3-21:11.

On the first day of trial, Defendants' counsel asserted that they had requested text messages and phone logs between Plaintiff and NYU employees, but that Plaintiff could not

produce them as they were no longer in his possession.  Tr. at 55:6-13.  Plaintiff's counsel

clarified that "all the texts [were] produced," although Plaintiff did not have "phone records and

call logs from 2020 with a number of people, most of whom . . . [P]laintiff[] never testified to

speaking to, including Daniel Driesen[ and] Ed Fishkin."  *Id.* at 60:20-61:4.  Plaintiff also no

longer possessed voicemails from certain NYU employees, but Plaintiff's counsel confirmed that

Plaintiff was "not going to testify to voicemails or text messages that have not been produced."

*Id.* at 62:3-5; *see id.* at 61:5-62:13.  Defendant's counsel requested that the Court preclude

Plaintiff from testifying about communications for which logs or texts were not produced.  *Id.*

at 64:2-16.  The Court reiterated that it would not be striking Plaintiff's cooperative-dialogue

claim because "[t]here was ample time for discovery in this area" since "the discussions

regarding the dialogue on accommodations have been part of this case since its inception" given

the relevance of these discussions to other undisputed longstanding claims in the case.  *Id.*

at 65:11-15.  However, the Court ruled that it would preclude Plaintiff from testifying about any

text messages or voicemails that were not produced, although he could testify to the contents of

phone conversations he remembered.  *Id.* at 65:16-66:3.

   To the extent that Defendants seek reconsideration of the Court's ruling on Plaintiff's

motion to amend, the Court denies the request.  "[I]t is well-settled that Rule 59 is not a vehicle

for relitigating old issues, presenting the case under new theories, securing a rehearing on the

merits, or otherwise taking a 'second bite at the apple,'" *Ojeda v. Metro. Transp. Auth.*, 477 F.

Supp. 3d 65, 76 (S.D.N.Y. 2020) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir.

1998)), *aff'd*, 41 F.4th 56 (2d Cir. 2022), and Defendants have not suggested that the Court

overlooked any facts or law when granting Plaintiff's motion to amend.

   Defendants argue that they "had no time to meaningfully seek recourse, such as a motion

to compel or Rule 37 sanctions," and had no opportunity to "obtain[] and present[] the phone

records to rebut Plaintiff's narrative" that he was "ghosted" by Defendants during the accommodations process. Br. at 23-24. Defendants do not explain, however, why they could not have obtained those records from their own witnesses. More fundamentally, the Court is unconvinced that Plaintiff's assertion that he was "ghosted" by NYU in relation to discussions about his disability or accommodations was a new theory presented on the eve of trial. In July 2023, two years before trial, for example, Plaintiff testified at his deposition that he "was not getting a response from [his] department back in 2020." Dkt. 79-7 at 14:4-5. When asked to elaborate, Plaintiff explained:

> [O]n November 19th, they sent a letter *without any engagement or interactive process* saying that I would be fired by December first if I didn't respond to them, and they had had a lot of false mischaracterizations, and I tried to call a number of people including Dr. Doug Lazzaro, and *I did not get a response.*

*Id.* at 14:8-13 (emphasis added). Plaintiff raised this topic again later in his deposition:

> I attempted to contact my vice chair, Doug Lazzaro, and the department, and I believe I even called HR, his number, and I did not get anywhere. And that's when I then decided to send a letter and escalate it to the dean hoping that it would be resolved, and that's when Austin Bender called me, and . . . *it was only until I didn't hear from anybody that I felt that I was being stonewalled . . . .*

*Id.* at 79:17-24; *see also id.* at 175:18-20 ("[Mellynchuk] never called me. He never phoned me . . . ."); *id.* at 176:4-15 ("There was no conversation. There was no interaction. It was fill out this form, and it was Patricia that, 'Oh, meet Scott. Fill out this form.' . . . I had reached out because nobody had interacted with me, I had reached out to the new chair at that time Dr. Colby. And I had tried to schedule an appointment with her, so we can talk about a return to work plan, and we can interact. But to my knowledge, there was no interaction with me and [Mellynchuk] for those months.").

Plaintiff has claimed since the very beginning of this litigation that he was qualified for his position and NYU failed to accommodate his disability, and the New York Court of Appeals

46

has advised that an employer's failure to engage in an interactive process "poses a formidable obstacle to the employer's attempt to prove that no reasonable accommodation existed for the employee's disability." *Jacobsen*, 11 N.E.3d at 169-70. The existence (or nonexistence) of a good-faith interactive process or cooperative dialogue has always been an essential component of the discrimination claims in this case, and Defendants had many years to request or compel phone records or other communications to rebut Plaintiff's claims that he was "ghosted" by Defendants. Some text messages were produced, Defendants presumably had access to the text messages to NYU personnel, and Plaintiff was precluded from testifying about any voicemails or text messages that were not produced. The Court finds no miscarriage of justice warranting a new trial or remittitur stemming from Plaintiff's amendment or the alleged lack of phone logs or additional text messages.

### 2. Coma References

Defendants next assert that they were prejudiced because Plaintiff testified that he was in a coma after contracting COVID-19, which evoked sympathy from the jury. Defendants had filed a motion *in limine* requesting that the Court "[p]reclude Plaintiff from offering or mentioning his COVID-19 diagnosis, treatment, and recovery," among other related topics. Dkt. 126 at 2; *see id.* at 14-15. The Court denied the motion, finding Plaintiff's illness and the resultant impact of the coma were directly relevant to his physical limitations, disability, and potential accommodations. *See* Dkt. 166-2 at 41:1-17. The Court found that the jury would be confused if it were not provided any context for why Plaintiff was disabled and limited in his physical abilities. *Id.* However, the Court advised that any "long, lengthy sympathetic monologue" about Plaintiff's illness would potentially run afoul of Rule 403 and would not be permitted. *Id.* at 55:10-16.

Defendants now argue that the size of the jury's award "reflects prejudicial testimony admitted over [their] objections" about Plaintiff's "coma and recovery," which "was undoubtedly sympathetic but bore no relation to whether NYU accommodated or retaliated against [Plaintiff]." Br. at 24. The Court disagrees.

Motions for a new trial based on improperly admitted evidence may not be granted unless the court finds, "in light of the entire record," that "the introduction of such evidence 'was a clear abuse of discretion *and* was so clearly prejudicial to the outcome of the trial that [the court is] convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Ojeda*, 477 F. Supp. 3d at 77 (first citing *Graham v. City of New York*, 128 F. Supp. 3d 681, 705 (E.D.N.Y. 2015); and then quoting *Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005)), *aff'd*, 41 F.4th 56 (2d Cir. 2022). The Court find that references to Plaintiff's contraction of COVID and resultant coma were proper, but even if such testimony raised concerns, its introduction was not harmful enough to so infect the jury's decision and warrant a new trial.

First, Defendants failed to object — as irrelevant, cumulative, or otherwise — to most of the testimony they now cite as problematic, which limited the Court's ability to provide contemporaneous curative statements. In any case, much of that unobjected testimony contained only brief references to Plaintiff's coma, usually to identify a relevant time period. *See, e.g.*, Tr. at 365:23-366:2 ("I woke up from the coma end of May. So, part of that [absence] was the coma, the two months, and then the hospitalization, . . . and the rest was medical leave . . . ."); *see also id.* at 126:14-15, 127:19-21, 137:10-24, 184:16-20, 185:12, 1269:8-10. Other portions of Plaintiff's testimony regarding the coma were brief or relevant to Plaintiff's limitations and accommodation requests, which were highly contested, relevant issues in this case. *See, e.g.*, *id.* at 178:9-15 (discussing diagnoses resulting from coma); *id.* at 229:22-230:24 (testifying that

lingering effects from coma affected his commute from Long Island to Woodhull); *see also id.* at 180:17-21, 197:10-16, 207:12-16, 213:8-10, 214:25-215:1. When there were unnecessary references to COVID or Plaintiff's coma, the Court proactively stepped in to instruct Plaintiff's counsel at sidebar to direct his client to avoid such emphasis, after which extraneous references significantly abated. *Cf. Ojeda*, 477 F. Supp. 3d at 80 (determining that the court's "timely interventions" and "warnings to [p]laintiff's counsel were sufficient to cure any prejudice that may have been caused by his actions"). And where Defendants did object to Plaintiff's testimony or counsel's questioning, the Court generally sustained those objections, unless the testimony was particularly relevant to another issue, and Plaintiff's counsel rephrased where required. *See, e.g.*, Tr. at 174:13-175:16; 176:11-15; 1270:5-24.

Importantly, despite their protestations now, Defendants themselves repeatedly referenced Plaintiff's coma as a result of COVID and even highlighted specifics about his physical condition during the coma. Defendants specifically emphasized that Plaintiff was in a coma and intubated to argue that Plaintiff's emotional distress could have been caused by his contraction of COVID, the coma, and intubation rather than any discrimination. *See, e.g.*, *id.* at 959:23-960:12, 963:17-967:18. Defendants further highlighted studies and literature discussing "post-COVID syndrome and how that can affect someone's emotional distress." *Id.* at 999-1001. Defendants also pointed out that Plaintiff was in "intensive care" and elicited testimony regarding studies showing that "there's an association between depression and the length of stay in the intensive care unit." *Id.* at 1001:20-24.

Finally, the Court clearly instructed the jury to "evaluate the evidence calmly and objectively, without . . . sympathy." Dkt. 161-9 at 3; *see Rhee-Karn v. Lask*, --- F. Supp. 3d ---, 2025 WL 2450731, at *8 (S.D.N.Y. Aug. 26, 2025) ("[C]ourts may 'generally presume that

jurors follow their instructions[.]'" (quoting *Penry v. Johnson*, 532 U.S. 782, 799 (2001))).  The Court will thus not require a new trial based on Plaintiff's COVID-related testimony.

   3.  *Testimony of Drs. Masterson and Lerner*

Defendants next argue that both Dr. Catherine Masterson (Plaintiff's treating clinician) and Dr. Mark Lerner (Plaintiff's expert witness in forensic psychology) "testified about topics previously excluded by the Court, including testimony about Plaintiff's children, employment qualifications, how Plaintiff possibly contracted COVID, and overpayment letters."  Br. at 25. The Court again disagrees.

As to Dr. Masterson, Defendants first cite to a portion of her testimony where she started to opine on the effect Plaintiff's termination had on his oldest son.  *See* Tr. at 952:17-22. Defendants objected, the Court sustained the objection, and Dr. Masterson did not finish her sentence.  *See id.* at 952:21-953:2.  Second, Defendants cite to a portion of Dr. Masterson's testimony where she began to refer to something she saw on Plaintiff's CV that corroborated her belief that he "was a reliable informant."  *Id.* at 958:15-16.  Again, Defendants promptly objected, the Court sustained the objection, and Dr. Masterson did not complete her thought or specifically refer to what she saw on Plaintiff's CV.  *Id.* at 958:17-949:5.

As to Dr. Lerner, Defendants cite to several portions of his testimony that the Court finds equally unproblematic.  First, at one point, Dr. Lerner seemed to veer toward testifying that Plaintiff contracted COVID while working at NYU, a topic the Court had expressly precluded. *See, e.g.*, *id.* at 1000:5-10.  The Court instructed him not to continue, and he did not provide that testimony.  *Id.* at 1000:7-9.  Defendants also take issue with three brief portions of Dr. Lerner's testimony where he began to discuss overpayment letters that Plaintiff received from NYU, which the Court had previously excluded as a basis for Plaintiff's retaliation claim in its summary-judgment ruling.  *See id.* at 1005:17-19, 1008:7-8, 1009:8-10.  On two of the

occasions, Defendants objected, the Court sustained the objections, and the jury did not hear any clear testimony about the content of the letters. *See id.* at 1005:20-23, 1008:9; *id.* at 1008:13-15 (striking the following answer from Dr. Lerner: "[Plaintiff] repeatedly told me that he was repeatedly receiving letters saying he owed — "). On the third occasion, Defendants did not object, although Dr. Lerner made only a brief allusion to "letters" and did not reveal any impermissible details. *See id.* at 1009:8-10 (acknowledging Plaintiff's receipt of "a series of letters that I am not supposed to talk about, so I will stop"). Finally, Defendants cite to a portion of Dr. Lerner's testimony where he mentioned the impact of Plaintiff's termination on his wife and children. *See id.* at 1009:15-19. Defendants promptly objected, and counsel was instructed to move on. *Id.* at 1009:20-22. The Court does not find that any of these cited excerpts from Dr. Lerner's testimony, alone or together with Dr. Masterson's testimony, were unduly prejudicial such that a new trial is warranted.

### 4. *Dr. Masterson's Progress Notes*

Finally, Defendants argue that they were unfairly prejudiced because Dr. Masterson was permitted to describe the general contents of progress notes from her sessions with Plaintiff that "were never produced or admitted into evidence." Br. at 24. At trial, the Court rejected Defendants' request for an adverse-inference instruction or to strike Dr. Masterson's testimony. *See* Tr. at 1237:7-1239:19.

The Court has broad discretion in whether to impose a sanction for the nonproduction of evidence. See *Drip Cap. Inc. v. JY Imps. of NY Inc.*, 348 F.R.D. 536, 560 (E.D.N.Y. 2025) ("Where 'the nature of the alleged breach of a discovery obligation is the nonproduction of evidence, a district court has broad discretion in fashioning an appropriate sanction, including . . . an adverse inference instruction.'" (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002), *abrogated in other part by* Fed. R. Civ. P. 37(e)(2))). "A court

may grant an adverse inference instruction for the non-production of evidence upon a showing

'(1) that the party having control over the evidence had an obligation to timely produce it; (2)

that the party that failed to timely produce the evidence had a culpable state of mind; and (3) that

the missing evidence is relevant to the . . . claim or defense [of the other party] such that a

reasonable trier of fact could find that it would support that claim or defense.'" *Icon Int'l, Inc. v.*

*Elevation Health LLC*, 347 F.R.D. 274, 295 (S.D.N.Y. 2024) (alteration and omission in

original) (quoting *Savor Health, LLC v. Day*, No. 19-cv-09798 (RA) (JW), 2022 WL 1912881,

at *4 (S.D.N.Y. May 17, 2022), *report and recommendation adopted*, 2022 WL 2315059

(S.D.N.Y. June 28, 2022)).  As the Court stated during the trial, Defendants provided no

evidence that Plaintiff acted with a culpable state of mind in failing to disclose Dr. Masterson's

treating notes.  *See Rivera v. Nat'l Passenger R.R. Serv.*, 442 F. Supp. 2d 164, 170 (S.D.N.Y.

2006) (denying request for adverse inference where moving party submitted no evidence that

established knowing or negligent spoliation); *Mali v. Fed. Ins. Co.*, 720 F.3d 387, 392–93 (2d

Cir. 2013) ("It is axiomatic that a Court may not punish without finding misconduct that merits

the punishment.").  It was uncontested that Plaintiff's counsel turned over all documents from

Dr. Masterson that were in his possession.  Even if Dr. Masterson turned over an incomplete

set of documents to both parties, which appeared to be the case, there was no evidence

regarding whether this was intentional or a negligent oversight and, in any event, Plaintiff should

not be sanctioned for a third-party's conduct.  Moreover, Defendants never elected to depose

Dr. Masterson and did not follow up to seek any additional documents from her, such as progress

notes, even though her 2022 case summary that was produced expressly stated that she had met

with Plaintiff 94 times for counseling sessions by that time.  Tr. at 955:1-4.  Dr. Masterson also

did not testify about the particulars of the progress notes and instead relayed her assessment of

Plaintiff's emotional state as set forth in her summary that was produced to the parties.  *See id.* at

52

955:6, 955:19-21 (Masterson: "I wrote progress notes, which is required and normal. . . . I briefly stated in those notes that he attended his session and how much time we spent, and the topic, and how I thought he was doing.").  She was cross-examined extensively about her assessment of Plaintiff and the rationale for her assessment of his emotional distress.  The jury was presented with the fact that she did not turn over her progress notes, *see id.* at 956:1-2, and the jury could assess her credibility and take into account the evidence presented as well as the lack of evidence, *see id.* at 1441:9-10.

For substantially the same reasons that the Court declined to provide an adverse-inference instruction or impose another sanction, the Court does not find that Dr. Masterson's testimony and the nondisclosure of session progress notes constitutes a miscarriage of justice or is otherwise so prejudicial as to warrant a new trial.

### B.    Backpay

Defendants next contend that they are entitled to a new trial on damages or reduction of the jury's award of $1,400,000 in backpay because the "award is excessive and unsupported by the record" since "Plaintiff repeatedly failed to mitigate his damages."  Br. at 14-15.  The Court does not agree.

"The NYSHRL and the NYCHRL . . . permit an award of back pay from the date of termination until the date of judgment."  *Yu v. Shanghai Dumpling, Inc.*, No. 19-cv-07601 (ALC) (VF), 2023 WL 8438669, at *3 (S.D.N.Y. Oct. 5, 2023), *report and recommendation adopted*, 2023 WL 7321595 (S.D.N.Y. Nov. 7, 2023).  If a plaintiff secures employment prior to the entry of judgment, the backpay award is generally "reduced by the amount of her earnings during this period."  *Rivera v. Baccarat, Inc.*, 34 F. Supp. 2d 870, 874 (S.D.N.Y. 1999).  The last salary Plaintiff received from NYU was $375,000.  He was terminated on January 5, 2021, and the jury returned its verdict on July 31, 2025 (approximately 238 weeks later).  After he accepted a new

position with Johnson & Johnson, Plaintiff earned a salary of $300,000 between August 19,

2024, and July 31, 2025, the last day of trial (approximately 49 weeks).  Thus, based on these

salaries, the Court calculates that Plaintiff's maximum entitlement to backpay damages through

the date of the verdict would be approximately $1,433,653.85 (($375,000 / 52 weeks × 238

weeks) – ($300,000 / 52 weeks × 49 weeks)).

  "'Back pay is available under the NYSHRL and the NYCHRL,' . . . to make a plaintiff

whole. . . . However, 'an individual complaining of discrimination has a duty to mitigate his or

her damages by making reasonable efforts to obtain comparable employment.'" *Contreras v.*

*Castro*, No. 23-cv-09083 (AMD) (LB), 2025 WL 1004524, at *7 (E.D.N.Y. Mar. 7, 2025) (first

quoting *Gordon v. APS Contractors Inc.*, No. 21-cv-00259 (WFK) (JRC), 2024 WL 4029520, at

*8 (E.D.N.Y. Feb. 20, 2024), *report and recommendation adopted*, 2024 WL 4028470

(E.D.N.Y. Sept. 3, 2024); and then quoting *Goldberg v. N.Y. State Div. of Hum. Rts.*, 927

N.Y.S.2d 123, 125 (App. Div. 2011)), *report and recommendation adopted*, 2025 WL 1002258

(E.D.N.Y. Apr. 3, 2025).  "'Generally, an employer seeking to avoid a lost wages award bears

the burden of demonstrating that a plaintiff has failed to satisfy the duty to mitigate' by

'establishing (1) that suitable work existed, and (2) that the employee did not make reasonable

efforts to obtain it.'" *Cardwell v. Davis Polk & Wardwell LLP*, No. 19-cv-10256 (GHW), 2023

WL 2049800, at *38 (S.D.N.Y. Feb. 16, 2023) (quoting *Broadnax v. City of New Haven*, 415 F.

3d 265, 268 (2d Cir. 2005)).  "The plaintiff's duty is 'not onerous, and does not require [her] to

be successful in mitigation.'" *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 93

(E.D.N.Y. 2020) (alteration in original) (quoting *Dailey v. Societe Generale*, 108 F.3d 451, 456

(2d Cir. 1997)).  "The question whether an employee has made reasonably diligent efforts [to

secure comparable employment] is one of fact for the jury." *Hawkins v. 1115 Leg. Serv. Care*,

163 F.3d 684, 696 (2d Cir. 1998).

Defendants first argue that Plaintiff failed to mitigate his damages because "[h]e declined NYU's offer [Options A and B] of continued employment at a reduced schedule and $290,000 salary." Br. at 15. However, this offer was made to Plaintiff (as a proposed accommodation) before his notice of termination, so his discrimination claim had not yet accrued, *see Shultz v. Congregation Shearith Isr. of City of N.Y.*, 867 F.3d 298, 305 (2d Cir. 2017), and there were not yet damages to mitigate. While "[a]n employee cannot collect damages for a period of unemployment occasioned by the employee's unreasonable rejection of a good-faith, unconditional offer of restoration to his or her former position and status," *id.* at 306, the trial record does not indicate that Defendants' offer remained open after Plaintiff was terminated. Plaintiff was only broadly informed upon his termination that he was "eligible to re-apply for employment with NYU Langone Health when and if [he] [was] medically cleared to return to work." PX 1. Even if the offer did remain open or was otherwise relevant to mitigation, the jury had sufficient evidence to conclude that Defendants had not made a "good-faith, unconditional offer of restoration to his or her former position and status" and that the modified position, which altered Plaintiff's responsibilities and reduced his salary, was not "substantially equivalent" to his former position.

Defendants further contend that Plaintiff failed to mitigate his damages because he "turned down multiple six-figure roles during his unemployment." Br. at 15. The Court does not agree that there was sufficient evidence to disturb the jury's award of backpay damages on this basis. At least two of the positions that Plaintiff turned down would have paid him an annual salary of $140,000, which was less than half of his salary at NYU. *See* Tr. at 511:4-512:8. As to the third job offer that Plaintiff declined, Defendants did not solicit testimony or introduce evidence regarding the salary of that position. *See Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 362 F. App'x 212, 216 (2d Cir. 2010) (summary order) ("The

defendant bears the evidentiary burden of showing that the plaintiff has failed to satisfy the duty

to mitigate.").  In any case, that position would have required Plaintiff to move to a different

state while he was in the middle of a divorce and while his children were attending in school in

New York, which the jury could have considered in concluding that his decision not to accept

that position was reasonable.  Tr. at 511:20-512:1; *see Walsh v. Scarsdale Union Free Sch. Dist.*,

No. 16-cv-03558 (NSR), 2019 WL 6789581, at *7 (S.D.N.Y. Dec. 12, 2019) ("Courts may

consider the 'employee's . . . ties to the community in determining the suitability of [alternative

employment].'  An employee is also 'not obligated to mitigate damages by pursuing or

continuing employment located . . . an unreasonable distance from her home.'" (alteration in

original) (citations omitted) (first quoting *Eassa v. Hartford Fire Ins. Co.*, No. 90-cv-00321,

1991 WL 255111, at *10 (N.D.N.Y. Nov. 29, 1991), *aff'd*, 979 F.2d 845 (2d Cir. 1992); and then

quoting *Bergerson v. N.Y. State Office of Mental Health*, 526 F. App'x 109, 111 (2d Cir. 2013)

(summary order))).

　　　Nor was the jury required to find that Plaintiff failed to mitigate his damages during the

time he pursued a master's degree in clinical informatics in 2023.  *See* Br. at 15.  "[T]here is no

*per se* rule that finds inherently incompatible the duty of a . . . plaintiff to use reasonable

diligence in securing comparable employment and such a plaintiff's decision to attend school,"

even "on a full-time basis."  *Dailey*, 108 F.3d at 456-57.  Plaintiff testified that he was still

"searching for jobs" while he pursued his degree, Tr. at 443:2-20, and he testified that the

"additional schooling," which "was at a good school and a good program," would make him at

least "a little bit [more employable]," *id.* at 508:21-509:1.  The jury was entitled to credit this

testimony as evidence that he was continuing to conduct a reasonably diligent search for

alternative employment while at school.  *See Dailey*, 108 F.3d at 457 n.1 ("[A] plaintiff who

chooses to attend school only when diligent efforts to find work proved fruitless or who

continues to search for work even while enrolled in school . . . meet[s] her duty to mitigate."). There is also no evidence that Plaintiff's master's program, which was hybrid and did not require full-time in-person attendance at Stanford, *see* Tr. at 443:2-20, would have prevented him from holding or accepting a full-time job had he received a suitable job offer.

   Nor will the Court reduce or offset the jury's backpay award based on Plaintiff's acceptance of disability benefits "on behalf of himself, his wife, and his children," however "substantial" those benefits may have been.  Br. at 16 (citing Tr. at 458:20-59:24).  A plaintiff is not required "to endure extreme hardship to meet her mitigation obligations," *Dailey*, 108 F.3d at 456, and "[t]he Second Circuit has [made] clear that the decision to offset a lost wages award in an employment discrimination case 'rests in the sound discretion of district court,'" *Tse v. N.Y. Univ.*, 190 F. Supp. 3d 366, 373 (S.D.N.Y. 2016) (quoting *Dailey*, 108 F.3d at 460).  The recent trend of courts in this Circuit has been to exercise that discretion "to decline to deduct collateral source payments from calculations of back pay."  *Id.* (collecting cases).  On this issue, *Tse v. New York University* is analogous and particularly persuasive.  In that case, in a pretrial motion *in limine*, NYU argued, as Defendants do here, that the plaintiff was "not entitled to back pay . . . or front pay because she was receiving SSDI and/or LTD payments."  *Id.* at 371.  The court disagreed, reasoning that "[o]ffsetting damages awards based on a plaintiff's receipt of disability benefits in such situations would create more than a windfall to employers; it would enable employers to shift the burden of their discriminatory conduct onto public and private insurance systems created to serve larger public purposes."  *Id.*  The Court agrees with this logic and rejects Defendants' contention that "the jury's backpay award constitutes a highly misplaced windfall" in light of his receipt of disability benefits.  Br. at 16.

   Looking beyond the individual issues that Defendants raise, the Court finds more broadly that the jury was presented with sufficient evidence to conclude that Plaintiff conducted a

reasonably diligent job search during his period of unemployment.  Plaintiff testified that he did

not "stop applying for jobs" until he received an offer from Johnson & Johnson on August 19,

2024.  Tr. at 446:22-25.  In total, Plaintiff estimated that he submitted fifty to sixty job

applications over three and a half years for positions in various roles and settings:

> Q. What kind of positions were you applying for?
> A. [Plaintiff:] I had no restrictions, whether it be ophthalmologist, . . .
> whether it be a medical officer, . . . whether it be in a hospital, whether it be an
> executive.  I was applying to everything that I thought I would be reasonably good
> at.
> Q. Were you applying to surgical positions?
> A. Yes.
> Q. Were you applying to administrative positions?
> A. Yes.
> Q. Were you applying to educational positions?
> A. Yes.

*Id.* at 248:2-15 (Plaintiff Direct); *cf. Fernandez v. N. Shore Orthopedic Surgery & Sports Med.,*

*P.C.*, 79 F. Supp. 2d 197, 205 (E.D.N.Y. 2000) (affirming jury award of approximately 3.5 years

of backpay even though plaintiff "submitt[ed] resumes and applications to only five hospitals

during the first thirteen months and to only three additional hospitals over the next three years").

     While it took Plaintiff nearly four years to obtain a position that he found suitable, "an

assessment of the reasonableness of a plaintiff's effort to mitigate encompasses more than a

simple review of the duration of his or her job search." *Dailey*, 108 F.3d at 456.  Indeed, there is

no *per se* rule "that a years-long failure to find comparable employment compels a finding of a

failure to search reasonably." *Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 385 (D. Conn.

2016) (finding duty to mitigate satisfied where plaintiff was still unemployed "after more than

four years of alleged searching").  Plaintiff suggested that the ongoing COVID-19 pandemic

negatively affected his search: "It was COVID, everybody was freaking out.  Maybe

opportunities weren't opening.  Hospitals weren't sure of their income.  They were closing

certain sections during the pandemic.  It was total free-for-all, quite frankly." *Id.* at 249:8-11

(Plaintiff Direct).  Plaintiff also posited that his termination from NYU and the subsequent gap in

his CV harmed his prospects:

> I can't think of many doctors that take a few months off, let alone three and a half
> years. . . . Oftentimes, if you're a surgeon or teacher in academia, any gap in your
> CV, even a few weeks, a month, two months, can be looked at as detrimental, like
> what happened, why did you take this time to be out of work for three and a half
> years.  It doesn't matter if I tell them my story, they'll just assume negative things.
> So, there was a lot of negative damage reputationally that can happen. . . . I took a
> lot of hit [*sic*] reputationally.

*Id.* at 250:10-19.  The jury was permitted to consider this testimony regarding Plaintiff's

"individual characteristics and the job market" in assessing his mitigation efforts in light of the

length of his search.  *See Dailey*, 108 F.3d at 456.

In sum, the Court finds that the jury had sufficient evidence to find that Plaintiff

mitigated his damages and will not disturb the award of backpay damages.

### C.    Front Pay

Defendant argues that the Court should vacate the jury's award of $375,000 in front pay

as unduly speculative.  Br. 18-19.  The Court, as well as the parties, presume that the jury

awarded Plaintiff five years of front pay because $375,000 is five times the $75,000 differential

between his salary at NYU ($375,000) and his salary at Johnson & Johnson ($300,000).  Tr.

at 1356:4-7 (Plaintiff's closing argument highlighting the $75,000 difference in salary in arguing

for front pay damages); Br. at 18 (Defendants arguing that "the jury's award effectively provided

five years of front pay which is an amount untethered to any evidence"); Opp. at 26 (Plaintiff

stating that the "[t]he jury awarded 5 years of front pay, totaling $375,000").  The Court agrees

that this award should be reduced and will remit it to $150,000.

"Under both the [NYCHRL] and [NYSHRL], front pay is a legal remedy that may be

awarded by a jury."  *Olaechea v. City of New York*, No. 17-cv-04797 (RA), 2022 WL 3211424,

at *8 (S.D.N.Y. Aug. 9, 2022); *accord Applegate v. Mt. Sinai Hosp.*, --- F. Supp. 3d ---, 2025

WL 2962618, at *4 (S.D.N.Y. Oct. 21, 2025). The parties also agreed that the jury would

determine front pay in this case. FPTC Tr. 114:5-8; Dkt 121 at 47-53 (jointly proposed jury

charge including front pay instruction). "The purpose of front pay is to 'mak[e] victims of

discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no

reasonable prospect of obtaining comparable alternative employment.'" *Sanderson v. Leg*

*Apparel LLC*, No. 19-cv-08423 (GHW), 2024 WL 898654, at *4 (S.D.N.Y. Mar. 1, 2024)

(alteration in original) (quoting *Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277,

286 (2d Cir. 2011)). "While 'back pay [runs] from the date of [plaintiff's] termination until the

date of judgment,' 'front pay is . . . money awarded for lost compensation during the period

between judgment and reinstatement or in lieu of reinstatement.'" *Olaechea*, 2022 WL 3211424,

at *8 (alterations in original) (first quoting *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 144

(2d Cir. 1993); and then quoting *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846

(2001)).

"When determining whether an award of front pay is warranted, the following factors

should be considered: the plaintiff's age; her 'reasonable prospects of obtaining comparable

employment;' and 'the ability of plaintiff to mitigate damages in the future.'" *Williams v.

Firequench, Inc.*, No. 21-cv-04112 (PAE) (JLC), 2022 WL 3571752, at *7 (S.D.N.Y. Aug. 19,

2022) (quoting *Gutierrez v. Taxi Club Mgmt., Inc.*, No. 19-cv-00532 (AMD) (VMS), 2018 WL

3432786, at *8 (E.D.N.Y. June 25, 2018), *report and recommendation adopted*, 2018 WL

3429903 (E.D.N.Y. July 16, 2018)). Moreover, while "'front pay awards always involve some

degree of speculation,' 'it is well settled that 'under no circumstances can . . . [a front pay] award

be based on undue speculation.'" *Pogil v. KPMG L.L.P.*, No. 21-cv-07628 (LTS) (BCM), 2024

WL 1208909, at *11 (S.D.N.Y. Mar. 21, 2024) (alteration and omission in original) (first quoting

*Chisolm v. Liberty Lines Transit Inc.*, No. 08-cv-07894 (GAY), 2013 WL 452408, at *7

(S.D.N.Y. Feb. 6, 2013); and then quoting *Press v. Concord Mortg. Corp.*, No. 08-cv-09497 (KTD), 2010 WL 3199684, at *2 (S.D.N.Y. Aug. 11, 2010)); *see also Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 577 (S.D.N.Y. 2011) ("[A]n award of front pay cannot be unduly speculative." (alteration in original) (quoting *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 159 (2d Cir. 1992))); *Olaechea*, 2022 WL 3211424, at *9 (noting that front-pay award is properly remitted when it is "impermissibly speculative"). "The longer a proposed front pay period, the more speculative the damages become." *Pogil*, 2024 WL 1208909, at *12.

As noted earlier, Plaintiff offered sufficient evidence to establish that he engaged in a reasonably diligent search for comparable alternative employment prior to accepting a position as a global medical director for Johnson & Johnson's surgical vision program. *See* Tr. at 245:10-13; *id.* at 250:5-7. Plaintiff's salary in the Johnson & Johnson position was lower than his NYU salary, and Plaintiff admitted that he "stop[ped] applying for jobs" in August 2024 after he "got the offer at Johnson & Johnson." *Id.* at 446:22-25. That said, the jury was entitled to conclude that Plaintiff's prior mitigation efforts were sufficient and that he does not have "reasonable prospects of obtaining comparable employment" in the near future due, for example, to the reputational damage he allegedly suffered following his termination. *See, e.g.*, *Davis v. Navada's Bar & Lounge, LLC*, No. 22-cv-04176 (LDH) (CLP), 2025 WL 1640499, at *10-11 (E.D.N.Y. Feb. 16, 2025) (recommending an award of front pay where Plaintiff "attempted to mitigate his damages, but . . . only managed to secure employment that pays him less than . . . what he [previously] earned," due to other factors).

Defendants' cited case to the contrary, *Press v. Concord Mortgage Corp.*, is distinguishable. *See* Br. at 18; 2010 WL 3199684. There, the court declined to award front pay where the plaintiff never found alternative employment, "presented *no* evidence on his future employment prospects," and submitted inconsistent testimony regarding his intention to continue

61

working into his early 70s. *Press*, 2010 WL 3199684 at \*2 (emphasis added). Here, in contrast, Plaintiff accepted a new position, provided testimony from which the jury could draw inferences regarding his future employment prospects, and did not make inconsistent statements indicating that he failed to search for comparable employment in good faith.

Nonetheless, the Court finds that the jury's award of front pay for five years is unduly speculative. Plaintiff's very brief testimony regarding his Johnson & Johnson position was limited to his salary; he provided little detail about the position and did not testify, for example, on his opportunity for advancement, promotions, or salary increases. Nor did he introduce any expert testimony from a vocational expert regarding his future earning potential, notwithstanding that Plaintiff produced an expert report from Andrew L. Gluck, a vocational economic analyst, who opined on Plaintiff's anticipated future lost earnings. Dkt. 82-3; Dkt. 104 at 70:4-72:24 (denying *Daubert* motion to preclude Gluck testimony about Plaintiff's future earnings). At bottom, there is no nonspeculative evidentiary basis to conclude that Plaintiff's salary will remain constant at $300,000 for the next five years. Given Plaintiff's "significant experience" in his field and his relatively young age, "it is reasonable to conclude that" as his "separation from [NYU] recedes in time, . . . its effect on [his] ability to secure and maintain comparable future employment would lessen." *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 261 (S.D.N.Y. 2007) (concluding that "an additional two years from the present 'is a reasonable allotment of time in which [the plaintiff] could be expected to find employment comparable to that which he lost" (quoting *Fernandez*, 79 F. Supp. 2d at 204)). Plaintiff is also unlikely to face the same difficulties today that he faced finding a job in the healthcare field during the COVID-19 pandemic. Indeed, Plaintiff is already receiving a salary that surpasses what he earned at NYU two years prior to his termination. *See* PX 38 at 1.

Accordingly, the Court finds that an award of two years in front pay, rather than five, is appropriate and in line with awards that other courts in this Circuit have deemed sufficiently nonspeculative. *See, e.g.*, *Thomas*, 508 F. Supp. 2d at 261; *Antoine*, 489 F. Supp. 3d at 95-96 (noting that "two-year award of front pay, based on the difference between plaintiff's past and current earnings, [was] customary" and concluding that "two years' front pay [was] appropriate and non-speculative given the formidable obstacles that confront[ed] plaintiff," including, among other things "numerous mental and emotional health conditions"); *cf. Graham v. Prizm Assocs., Inc.*, No. 20-cv-00461 (CS) (PED), 2022 WL 20403411, at *6 (S.D.N.Y. Jan. 10, 2022) (awarding three years of front pay where plaintiff had to "explain her termination to new employers" and "continued to look for work, but ha[d] been unsuccessful to date"); *Angulo v. 36th St. Hosp. LLC*, No. 19-cv-05075 (GBD) (SLC), 2020 WL 4938188, at *11 (S.D.N.Y. July 31, 2020) (awarding four years of front pay where the plaintiff was 27 years old and unable to retain employment, with or without comparable compensation, for more than a few months at a time despite diligent search efforts), *report and recommendation adopted*, 2020 WL 4936961 (S.D.N.Y. Aug. 24, 2020); *cf. Osorio v. Source Enters., Inc.*, No. 05-cv-10029 (JSR), 2007 WL 683985, at *6 (S.D.N.Y. Mar. 2, 2007) (awarding five years of front pay where plaintiff was terminated from unique position as editor-in-chief of "one of only a handful of leading hip-hop magazines" and "would have difficulty ever attaining a comparable editorial position").

The Court will thus order remittitur of the front-pay award to $150,000. This constitutes the difference between Plaintiff's salary at NYU ($375,000) and his salary at Johnson & Johnson ($300,000) for two years.

### D.    Emotional-Distress Damages

Defendants next claim that the emotional-distress award of $2 million is excessive and speculative, warranting a new trial on damages or remittitur. "In reviewing the amount of

63

damages awarded on a New York state law claim, federal courts are bound to apply substantive

New York law," *Carroll v. Trump*, 151 F.4th 50, 80 (2d Cir. 2025), which provides that "a court

'shall determine that an award is excessive or inadequate if it deviates materially from what

would be reasonable compensation,'" *Stampf*, 761 F.3d at 204  (quoting N.Y. C.P.L.R.

§ 5501(c)).  "'To determine whether a jury award is excessive within the meaning of [N.Y.

C.P.L.R.] § 5501(c), New York courts compare it with awards in similar cases.'"  *Boateng v.

BMW AG*, 753 F. Supp. 3d 215, 253 (E.D.N.Y. 2024) (quoting *Stampf*, 761 F.3d at 204).

"Though earlier court awards are instructive, they are not binding on the reviewing court."  *Id.*

(citing *Lewis v. City of New York*, 689 F. Supp. 2d 417, 430 (E.D.N.Y. 2010)).  "The relevant

standard 'is not whether an award deviates *at all* from past awards — it is whether an award

deviates *materially* from *reasonable compensation*."  *Carroll*, 151 F.4th at 80 (quoting *Stampf*,

761 F.3d at 204).  "This standard requires a more exacting review than the 'shocks the

conscience' standard generally applied by federal courts."  *Id.* (quoting *Patterson v. Balsamico*,

440 F.3d 104, 119 (2d Cir. 2006)).  "The calculation of damages is the province of the jury," and

a court should "not vacate or reduce a jury award merely because [it] would have granted a lesser

amount of damages."  *Id.*  Nonetheless, "[c]ourts have 'an obligation to ensure that' awards for

'intangibles' such as emotional and mental distress are 'fair, reasonable, predictable, and

proportionate.'"  *Id.* (quoting *Stampf*, 761 F.3d at 204).

     "Earlier awards are instructive — rather than binding — because courts have recognized

that 'awards for pain and suffering . . . do not lend themselves as easily to computation' as

quantifiable economic awards, such as compensation for past medical bills."  *Boateng*, 753 F.

Supp. 3d at 253 (omission in original) (quoting *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp.

2d 420, 435 (S.D.N.Y. 2008)); *see also Stampf*, 761 F.3d at 205 ("Awards for mental and

emotional distress are inherently speculative.  There is no objective way to assign any particular

dollar value to distress."). "As [the Second Circuit] previously noted in the context of discrimination claims, 'New York cases vary widely in the amount of damages awarded for mental anguish.'" *Stampf*, 761 F.3d at 207 (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012))). "That 'there exists an infinite variety of people who will experience different reactions to similar tragedies further compounds the difficulty of quantifying a reasonable verdict.' Due to these complexities, reviewing the appropriateness of an award under § 5501(c) has been described as 'one of the most difficult decisions' a trial court can face." *Boateng*, 753 F. Supp. 3d at 253 (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 9 F. Supp. 2d 307, 311, 312 (S.D.N.Y. 1998)).

### 1. *Plaintiff's Claims and Trial Testimony Regarding Plaintiff's Emotional Distress*

The jury rejected many of Plaintiff's claims, including his retaliation claims and all federal claims, finding NYU liable for disability discrimination under only the New York state and city laws and all Defendants liable for failure to engage in a good-faith cooperative dialogue as required by the NYCHRL. Dkt. 161-17. Thus, only emotional-distress damages stemming from those claims are recoverable. It might be difficult to justify a significant emotional-distress award based solely on a flawed cooperative dialogue, especially since there were discussions that took place over an extended period of time between the parties, senior leaders considered Plaintiff's job responsibilities, HR was involved and provided Plaintiff with accommodation paperwork, and options were presented to Plaintiff. But, the jury also concluded that NYU engaged in disability discrimination such that Plaintiff's disability was at least a motivating factor in his termination, a determination that would certainly support an award of emotional-distress damages.

More significantly here, though, there was testimony from Plaintiff, his treating psychologist, and an expert from which a reasonable juror could conclude that Plaintiff's unlawful termination based on his disability had an outsized effect on his life and mental health. For example, Plaintiff offered the following testimony regarding the impact of Defendants' conduct and his termination:

> I have visceral reactions to the color purple [ — the color associated with NYU]. I don't feel good. I'm seeing a therapist since 2020, basically. It's affecting me on a lot of levels, physically and emotionally. I started having PTSD, started feeling like I'm the problem. I didn't trust employers anymore. I thought I was not enough. I felt like I wasn't complete, that nothing I did could ever, you know, be good enough for any future employer. It's really hard when a hospital lets you go, basically fires you. It makes you feel like you're the one, you're the damaged one.
>
> . . . I've never been fired before. I never had this. I'm a kid from Brooklyn. I worked my butt off. I don't look at hospitals anymore — that's why I went into the medtech industry. I don't look at hospitals, like it felt like they were not professional, they didn't play by the rules. It felt like I was David versus Goliath, to be honest, and I don't trust them anymore. I felt I was expendable. This felt . . . predetermined. I felt useless. I cried a lot. There was years where I didn't know my value, and it took a lot of years of therapy just to even get out of that. . . . I felt like a failure as a dad, as a husband. I got divorced. That was part of what happened afterwards. It ruined my life in so many ways. So, no, it affected me. It took a lot out of me, and I don't know if I'll ever get some of it back.

Tr. at 251:17-252:10. Plaintiff further testified that he attended therapy two times per week, which he found helpful for the treatment of his severe, frequent, and still-ongoing ruminations. *See id.* at 253:4-19. Plaintiff does not currently have any plans to stop attending therapy. *Id.* at 254:15-16.

According to Plaintiff, he "did not have any psychiatric or mental disorder" prior to his termination, *id.* at 254:7-13, but he was subsequently diagnosed with major depressive disorder ("MDD"), and posttraumatic stress disorder ("PTSD"). *Id.* at 253:20-254:13. Dr. Catherine Masterson, a clinical psychologist and Plaintiff's treating therapist, testified at trial and corroborated this testimony. Dr. Masterson testified that she started seeing Plaintiff in October

2021 (before this lawsuit was filed), was continuing to treat Plaintiff, and had held 353

individual, hour-long therapy sessions with Plaintiff as of the time of trial.  *Id.* at 947:9-14.

Dr. Masterson is a licensed clinical psychologist who has been practicing for 46 years, *id.*

at 945:16-23, and for the last fifteen or so years, "a lot of [her] practice . . . has been for patients

suffering from trauma and PTSD and complex PTSD," *id.* at 946:8-12.  She "was trained in

disaster responses and trauma," and her "experiences with these conditions goes far back to

when [she] [volunteered] for the American Red Cross in the World Trade Center disaster" and

"for plane crashes."  *Id.* at 946:12-15.  Dr. Masterson testified that "the appropriate diagnosis"

for Plaintiff was severe PTSD, "severe other specific trauma and stress-related disorder," and

severe MDD with "severe anxious distress."  *Id.* at 948:22-949:2.  Importantly, according to

Dr. Masterson, Plaintiff had "the most severe case of PTSD that [she had] seen in [her] 45-plus

years of experience working with patients."  *Id.* at 949:8-10.  She testified that Plaintiff's

presentation did not "suggest exaggeration or malingering," and she noted that she "learned to

tell the difference between genuine pain and faking it" due to her experience working with

patients who have malingered or otherwise attempted to fake their symptoms.  *Id.* at 948:8-19;

*see also id.* at 958:6-9: ("[W]ith my years of experience, I've learned to weed out malingerers

and people who are trying to use my services for something other than mental health

treatment.").  Although his condition had improved due to his active participation in therapy —

at first, "[h]e could barely stop himself from crying. . . spontaneously when just talking about his

life experiences and what has happened to him" — his symptoms have been "consistent over

time."  *Id.* at 949:25-950:10; *see also id.* at 958:12-15 ("I've seen him for such a lengthy period

of time, 353 hours to be exact, [and] patients do not maintain the consistency of their

presentation over that length of time.").  She testified that Plaintiff's condition was "long-term"

in the sense that he would "never fully get over" the "psychological traumas that occurred to

him," but that it would not necessarily permanently "interfere[] significantly with life moving forward" because "he's moving forward with his career again, and he hopes to kind of move forward in his family life." *Id.* at 953:19-954:3.

Defendants sought to elicit testimony from Dr. Masterson suggesting that the bulk of Plaintiff's psychological symptoms were due to his experience with COVID-19, including the trauma of intubation while in a coma, and his divorce. *See, e.g.*, *id.* at 959:23-960:12, 963:17-969:7. But while Dr. Masterson acknowledged that some of Plaintiff's psychological injury was attributable to COVID, "a life-threatening illness that almost took his life away and led to quite a lengthy coma," she "conclud[ed] that his psychological injury went beyond that" and that there were "quite a few . . . things that would be causing psychological stress and harm, independent of the physical effects of COVID." *Id.* at 951:5-952:2. She opined that Plaintiff "would have progressed more quickly" following his coma in the absence of subsequent stressors; however, "he kept on having these psychological, highly stressful events occur to him over the period of time, over a year or two, and that included things related to his job and how he was being treated at work," in addition to "the loss of his job, the financial stress that caused," and the associated "family stress." *Id.* at 952:3-19. When Plaintiff's counsel asked whether, in her opinion, "NYU's actions [were] a significant factor in the severity and persistence of [Plaintiff's] symptoms," she stated that "they were a significant factor," "[s]o much so that [she] felt it warranted the second diagnosis of other specific trauma and stressor-related disorder." *Id.* at 974:4-15.[2]

---

[2] The Court initially ruled at the FPTC that Dr. Masterson should not opine as to the cause of Plaintiff's emotional distress, *see* FPTC Tr. at 99:12-101:23, and Plaintiff's counsel did not elicit such testimony on direct examination. However, on cross-examination, Defendants spent considerable time asking Dr. Masterson about alternative causes of his emotional distress and PTSD, including his coma and intubation, divorce proceedings, and financial stressors. *See, e.g.*,

Plaintiff also called an expert witness in forensic psychology, Dr. Mark Lerner, to opine on Plaintiff's symptoms and whether they were caused by Defendants' conduct. Defendants did not contest Dr. Lerner's qualifications, and his areas of professional interest include, among other things, "traumatic stress" and "helping to prove and disprove claims of emotional distress." *Id.* at 977:16-19. He "help[s] attorneys and organizations in determining the psychological fitness of health care providers, often physicians." *Id.* at 977:19-23. He has "conducted evaluations involving trauma and PTSD" and has "testified in court at least a dozen times, and in formal hearings at least 50 times . . . for both plaintiffs and defendants." *Id.* at 978:2-10. Plaintiff retained Dr. Lerner to "evaluate [his] . . . psychological functioning," and Dr. Lerner performed a number of psychological tests on Plaintiff over two sessions in October 2023, *id.* at 979:5-980:1; 989:7-11, including "[t]he Beck Depression Inventory, the Burns Depression Checklist, the Penn State Worry Questionnaire, the Patient Health Questionnaire 9, the PTSD checklist 5, the International Trauma Questionnaire, the Lerner Egregious Emotional Distress Checklist, the Miller Forensic Assessment of Symptoms Test, and the Incomplete Sentence Blank," *id.* at 981:14-19.

Dr. Lerner testified that Plaintiff "met the diagnostic criteria for [PTSD]," *id.* at 982:14-21, based on symptoms and patterns including "[s]ignificant levels of anxiety, depression, problems with sleep, haunting nightmares, hypervigilance, meaning excessive watchfulness or

---

Tr. at 957:3-25 (highlighting "long COVID recovery" as potentially causing Plaintiff's symptoms); *id.* at 960:1-17 (raising family issues and divorce proceedings as potential contributors); *id.* at 965:4-966:17 (refencing how Plaintiff was intubated and studies that show the traumatizing impact of intubation); *id.* at 967:4-23 (eliciting testimony that COVID patients have a lot of "psychological problems"); *id.* at 968:3-969:6 (raising questions about the financial resources provided to Plaintiff through disability benefits in an effort to counter the conclusion that emotional distress was caused by the financial strain of the termination by NYU). Thus, Defendants opened the door to Dr. Masterson providing her opinion as to the cause of his emotional distress, and the Court permitted her to provide brief testimony in this regard given her extensive experience in this area and with Plaintiff. *See id.* at 971:3-972:17.

cautiousness; exaggerated startle response; avoidance behaviors, in his case, suicidal thoughts; feelings of humiliation; and . . . overall a depressive picture," *id.* at 982:22-983:6.  According to Dr. Lerner, Plaintiff showed no "indication of exaggerating or malingering symptoms," and "his results [were] consistent across tests, interviews, and records."  *Id.* at 982:4-13.  At the time Dr. Lerner observed Plaintiff, his symptoms were "[h]ighly severe" and "interfere[d] with his ability to function day to day."  *Id.* at 983:7-11.  Dr. Lerner "factored . . . in" Plaintiff's "hospitalization and coma as a result of COVID," *id.* at 983:12-15, but still determined "that the workplace events at NYU play a significant role in [Plaintiff's] psychological state," *id.* at 986:4-6.  Dr. Lerner explained that "events that are deliberately caused by people" lead to "PTSD at a far greater rate than natural disasters," *id.* at 983:16-22, and that Plaintiff's test results and medical records showed "a consistent picture of a man who was very, very distraught by the manner in which he was being treated after he returned from his health condition," *id.* at 987:3-17.  Although Plaintiff "later attended graduate school and found employment," Dr. Lerner testified to "a reasonable degree of psychological certainty" that he did not "expect a full recovery" from Plaintiff.  *Id.* at 987:18-988:18.

It would certainly be a reasonable hypothesis that Plaintiff suffered significant emotional distress because he contracted COVID-19 at the onset of the pandemic; was in a coma for almost two months, during which time he was intubated; and had to relearn how to walk and gain back his physical strength.  However, Plaintiff presented evidence to the jury that Defendants' actions caused him significant emotional distress.  Defendants did not present competing expert testimony but instead relied on their cross-examination that sought to persuade the jury that Plaintiff's emotional distress was not due to the termination and instead stemmed in part from the COVID trauma he endured.  The jury evaluated that testimony, presumably found Plaintiff's

witnesses and evidence of causation to be credible and reliable, and thus awarded emotional-distress damages.

The Court cannot second guess the jury's credibility determinations and assessment of the evidence as to causation and psychological impact. However, it must evaluate the damages award to determine whether it "deviates *materially* from *reasonable compensation*," *Carroll*, 151 F.4th at 80 (quoting *Stampf*, 761 F.3d at 204), looking to earlier awards as guidance to find the upper limit of a reasonable amount that could be awarded by the jury, *Boateng*, 753 F. Supp. 3d at 253 ("Earlier awards are instructive — rather than binding . . . .").

### 2. *Assessment of Amount of Emotional-Distress Award*

Based on its review of other cases, the Court finds that $1 million is the maximum amount of emotional-distress damages that would not materially deviate from reasonable compensation and that more than that would be excessive. On one hand, Plaintiff has not suffered any of the egregious, prolonged, or grotesque forms of discrimination that plaintiffs have suffered in other cases involving multimillion-dollar jury awards for emotional distress. On the other, Plaintiff's lasting and ongoing emotional-distress symptoms and psychological conditions, which Dr. Lerner purportedly disaggregated from his traumatic experience with COVID-19, are much more severe than those suffered by plaintiffs in discrimination cases involving more outrageous conduct. Indeed, as previously noted, Dr. Masterson stated that Plaintiff had "the most severe case of PTSD that [she had] seen in [her] 45-plus years of experience working with patients," *id.* at 949:7-10, which included patients who had survived terrorist attacks and plane crashes, *id.* at 946:10-15.

Given the severity of Plaintiff's symptoms, the Court conducted a review of other discrimination cases arising under New York law involving plaintiffs with PTSD. One particularly useful example is *Russo v. Tuttnauer USA Co.*, a hostile work environment case,

where the court remitted a $2.5 million emotional-distress award to $1 million.  No. 21-cv-01720

(JMA) (AYS), 2025 WL 1604063, at *9 (E.D.N.Y. June 6, 2025).  The court noted that several

cases in this Circuit involving "seven-figure damages awards," while not entirely analogous, "set

an upper range for cases involving serious emotional distress as a result of long-term harassing

conduct."  *Id.* at *10.  Because the plaintiff suffered from severe, lasting, and medically

corroborated psychological damage (including PTSD) due to multiple years of harassment that

culminated in a sexual-assault attempt, the *Russo* court found a substantial award was

appropriate.  However, the court determined that any award over $1 million would be excessive,

emphasizing that the plaintiff "did not experience multiple outright threats against her life and

did not experience two hospitalizations during the course of the alleged hostile work

environment."  *Id.* at *9 (distinguishing *Turley*, 773 F.3d 140).  The Court finds that *Russo*

establishes the outer bounds of reasonable compensation in the instant case.  As in *Russo*,

Plaintiff was never threatened with physical violence or hospitalized due to Defendants' conduct,

but he has suffered very severe, medically corroborated psychological symptoms, including

PTSD and suicidality, that have affected his daily life.

Another case in this range is *Sogg v. American Airlines, Inc.*, in which the Appellate

Division directed remittitur of a $1.125 million emotional-distress award to $400,000 —

approximately $900,000 today when adjusted for inflation[3] — where the plaintiff, a high-ranking

employee, was terminated and denied a promotion on the basis of her sex, age, and disability.

*See* 603 N.Y.S.2d 21, 2-25, 27-28 (App. Div. 1993).  The *Sogg* plaintiff's psychologist testified

at trial that the "plaintiff had suffered a post-traumatic stress disorder . . .  and continued to suffer

the tearfulness, sleeplessness, lack of self-confidence, nervousness, and other effects of that

---

[3] *See* U.S. Bureau of Labor Statistics, *CPI Inflation Calculator*,
https://www.bls.gov/data/inflation_calculator.htm.

trauma." *Sogg v. Am. Airlines, Inc.*, N.Y. L.J., Apr. 30, 1992, at 27, col. 6 (N.Y. Sup. Ct. 1992).

Those injuries are analogous to Plaintiff's here.

One of Plaintiff's cited cases, *Bianco v. Flushing Hospital Medical Center*, is also

instructive, but in some senses distinguishable. *See* No. 18702-04, 2009 WL 2984842 (N.Y.

Sup. Ct. Sept. 11, 2009), *aff'd*, 912 N.Y.S.2d 433 (App. Div. 2010). There, the plaintiff "alleged

that while an employee of the [defendant] hospital, she was sexually harassed by [the individual

defendant] with the knowledge of the hospital[,] which failed to take reasonable steps to prevent

his misconduct." *Id.* at 1. The plaintiff subsequently sought treatment from a clinical

psychologist, who diagnosed her with PTSD and MDD. *Id.* at 2. The plaintiff prevailed at trial,

and the jury awarded her $8 million "for the emotional distress she suffered from the date of the

injury to the date of the verdict" and $5.5 million for future emotional distress. *Id.* The trial

court struck the award for future emotional distress because plaintiff was not qualified to testify

as to her "future emotional state" and plaintiff's treating psychologist stated that she could not

predict with a reasonable degree of medical certainty that the plaintiff would continue to suffer

emotional-distress damages in the future. *Id.* at 5. The court further determined that the

$8 million award for past emotional distress was excessive and remitted it to $750,000, although

it acknowledged the "admittedly erratic line of legal precedent" on emotional-distress awards.

*Id.* at 7. Today, that award would be valued at approximately $1.1 million. It is difficult to

directly compare the *Bianco* plaintiff's injury, which was based largely on a single incident of

acute sexual harassment and did not result in the plaintiff's termination, to Plaintiff's injury in

this case, which stemmed from several months of far less severe conduct but resulted in his

termination. In both cases, however, the plaintiffs suffered from PTSD and MDD, corroborated

by testimony from their treating physicians. And, unlike in *Bianco*, where the plaintiff's treating

clinician was deemed unqualified to opine on her future psychological condition, *see id.* at *4-5,

both Dr. Masterson and Dr. Lerner testified, without objection, that they did not believe Plaintiff

would ever fully recover from his psychological injuries in the future, *see* Tr. at 953:19-954:3

(Masterson); *id.* at 987:18-988:18 (Lerner).  The Court thus finds that an award approaching that

of *Bianco* would be appropriate here, although adjusted downward to account for the less severe

conduct that Plaintiff has endured.

In addition, several courts have sustained or remitted awards in the high-six-figure range

based on symptoms similar to those suffered by Plaintiff (with considerably lower awards in

cases where the distress appears less than that experienced by Plaintiff), indicating that a

maximum award of $1 million would be appropriate in the instant case.  *See, e.g.*, *Thorsen v.*

*County of Nassau*, 722 F. Supp. 2d 277, 294-96 (E.D.N.Y. 2010) (remitting $1.5 million award

to $500,000 — approximately $750,000 today — where plaintiff was retaliated against due to

political affiliation and suffered from humiliation and loss of reputation in addition to depression

and anxiety, although with no long-term or lasting effects); *Olsen v. County of Nassau*, 615 F.

Supp. 2d 35, 49 (E.D.N.Y. 2009) (sustaining $500,000 award  — approximately $760,000

today — to plaintiff who required weekly psychological treatment and suffered from continued

depression, anxiety, sleep problems, and relationship issues due to gender-based employment

discrimination); *Sorrenti v. City of New York*, 851 N.Y.S.2d 61, at *8 (Sup. Ct. 2007) (sustaining

approximately $492,000 emotional-distress award — around $770,000 today — where the

plaintiff was subjected to harmful stereotyping based on his perceived sexual orientation and

constructively discharged, resulting in "episodes of suicidal ideation," a "current diagnosis of

major reactive depression," and an "ongoing need for psychotropic medication," and noting that

courts have upheld awards of up to $1 million, adjusted for inflation, based on similar conduct),

*aff'd*, 947 N.E.2d 135 (N.Y. 2011); *Ravina*, 2019 WL 1450449, at *13 (remitting award of

$750,000 to $500,000 where plaintiff was diagnosed with generalized anxiety disorder and "also

experienced symptoms of depression and post-traumatic stress" but did not have difficulty

finding another job after termination); *Santana v G.E.B. Med. Mgmt., Inc.*, No. 305261/2008,

2017 N.Y. Misc. LEXIS 4186, *5 (Sup. Ct. Oct. 20, 2017) (reducing $1.5 million award per

plaintiff to $400,000 — around $530,000 today — in employment-discrimination case where

each plaintiff was diagnosed with PTSD by an expert witness "five years after the fact"); *Katt v.

City of New York*, 151 F. Supp. 2d 313, 369-71 (S.D.N.Y. 2001) (sustaining $400,000 award —

approximately $730,000 today — in hostile work environment case involving "regular incidents

of degrading and sexually provocative conduct, as well as unwelcome sexual advances" and

plaintiff developed likely permanent PTSD), *aff'd in part sub nom. Krohn v. N.Y.C. Police

Dep't*, 60 F. App'x 357 (2d Cir. 2003) (summary order); *Marchisotto v. City of New York*, No.

05-cv-02699 (RLE), 2007 WL 1098678, at *11 (S.D.N.Y. Apr. 11, 2007) (sustaining $300,000

award – approximately $470,000 today — in retaliation case where Plaintiff developed panic

disorder, PTSD, MDD, problems sleeping, anxiety, humiliation, and suffered from loss of

career), *aff'd*, 299 F. App'x 79 (2d Cir. 2008) (summary order).

Defendants' cited cases are largely distinguishable but are useful comparators when those

distinctions are considered.  For example, in *Mayo-Coleman v. American Sugar Holdings, Inc.*, a

hostile work environment case based on sexual harassment, the court remitted an award of $1.7

million in emotional-distress damages to $500,000.  No. 14-cv-00079 (PAC), 2018 WL

2684100, at *3-5 (S.D.N.Y. June 5, 2018).  As in the instant case, the plaintiff's experiences with

discrimination interfered with her relationships, led her to seek psychological treatment for the

first time in her life, and resulted in an MDD diagnosis.  *Id.* at *3.  However, it does not appear

that the plaintiff was diagnosed with severe PTSD, or anything similar, and it is unclear whether

the plaintiff continued to receive continuous medical treatment from a psychologist several years

after she was terminated, as in the instant case.  *See generally id.*  Defendants also cite

*Sooroojballie v. Port Authority of New York & New Jersey*, where the Second Circuit found that

an emotional-damages award of $2.16 million in a hostile work environment case was excessive,

concluding that $250,000 was "the upper limit of the reasonable range for the significant

emotional distress that was described in [the plaintiff]'s testimony." 816 F. App'x 536, 548 (2d

Cir. 2020) (summary order).[4]  *Sooroojballie* is not comparable to the instant case for several

reasons. First, the plaintiff attended only "14 counseling sessions with [a] social worker," lasting

for only "one to two months after he left [his employer]." *Id.* at 547.  He "did not provide

evidence of lasting psychological effects from the hostile work environment, and had no further

contact with his internist (who was treating his mental health issues) after he began his new job."

*Id.*  Here, in contrast, Plaintiff has attended hundreds of therapy sessions with no plans of

stopping. Moreover, the symptoms alleged in *Sooroojballie* were much less severe than those

alleged here — the plaintiff testified that he "suffered stress at work from the hostile work

environment, resulting in insomnia, anxiety, and depression, for which he was prescribed

medication." *Id.*  Lastly, it appears that the *Sooroojballie* plaintiff's testimony was not

corroborated by any expert, treating physician, or otherwise. *See id.* at 544 (noting that "the jury

was entitled to consider and weigh the credibility of [the plaintiff]'s testimony regardless of

whether it was corroborated").[5]  Given these differences, the Court finds that an award of

$250,000 would be too low here.

---

[4] *Sooroojballie* arose under federal law rather than state law. *See* 816 F. App'x at 539.

[5] Defendants also cite to *Norville v. Staten Island University Hospital*, a failure-to-accommodate case, where the court remitted a $575,000 emotional-distress award to $30,000. *See* 2003 U.S. Dist. LEXIS 28399, at *1-3, *21 (E.D.N.Y. Oct. 17, 2003).  In that case, the plaintiff "testified that as a result of her termination she had difficulty sleeping, experienced panic attacks, and spent most of her days crying or watching television." *Id.* at *16.  However, "she never sought psychological treatment," *id.*, and the only corroborating expert testimony came from a licensed clinical social worker who diagnosed her with clinical depression and PTSD based on "a

On the other end of the spectrum, most of Plaintiff's cited cases involve awards that would be excessive if awarded in the instant case. In *Turley v. ISG Lackawanna, Inc.*, for example, the jury awarded the plaintiff $1.32 million in compensatory emotional-distress damages — approximately $1.86 million today — and the district court declined to order remittitur. 960 F. Supp. 2d 425, 447-50 (W.D.N.Y. 2013), *aff'd in part, vacated in part on other grounds*, 774 F.3d 140. Although *Turley* involved some similar diagnoses, including PTSD, depression, and panic disorder, the *Turley* plaintiff was also hospitalized due to defendants' conduct. *See* 774 F.3d at 151. Indeed, the defendants' conduct was far more egregious and extreme than that alleged in the instant case — the *Turley* plaintiff was frequently subjected to "repeated intimidation and harassment" in addition to "racist epithets, degrading treatment, and, from time to time, outright threats," among other things, *id.* at 148-50, which the Second Circuit characterized as "years of grotesque psychological abuse," *id.* at 163. And even then, the Second Circuit determined that the award "test[ed] the boundaries of proportionality and predictability," although it ultimately upheld the award. *Id.* at 163. While the jury found that Plaintiff was not afforded a good-faith cooperative dialogue and that NYU was motivated by his disability to fire him, the alleged wrongdoing here does not come close to "years of grotesque psychological abuse." *Id.*

Also distinguishable is *Madrigal v Montefiore Medical Center*. *See* 141 N.Y.S.3d 46 (App. Div. 2021). In that case, "[t]he jury heard evidence of a years long campaign of physical

---

single 75 minute interview . . . conducted six years after plaintiff's termination," *id.* at *17-18. The only other corroborating testimony came from the plaintiff's daughter, who stated that plaintiff "was 'sad all the time'" but who "only lived with plaintiff for one month after her termination." *Id.* at *17. "Plaintiff presented no other witness to corroborate the emotional distress that she suffered on a daily basis for over six years." *Id. Norville* is thus wholly inapposite from the instant case where Plaintiff has offered much more robust corroborating evidence of significant emotional distress and long-standing particularized symptoms from both an expert and his treating physician.

and emotional abuse against plaintiff by her colleagues and supervisors that was willfully ignored by her employer," which "caused plaintiff to suffer panic attacks and anxiety, with physical symptoms including sleeplessness, shortness of breath, and chest pain, necessitating several visits to the emergency room over the course of several years." *Id.* at 48-49. The jury awarded Plaintiff $2.1 million for mental anguish on her termination claim, which the trial court reduced to $1 million. *Id.* at 48. On appeal, the Appellate Division reversed, finding that the trial court erred by reducing the awards "to levels that were disproportionately low." *Id.* at 49 (citing *Turley*, 774 F.3d at 163). In the instant case, however, Plaintiff did not endure any similar years-long campaign of physical and emotional abuse prior to his termination, nor did he require repeated hospitalization as in *Madrigal*. *See id.* at 48-49.[6]

In sum, the jury heard compelling testimony from Plaintiff, his treating clinician, and an expert forensic psychologist that connected Defendants' conduct to Plaintiff's substantial and persistent psychological injuries. While Plaintiff's symptoms appear unusually severe in light of the conduct alleged, both Drs. Masterson and Lerner testified that they did not believe Plaintiff was malingering or exaggerating his symptoms. Based on that testimony, consideration of confounding factors, a review of awards that were upheld or remitted in other cases, and application of the least intrusive standard for calculating remittitur, the Court finds that an award of $1 million is the "'maximum amount that would be upheld . . . as not excessive' and would not 'materially deviate' from reasonable compensation in comparable cases." *Emamian v.*

---

[6] Lastly, Plaintiff cites to *Osorio v. Source Enterprises, Inc.*, where a jury found that the plaintiff's employer terminated her for complaining about gender discrimination. 2007 WL 683985, at *1. The jury awarded the plaintiff "$4 million in compensatory damages" — more than $6.3 million in today's dollars — "for emotional distress and harm to reputation." *Id.* The damages awarded in *Osorio* are not comparable because they also included damages for reputational harm, damages that were not sought or awarded in the present case, and in *Osorio*, the plaintiff was the "Editor-in-Chief . . . of one of only a handful of leading hip-hop magazines." *Id.* at *6. The circumstances here are not comparable to *Osorio*.

*Rockefeller Univ.*, No. 07-cv-03919 (DAB), 2018 WL 2849700, at *19 (S.D.N.Y. June 8, 2018) (first quoting *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990); and then citing N.Y. C.P.L.R. § 5501(c)), *aff'd*, 823 F. App'x 40 (2d Cir. 2020) (summary order).

## CONCLUSION

For the foregoing reasons, Defendants' motion for judgment notwithstanding the verdict pursuant to Rule 50(b) is GRANTED in part and DENIED in part. Defendant NYU is entitled to judgment notwithstanding the verdict on Plaintiff's request for punitive damages, and Defendants' motion is denied in all other respects such that judgment in favor of Plaintiff will be granted on his claims for disability discrimination under the NYSHRL and NYCHRL and for failure to engage in a good-faith cooperative dialogue under the NYCHRL.

Defendants' motion for a new trial or remittitur pursuant to Rule 59(a) is GRANTED in part and DENIED in part. No later than **November 12, 2025**, Plaintiff shall file a letter informing the Court whether he accepts remittitur of the jury's awards for emotional distress and front pay, or instead seeks a new trial as to damages.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 162.

Dated:  October 29, 2025
        New York, New York

                                    SO ORDERED.

                                    *Jennifer Rochon*
                                    _____
                                    JENNIFER L. ROCHON
                                    United States District Judge